UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. 16-30061 |
| | ) | |
| AARON J. SCHOCK, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S REPLY

The United States of America, by its attorneys, Patrick D. Hansen, Acting United States Attorney for the Central District of Illinois, and Timothy A. Bass, Assistant United States Attorney, respectfully submits its reply to Defendant Schock's response to the government's motion for extension of time to complete Rule 16 disclosure. The government states the following:

I.    **Background**

   A.    **Government's Discovery Disclosures**

As noted in the government's motion for extension of time to complete Rule 16 disclosures, prior to and following the return of the indictment, the government initiated discovery conferences with Defendant Schock pursuant to Local Rule 16.1 and advised that the government had elected to exceed its constitutional and Rule 16 discovery obligations. Beginning on December 28, 2016, and continuing to the present, the government has provided discovery materials far beyond that which is required. Specifically, the government has provided access and copies to Defendant Schock of the

following:

• All consensual recordings, including the recorded statements of Defendant Schock and his former staffers, and draft transcripts, all reports involving law enforcement contact with Defendant Schock's former Office Manager (OM), all existing text messages between the OM and law enforcement agents (Jencks statements), and transcripts of text messages between the OM and law enforcement agents. The government has requested that the OM provide copies of any emails with law enforcement agents in his possession, which the OM produced to the government on April 17, and the government produced to the defense on April 20. Any additional emails (potentially witness (Jencks) statements) that are discovered or disclosed to the government will be produced to the defense. (Exhibit 1)

• All Rule 16 documents, objects, etc. in the government's possession with a detailed discovery index, which has been supplemented and will continue to be supplemented as Rule 16 disclosure is completed. (Exhibit 1)

• All completed law enforcement reports of interviews of potential trial witnesses and a corresponding index of reports. (Additional interview reports have been completed and are in the process of being completed as witnesses are being interviewed in preparation for trial. These reports will be disclosed prior to trial on an ongoing basis following their completion). (Exhibit 1)

• All transcripts of witnesses who testified before the grand jury and a corresponding index of transcripts (Jencks material). (Exhibit 1)

• Copies of the search warrant documents relating to the search warrant executed at Defendant Schock's campaign offices in Peoria. All electronic data seized during the execution of the search warrant and an index of data provided.

The total volume of discovery materials provided is approximately 5.8 TB. Approximately 5.4 TB of this amount is electronic data copied from computers seized from and then returned to Defendant Schock's campaign office in Peoria and a reproduction of the same data he received from the House at the same time it was produced by the House to the government.

In its disclosures of materials other than electronic data (i.e. copies of non-email computer data) to Defendant Schock, the government initially provided the materials, including those previously produced to him by the House, in a searchable *Eclipse* format. The *Elcipse* program is standard in the Central District of Illinois. After full disclosure, the defense then requested that the government also disclose the material using a program called *Relativity* as it would be easier for the defense to review. The government has accommodated this request.

In addition, the government has made its one IT official and one assigned paralegal available to Defendant Schock's team throughout the discovery process. These two staff members have been committed nearly full time, including overtime hours and on weekends, in the discovery process and in providing personal assistance to Defendant Schock's representatives. This assistance has included the IT person's operation of as many as *seven* government office computers, running non-stop and

simultaneously. The government's discovery disclosures in this case, including multiple repetitive disclosures of the same materials in the specific electronic format requested by the defense, and the assistance provided to the defense by government staff is unprecedented in the Central District of Illinois.[1]

B. **Trial Subpoenas**

As part of the discovery conferences the government initiated with the defense at the outset of this matter, the government has repeatedly advised the defense that it has issued trial subpoenas for records to be introduced at trial and has timely produced those records to the defense upon their receipt by the government (Exhibit 2, detailing the trial subpoenas and production to the defense).

From February 21, 2017, to April 11, 2017, the government has issued a total of 28 trial subpoenas. (Exhibit 2) All of the trial subpoenas contain a compliance date of July 10, 2017, the date of trial. Of the 28 total subpoenas, 3 are for witness appearances and 25 are for production of records that relate to specific charges in the indictment and that the government intends to present as *evidence* at trial. (Exhibit 2) Of the 25 trial subpoenas issued for records, 6 recipients responded with no records and 6 are pending responses from the recipients. Of the 13 trial subpoenas for which records have been received, the government promptly produced the records to the defense, with a

---

[1] It is unfortunate that Defendant Schock refers to government staff's efforts to accommodate his request for production of the voluminous discovery in the specific electronic format he demands as "fraught with issues." (Def.Res. at 12 n.8)

maximum turnaround time of 12 days and a minimum turnaround time of 2 days. (Exhibit 2)

Prior to the April 14, 2017, filing of his response to the government's motion for extension, Defendant Schock raised no objection to the government's issuance of trial subpoenas, which began on February 21, nor did he object to the government's production of records from the trial subpoenas, which began on March 11. In fact, on the date (April 14) that he filed his response, the government had produced or mailed, with one exception, all of the records from the trial subpoenas it had received. As to the one exception, the government received the records on April 11 and produced them on April 20.

As part of issuing the trial subpoenas, the government's staff presented the completed subpoenas to the U.S. District Court Clerk's Office without prior approval of the Court but with the trial compliance date, consistent with the practice in the Central District of Illinois. In serving the subpoenas to their recipients, government staff attached notices to 16 of the subpoenas, advising the recipient that the government "would greatly appreciate the processing of this subpoena at your earliest convenience." In addition, 7 of the subpoenas were served through email or by mail by government staff with a request that the recipient produce the records by March 30, the week following the service of the subpoena if possible, or as soon as possible (Exhibit 2), in order to provide discovery in a timely fashion. None of the recipients of the subpoenas have raised an objection to the subpoenas or stated that compliance would

be unreasonable or oppressive. One recipient, Uber, has requested an explanation for the purpose of the subpoena and advised that it intends to notify Defendant Schock of the subpoena's existence, which, of course, is entirely appropriate.

During the most recent discovery conferences with the defense prior to April 10, 2017, the government advised Defendant Schock of its intention to seek an extension of the April 1 discovery deadline to accommodate these additional matters. The government advised of the nature of the outstanding Rule 16 materials, which were being completed or which the government did not yet possess, including materials sought pursuant to Rule 17 subpoenas. The government asked the defense whether it would agree to an extension to May 1 (more than two months prior to trial), to which the defense replied that it would be inclined to agree to an extension if it was aware of the nature of the materials being sought, which the government had already advised of during the conference. Defendant Schock again did not object to the government's issuance of trial subpoenas for evidence it intends to present at trial.

Following the most recent discovery conference, and to avoid any misunderstanding with the defense, the government filed its motion for additional time to complete its Rule 16 disclosures by May 1. In the motion, the government again described the nature of the outstanding Rule 16 materials, including materials sought by Rule 17 subpoenas, a search warrant for the email account of Defendant Schock's Political Director, the IRS summary/expert witness disclosure, and additional draft summary charts.

On April 10, 2017, Defendant Schock requested that the government provide him with copies of the actual trial subpoenas and the search warrant. On April 11, the government responded and again provided information concerning the specific number of trial subpoenas outstanding, stating: "[w]e have approximately seven trial subpoenas outstanding for travel records relating to private flights, Uber, American Airlines. We also have two trial subpoenas outstanding relating to FedEx records." (Exhibit 3) The government also provided a status of the execution of the search warrant for the Political Director's email account and the reproduction of emails from Defendant Schock's campaign treasurer, Professional Data Services (PDS) (Exhibit 3), the majority of both of which the government had already produced to the defense. (Exhibit 1) The government declined to provide a copy of every trial subpoena and the search warrant as it remains sealed. (*See* No. 16-MJ-3091) (sealed)

C.    **Email Reproduction from Defendant Schock's Campaign Treasurer – Professional Data Services**

As noted in the government's response to Defendant Schock's discovery motions, on June 4, 2015, due to Defendant Schock's refusal to comply with the district court's order to produce campaign records (including electronic records), the district court in Springfield authorized a search warrant for his campaign offices in Peoria.[2]  In addition, in an effort to receive complete production of campaign records, the

---

[2] As further noted in the government's response to Defendant Schock's discovery motions, he denied that he was in possession of or controlled the campaign records, despite the fact that he was continuing to expend funds from his principal campaign committee, Schock for Congress, and directing his Political Director in the reporting of campaign expenditures.

government issued grand jury subpoenas to PDS, the treasurer of Defendant Schock's campaign committees. The owner of PDS and two of his employees will be important witnesses for the government at trial.

At the outset of the grand jury investigation in March 2015, PDS was initially represented by prior counsel and produced certain materials, including emails, in response to the subpoenas. Following that production, PDS retained separate counsel, Berke Farrah LLP, which continues to represent PDS. (Exhibit 4) During its communications with current counsel for PDS, the government advised that PDS's initial production of subpoenaed emails was incomplete, namely, the produced emails did not contain the corresponding attachments, resulting in the government's inability to identify which attachments corresponded to each of the produced emails. (Exhibit 4)

In February 2017, the government continued its discussions with counsel for PDS and advised counsel that PDS had "not produced all responsive emails to and from the email accounts of" PDS employees. (Exhibit 4) On February 16, 2017, the government explained to counsel for PDS the relevance of and need for the emails and their relation to the anticipated testimony of PDS employees and the government's April 1 Rule 16 obligations. On February 17, 2017, when the government asked for confirmation of PDS's agreement to reproduce all emails, counsel for PDS responded: "We agree to conduct a search based on those email accounts, and produce them by April 1." (Exhibit 4) Counsel for PDS acknowledged that the government's request was not pursuant to a trial subpoena, but stated "we presume you are operating under a Rule 17 trial

subpoena" and further stated: "Can you go ahead and send that to us as well as one for trial testimony?" (Exhibit 4) On March 26, 2017, the government provided the trial subpoenas *as requested* by PDS with the trial date of July 10. (Exhibit 2) PDS reproduced the emails and attachments (totaling approximately 36,378 pages) on April 5, which were then disclosed to the defense on April 14. (Exhibit 1)

D.     **Search Warrant for Political Director's Email Account**

The Political Director will also be an important witness for the government at trial. Since 2013, Defendant Schock has directed the Political Director on the spending and reporting of campaign funds from each of the committees identified in the indictment. One of the Political Director's primary means of communication with Defendant Schock and with PDS was email communication. The Political Director's and PDS's email communications with each other on behalf of Defendant Schock will be part of the government's evidence at trial.

Since the beginning of the grand jury investigation, the government has sought to obtain the Political Director's complete production of her email communications with Defendant Schock, other members of his Congressional and campaign staff, and PDS. (Exhibit 5) While the Political Director has produced a number of emails, the government believes, like with PDS, that her production of relevant and material evidence was incomplete. For more than one year, the government sought complete production of the Political Director's emails through her counsel. (Exhibit 5)

On December 12, 2016, when those efforts failed, the district court in Springfield

issued a search warrant for her email account. The Political Director thereafter filed a motion with this Court, seeking to quash the warrant. This Court summarily denied the motion. (No. 16-MJ-3091) (sealed) As noted in the government's motion for extension of time to complete Rule 16 disclosures, the execution of the search warrant is ongoing and involves a filter review to ensure that any potentially privileged materials of the Political Director and PDS are extracted from the seized emails prior to their disclosure to the prosecution team.

### E.    Defendant Schock's Disclosures

Defendant Schock has produced no discovery to the government to date, and, prior to April 14, 2017, declined to engage in a discovery conference with the government concerning the defense's discovery production. On April 14, 2017, after the filing of his discovery motions, counsel for Defendant Schock advised that they would be willing to engage in such a conference during the week of April 24, 2017.

## II.    Reply to Defendant Schock's Response

### A.  Applicable Law

Rule 17(c) of the Federal Rules of Criminal Procedure allows for subpoenas for papers, documents, data, or other objects, which the court may direct be produced before trial. Fed.R.Crim.P. 17(c)(1). "Rule 17(c) was not intended to provide an additional means of discovery. Its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials." *Bowman Dairy Co. v. United States,* 341 U.S. 214, 220 (1951).

Under Rule 17(c), the party seeking documents pursuant to Rule 17(c) must show:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

*United States v. Nixon*, 418 U.S. 683, 699-700 (1974).

To satisfy this standard, a party "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." *Id.* at 700; *see United States v. Tokash*, 282 F.3d 962, 971 (7th Cir. 2002). The rule "allows only for the gathering of specifically identified documents which a [party] knows to contain relevant evidence to an admissible issue at trial." *Id.*

In addition, although a Rule 17 subpoena may not be used "as a general fishing expedition[,]" *Nixon*, 418 U.S. at 699-700, or as a discovery device, *Bowman Dairy Co.*, 341 U.S. at 220, "Rule 17(c) expressly authorizes the use of a trial subpoena to obtain documentary evidence." *United States v. McCollom*, 651 F.Supp. 1217, 1225 (N.D. Ill. 1987); *Bowman Dairy Co.*, 341 U.S. at 220 ("No good reason appears to us why they may not be reached by subpoena under Rule 17(c) as long as they are evidentiary."). "It is not necessary[, however,] that a subpoena designate each particular paper desired." *McCollom*, 651 F.Supp. at 1224. "Designation of kinds of documents with reasonable particularity will suffice." *Id.* (citing 2 Wright, Federal Practice and Procedure, § 274 at 159 (2d ed. 1982)).

Finally, "[u]nder Rule 17(c) the materials subpoenaed need not actually be used in evidence." *McCollom*, 651 F.Supp. at 1224; *see Bowman Dairy Co.*, 341 U.S. at 219 ("That is not to say that the materials thus subpoenaed must actually be used in evidence."). As the Supreme Court concluded in *Bowman Dairy Co.*, "[i]t is only required that a good-faith effort be made to obtain evidence." 214 U.S. at 220; *McCollom*, 651 F.Supp. at 1224 (quoting *Bowman Dairy*). Under Rule 17(c), "the court may quash or modify the subpoena if compliance would be unreasonable or oppressive." *Id.* at (c)(2); *Nixon*, 418 U.S. at 699 ("A subpoena for documents may be quashed if their production would be 'unreasonable or oppressive,' but not otherwise.").

### B. Legal Analysis

In this case, Defendant Schock is charged with mail and wire fraud, theft of government funds, making repeated false statements to the House Finance Office and to the FEC concerning the basis for and manner in which funds from the federal treasury were disbursed to him and the manner in which the expenditure of campaign funds were reported to the FEC, and the repeated filing of false federal income tax returns. The indictment alleges that Defendant Schock's scheme to defraud continued even after his resignation from Congress in March 2015 and even after he was made aware of his status as a target of a criminal grand jury investigation.

To prove these offenses, the government will present testimony from numerous witnesses, including his former Congressional and campaign staff members and employees of PDS, his campaign treasurer. This testimony will involve substantial

financial and documentary evidence, detailing Defendant Schock's travel, including his submission of false mileage claims to the House and his campaign committees that far exceeded the amount of miles actually driven, his use of commercial and private aircraft, and his use of chauffeur, limousine, taxi, and Uber services. As noted above, this testimonial and documentary evidence has been produced and reproduced by the government to the defense.

The trial subpoenas issued by the government, which contain the trial date of July 10, all request additional documentary *evidence* that relate directly to the charges in the indictment. Several of the subpoenas merely supplement or update subpoenas issued during the grand jury investigation. (*See* Exhibit 1 (discovery index) and Exhibit 2 (listing of subpoenas)). In addition, each of the subpoenas specifically identify documentary evidence that the government knows or has a good-faith reason to believe will be admissible at trial as business records under Rule 803(6) (Records of a Regularly Conducted Activity) of the Federal Rules of Evidence.

For example, the trial subpoenas for records reflecting use of commercial and private aircraft, and use of chauffeur, limousine, taxi, and Uber services are all relevant to the charges in the indictment. They will tend to establish Defendant Schock's mode and dates of travel; the manner in which that travel was paid for by the federal treasury, his campaign committees, or himself personally. In addition, the travel records will also tend to establish that Defendant Schock used a mode of travel other than his own personal vehicle during the time he was submitting false mileage claims to the House

Finance Office and his campaign committees, and the manner in which the travel was otherwise represented to the House Finance Office and the FEC, as charged in the indictment. Finally, the travel records will tend to establish that following his resignation from Congress and knowledge of his status as a target of a criminal investigation, Defendant Schock continued to use campaign funds for personal expenses and falsely represented such expenses to the FEC as legitimate campaign travel expenses, as charged in the indictment.

For a second example, the trial subpoena to Verizon was for the supplemental production of additional documentary records, namely, Defendant Schock's personal cell phone records, produced during the grand jury investigation. The phone records will also tend to establish his locations at various times material to the charges in the indictment, including whether he was on personal or post-resignation business travel when causing his campaign funds to pay for his cell phone bill and other expenses. In fact, the cell phone records will tend to establish that following his resignation from Congress, Defendant Schock caused his campaign committee, Schock for Congress, to pay more than $8,000 for his personal cell phone bill. He only agreed to stop billing the campaign for his cell phone bill after the indictment when the government requested that the district court in Springfield impose a bond condition requiring a notice of his campaign expenditures.

For a third example, the trial subpoenas for FedEx records were for the production of records showing that Defendant Schock caused his campaign committee

14

to pay for the shipment of personal items during the period of the charged scheme. As one example, in December 2014, he caused a GoPro mobile camera device to be shipped to a friend for transport for his personal vacation in Argentina. In January 2015, when Defendant Schock returned from the vacation, a friend, who had accompanied Defendant Schock on the trip, then shipped the camera from Peoria to another friend in Hawaii. In July 2015, Defendant Schock caused a FedEx shipment to be sent to another friend at the Embassy of Panama in Washington, DC. All of the FedEx expenses were then paid for by his campaign committee and falsely reported to the FEC as legitimate campaign expenses.

Accordingly, the government has made "a good-faith effort . . . to obtain evidence." *Bowman Dairy Co.* 214 U.S. at 220. And the subpoenas meet the standard of "(1) relevancy; (2) admissibility; (3) specificity." *Nixon*, 418 U.S. 683, 699-700; *see Tokash*, 282 F.3d at 971. Moreover, not only has the government engaged in a good-faith effort to obtain "documentary evidence[,]" *McCollom*, 651 F.Supp. at 1225, the government has, as noted above, demonstrated unprecedented good faith in exceeding its discovery obligations in this matter and in disclosing the materials obtained pursuant to trial subpoenas to the defense as soon as possible. As further noted above, the government repeatedly advised the defense of its issuance of trial subpoenas and its expected receipt of additional documentary evidence. Further, once the expected records were received, they were promptly disclosed to the defense. Of the 13 trial subpoenas for which records have been received, the government promptly produced the records to the

defense, with a maximum turnaround time of 12 days and a minimum turnaround time of 2 days. (Exhibit 2)

Defendant Schock, however, ignores the government's good faith and has unfortunately attempted to advance yet another unfounded claim of misconduct. In alleging that the "government's violations are two-fold[,]" (Def.Res. at 4), he claims that the government has abused the Rule 17 process because: (1) it "apparently told" subpoena recipients to produce the records prior to the trial date; and (2) it has engaged in a "far-reaching fishing expedition." (*Id.*) These claims are both erroneous.

First, as discussed above, the government did not "tell" subpoena recipients to do anything. Rather, government staff merely asked if the recipients could produce the records prior to the trial date for the *sole* reason of producing them to the defense in a timely fashion. *See Bowman Dairy Co.*, 341 U.S. at 220. (Rule 17's "chief innovation was to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials.").

Second, the government, as described above, engaged in no fishing expedition, but rather has engaged in a good faith effort "to obtain documentary evidence" as Rule 17(c) expressly allows. *McCollom*, 651 F.Supp. at 1225 (N.D. Ill. 1987) ("Rule 17(c) expressly authorizes the use of a trial subpoena to obtain documentary evidence."); *Bowman Dairy Co.*, 341 U.S. at 220 ("No good reason appears to us why they may not be reached by subpoena under Rule 17(c) as long as they are evidentiary.").

In support of his claim of abuse, Defendant Schock relies on a district court's

decision in the District of Columbia. *United States v. Vo*, 78 F.Supp.3d 171 (D.D.C. 2015). This case, however, is not *Vo*. First, the district court in *Vo* concluded that the government used a Rule 17 subpoena "to obtain impeachment evidence[,]" i*d.* at 181, and "that the subpoenas were "a general 'fishing expedition' that attempts to use the rule as a discovery device." *Id.* at 182. Here, the government issued subpoenas for documentary evidence it intends to present at trial and promptly disclosed them to the defense.

Second, although the district court also concluded that Rule 17 does not authorize a party to invite pretrial production of subpoenaed records in advance of trial in that district, *id* at 179, the practice in the Central District of Illinois is different. In *United States v. Llanez-Garcia*, 735 F.3d 483 (6th Cir. 2013), the Sixth Circuit, in reversing an order of sanctions against defense counsel for misusing Rule 17 subpoenas, declined to "provide controlling guidance concerning Rule 17(c) procedures," because it concluded that the rule was properly "capacious enough to accommodate differing levels of oversight that district courts deem desirable to impose." *Id.* at 500. The court further concluded that the rule "commits the task of supervising subpoenas to the sound discretion of those courts, which can determine the appropriate mechanisms for exercising oversight as they see fit – by standing order, local rule, or no rule at all." *Id.*

In this case, the *only* reason government staff requested early production of records was so that they could be produced to the defense. Defendant Schock's complaint about the government's issuance of Rule 17(c) trial subpoenas is really not

about the process in which the subpoenas were issued and the timely production by the government of documentary evidence to him. It is rather a complaint that the subpoenas were issued in the first place. It would undoubtedly be the case that had the government simply waited to obtain the records until the trial date and then disclosed them, Defendant Schock would then complain about a Rule 16 violation. That argument is simply without merit.

If this Court directs that the government discontinue requests for early production of documentary evidence, the government will immediately do so. Given the government's demonstration of good faith in seeking that evidence and disclosing it to the defense, however, the government respectfully requests that this Court deny Defendant Schock's request that any trial subpoenas be quashed. *See McCollom*, 651 F.Supp. at 1225. ("Absent stronger indications that the subpoena was not issued in a good-faith effort to obtain evidence, this court will not invoke its supervisory powers to quash it entirely.").[3]

## III.    This Court's Directives

In its order directing the government to submit this reply, this Court requested that the government address certain issues relating to the (1) manner of service of the Rule 17(c) subpoenas; (2) whether any subpoenas issued required the production of

---

[3] Defendant Schock further makes the unsupported claim that an FBI agent threatened a witness if the witness "does not voluntarily provide information to the government." (Def.Res. at 9) This unsupported claim is likewise meritless. The government has simply attempted to contact an out-of-state witness to determine that witness's preference on the manner in which a trial subpoena is served.

50,000 emails; (3) and the current status and intended production or disclosure dates of discovery under Fed.R.Crim.P. 16, 18 U.S.C. § 3500, and *Brady/Giglio* materials. The government has attempted to address these issues in this reply and respectfully provides the Court with the following additional response:

(1)    The government has produced text messages and emails between law enforcement agents and the Office Manager (OM). The only illegible parts of the text messages are certain dates and times and not the body of the message. To further accommodate the defense, the government has transcribed all of the text messages and provided the transcription to the defense. In addition, the OM has produced the OM's emails to the government, which have also been disclosed to the defense. Any additional emails/text messages (potentially witness (Jencks) statements) that are discovered or disclosed to the government will be produced to the defense. The government fully recognizes its continuing *Brady/Giglio* obligations, and it assures the Court that it will comply with those obligations. "It has been repeatedly held that where the Government has made assurances it will comply with *Giglio* and *Brady*, those assurances are sufficient." *United States v. Johnson*, 2012 WL 1994848, at *2 (S.D. Ill. Jun. 4, 2012).

(2)    The government has not issued a trial subpoena for the production of 50,000 emails. PDS voluntarily agreed to reproduce its emails and attachments to the government to enable identification of attachments corresponding to each email. Following its agreement to produce the emails, PDS requested that the government

19

issue a trial subpoena. The government complied with PDS's request. PDS subsequently reproduced the emails and attachments (totaling approximately 36,378 pages) to the government, which have been produced to the defense;

(3)     The government will confer with law enforcement agents to determine if it is possible to provide what Defendant Schock defines as an "*exact* duplicate" of the consensual recordings; the government is unable to provide the defense with the original recordings;

(4)     The government is continuing to execute a search warrant authorized by the district court in Springfield of the Political Director's email account. Given the ongoing filtering process with the Political Director's counsel and PDS's counsel, it does not appear that the execution of the search warrant will be completed by May 1. The government will submit a separate motion for extension of time to produce the search warrant materials upon completion of the search warrant and will advise the defense and the Court of the ongoing status of the warrant's execution.

(5)     The government will produce its Rule 16 IRS summary/expert disclosure and additional drafts of summary exhibits to the defense on or before May 1, 2017.

(6)     The government acknowledges its continuing obligations under Rule 16(c) to disclose additional evidence or material.

Accordingly, the government respectfully requests that its motion for extension of time to complete Rule 16 disclosure by May 1 (more than two months before trial) be allowed.

Respectfully submitted,

PATRICK D. HANSEN
ACTING UNITED STATES ATTORNEY

BY:    s/Timothy A. Bass
        Timothy A. Bass, Bar No. MO 45344
        Assistant United States Attorney
        318 S. Sixth Street
        Springfield, IL 62701
        Phone: 217/492-4450
        Fax: 217/492-4044
        tim.bass@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of April 2017, I filed the foregoing directly with the Clerk of Court using the CM/ECF system, which will send notice to the following:

Counsel of record

s/Timothy A. Bass
Timothy A. Bass, Bar No. MO 45344
Assistant United States Attorney
318 S. Sixth Street
Springfield, IL 62701
Phone: 217/492-4450
Fax: 217/492-4044
tim.bass@usdoj.gov