E-FILED
Friday, 02 June, 2017 11:47:14 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. 16-30061 |
| | ) | |
| AARON J. SCHOCK, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT SCHOCK'S MOTION TO DISMISS; MOTION TO DISMISS COUNTS 14 – 18; AND MOTION TO DISMISS COUNT 11 OF THE INDICTMENT**

The United States of America, by its attorneys, Patrick D. Hansen, Acting United States Attorney for the Central District of Illinois, and Timothy A. Bass and Eugene L. Miller, Assistant United States Attorneys, respectfully submits its consolidated response to Defendant Schock's motion to dismiss indictment; motion to dismiss Counts 14 through 18 of the indictment; and motion to dismiss Count 11 of the indictment. The government states the following:

## INTRODUCTION

Defendant Schock has filed three motions to dismiss the indictment: (1) motion to dismiss indictment; (2) motion to dismiss Counts 14 through 18 of the indictment; and (3) motion to dismiss Count 11 of the indictment. For the reasons stated in this consolidated response, the government respectfully requests that his motions be denied.

## BACKGROUND

### I. Relevant Statutes/House Regulations Governing a House Member's Use of Federal Funds

As alleged in the indictment, Defendant Aaron Schock was the U.S. Representative for the 18th Congressional District of Illinois from January 2009 until his resignation on March 31, 2015. At the relevant times, Congress authorized and appropriated federal funds for the operation of the Congressional offices of a Member of the U.S. House of Representatives (House), which was known as the Members' Representational Allowance. In addition, pursuant to federal law, Congress promulgated "regulations" governing a Member's use of these federal funds. Finally, in 1996, Congress amended the criminal statute proscribing false or fraudulent statements and schemes to conceal material facts, 18 U.S.C. § 1001(a), (c)(1), to make it specifically applicable to the "legislative branch," and its "*administrative* matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or *regulation* to be submitted to the Congress or any office or officer within the legislative branch." (emphasis added). These statutes and regulations are summarized as follows:

#### A. Authorizing Statutes

Title 2, United States Code, Section 5341 establishes "for the House of Representatives a single allowance, to be known as the 'Members' Representational Allowance" [MRA], which shall be available to support the conduct of the official and representational duties of a Member of the House of Representatives with respect to the

district from which the Member is elected." Section 5341(d) further provides that "[t]he Committee on House Oversight [now the Committee on House Administration (CHA)] of the House of Representatives shall have authority to prescribe regulations to carry out this section."

In addition, Section 5342 provides for reimbursement of travel expenses of an employee of a House Member and requires that:

> payment shall be made *only upon vouchers* approved by the Member containing a certification by him that such travel was performed in line of official duty, but the mileage allowed for any such trip shall not exceed the round trip mileage by the nearest usual route between Washington, District of Columbia, and the Member's place of residence in the congressional district involved.

(emphasis added).

Section 5342 further provides that "[t]he Committee on House Oversight [now the CHA] of the House of Representatives shall make such rules and *regulations* as may be necessary to carry out this section." (emphasis added).

Title 2, United States Code, Section 4313 provides that, subject to the limitation in section 4314, the CHA "may, by order of the Committee, fix and adjust the amounts, terms, and conditions of, and other matters relating to, allowances of the House of Representatives" . . . namely, "the Members' Representational Allowance[.]"

**B. CHA Regulations: The Members' Congressional Handbook**

As also alleged in the indictment, during each year Defendant Schock was in Congress, each Member's MRA was in excess of $1,000,000 per year and was not transferable between legislative years, so any balance did not carry over to the next

year. (*See* Def.Ex. C)[1] The Chief Administrative Officer (CAO), through the House Finance Office, accounted for MRA funds, and the Clerk of the House published a quarterly Statement of Disbursements, which listed the MRA expenditures of each Member. *See* www.disbursements.house.gov.

The proper uses of federal funds under a MRA were set forth in *regulations*, which were published by the CHA and contained within a Members' Congressional Handbook (Handbook). (*See* Def.Ex. C) At its beginning, the Handbook provides that it contains "*regulations* to ensure that Members of the United States House of Representatives utilize official resources to support the conduct of the official representation duties on behalf of the district from which he or she is elected." (Def.Ex. C, at opening unnumbered page) (emphasis added).

In promulgating these regulations, the CHA distinguished between "regulations" and "House Rules." (Def.Ex. C, at opening unnumbered page and at pp.1 and 2) In addition, the Handbook repeatedly references that reimbursements to a Member and his conduct and that of his staff must be consistent with all applicable "federal laws," House "Rules," and CHA "regulations." (Def.Ex. C, at pp.1, 2, 3, 25; *see also id.* at 26 ("laws")

The Handbook provides in relevant part:

> <u>Introduction: Members' Representational Allowance</u>
>
> Ordinary and necessary expenses incurred by the Member or the Member's employees in support of the conduct of the Member's official

[1] To eliminate redundant submission of exhibits, the government cites to Defendant Schock's exhibits where possible.

> and representational duties to the district from which he or she is elected are reimbursable in accordance with the regulations contained in the Handbook. 'Ordinary and necessary' means reasonable expenditures in support of official and representational duties to the district from which he or she is elected that are consistent with *all applicable federal laws, Rules of the House of Representatives and regulations* of the Committee on House Administration.

(Def.Ex. C, at p.1) (emphasis added).

**1. General Provisions**

Among the "regulations" contained in the Handbook relevant to the MRA were the following:

> <u>Disbursements</u>
>
> Disbursements from the MRA are made on a reimbursement or direct payment basis and must be supported with specific documentation. To request a reimbursement or payment, each Member must provide a certification as to the accuracy of the charge and its compliance with *applicable federal laws, House Rules, and Committee regulations.*"

(Def.Ex. C, at p.2 (Disbursements) (emphasis added); *see also id.* at 32 (Vouchers and Payments)

This certification is on a "voucher" that is submitted to the House Finance Office and contains the following:

> I certify (1) that the above articles have been received in good condition and are of the quality and in the quantity above specified, or the services were performed as stated; (2) that they are in accordance with the orders therefore; (3) that the prices charged are just; (4) that they are for use in my office in the discharge of my duties; and (5) that these are true copies and will be the only submission for payment.

(*See* Exhibit 1) (Defendant Schock's first mileage voucher)

Additional general provisions of the Handbook provide:

General

To be reimbursable with federal funds under the MRA, the primary purpose of the expense must be official and representational and incurred in accordance with the Handbook. (Def.Ex. C, at p.1) Specifically:

1. The MRA may only be used for official and representational expenses.

* * *

3. The MRA may not be used to pay for any expenses related to activities or events that are primarily social in nature.

4. The MRA may not pay for personal expenses.

5. The MRA may not pay for campaign expenses.

6. The MRA may not pay for campaign-related political campaign expenses.

* * *

9. Except where authorized by the Committee on Ethics, campaign funds may not pay for a Member's official and representational expenses.

10. A Member may not maintain, or have maintained for his use, an unofficial office account for the purpose of defraying or reimbursing ordinary and necessary expenses incurred in support of a Member's official and representational duties.

11. A Member may not accept from any private source in-kind support having monetary value for an official activity.

* * *

13. Unless specifically authorized by an applicable provision of *federal laws, House Rules, or Committee Regulations*, no Member, relative of the Member,

or anyone with whom the Member has a professional or legal relationship may directly benefit from the expenditure of the MRA.

14. Each Member is personally responsible for the payments of any official and representational expenses incurred that exceed the provided MRA or that are incurred but are not reimbursable under (the regulations).

(Def.Ex. C, at pp.1-2) (emphasis added)

**2. Office Expenses**

Decorating Expenses

Decorations of nominal value (e.g., frames, bookends, flags, seals, rugs, etc.) for Congressional offices are reimbursable.

(Def.Ex. C, at p.13)

* * *

Furniture

Furniture (e.g., furniture, rugs, carpet, draperies, repairs, etc.) is supplied and maintained by the CAO for Washington, DC, congressional offices through First Call at x58000 without charge to the MRA. Furniture is not reimbursable for the Washington, DC, congressional offices.

(Def.Ex. C, at p.14)

**3. Travel**

General

Travel by Members, Members' employees, and vendors in support of the official and representational duties of that Member to the district from which he or she is elected is official travel . . .

Ordinary and necessary expenses associated with official travel are reimbursable.

Official travel includes local travel and travel away from home overnight to conduct official and representational duties.

Living expenses and commuting expenses are not reimbursable, except in extraordinary circumstances. Living expenses include meals, housing, and other personal expenses incurred at the Member's or employee's residence or duty station. Commuting expenses are transportation expenses incurred by the Member or employee while commuting between their residence and duty station.

Official travel, paid for with the MRA, may not be for personal, campaign-related political party, or committee purposes.

(Def.Ex. C, at p.27)

* * *

<u>Privately-Owned Vehicles</u>

The costs of transportation by Member or employee via a privately owned or privately leased vehicle while on official and representational business is reimbursable on a rate per mile basis . . .

For the current applicable rates, contact the Committee on House Administration at x58281. Each Member office may set lower reimbursement rates.

Only mileage for use of an aircraft that is privately owned by either a Member or the Member's employee is reimbursable. Gasoline purchased for privately owned vehicles is not reimbursable; reimbursement is provided through mileage rate reimbursement.

(Def.Ex. C, at p.31)

**4. Vouchers and Payments**

<u>Reimbursements and Direct Payment</u>

Disbursements from the MRA are paid on a reimbursement basis or by direct payment (to vendors) and require:

1. The Member's signature, certifying that the expense was incurred in support of the Member's official and representational duties to the district from which he or she is elected.

2. Supporting documentation (receipt, lease, bill etc.).

> Seeking Reimbursement: Vouchers
>
> For information related to submitting vouchers for reimbursement, please refer to the Voucher Documentation Standards available on HouseNet.
>
> Government Travel Card
>
> The Government Travel Card is available for Member and employee use for official travel and travel-related expenses. Travel expenses incurred on this card are directly reimbursable to Citibank with a copy of the credit card statement, an accompanying voucher, and applicable receipts.

(Def.Ex. C, at p.32)

**5. Vouchering Standards**

In addition to the Handbook, the CHA established "Voucher Documentation Standards." (Standards) (Def.Ex. H, at p.1) These Standards state yet another reference to compliance with "all applicable laws" and provide:

> Detailed supporting documentation is essential to providing outstanding service while ensuring compliance with government accounting practices and standards, and *all applicable laws, House Rules, and House Administration Committee Regulations*. Appropriate supporting documentation also reduces the risk of erroneous and *fraudulent disbursements*.

(Def.Ex. H, at p.1) (emphasis added)

The Standards further "specif[y] the required supporting documentation for the processing of vouchers[]" according to the type of expense incurred. (*Id.*) For a mileage expense, the Standards require:

> Mileage
>
> Required travel information (derivative of a travel log) includes the following:

a. Name of traveler

b. Dates of travel or period during which travel occurred (not to exceed one month)

c. Location of travel (including start and end points)

d. Number of miles traveled

e. Mileage Rate at which travel is to be reimbursed

A travel log need not be submitted with the voucher, but must be maintained by the office and available for audit. A travel log template is available at ___ [*hyperlink to form*]

(Def.Ex. H, at p.3)

**6. House Rule XXIV (House Rule 24/House Ethics Manual)**

House Rule 24 provides in part:

> Except as provided in paragraph (b), a Member, Delegate, or Resident Commissioner may not maintain, or have maintained for the use of such individual, an unofficial office account. Funds may not be paid into an unofficial office account.

In providing guidance as to House Rule 24, the House Ethics Manual provides in part:

> A House office may, consistent with House Rule 24, charge a registration fee to attendees at an event it is sponsoring for the purpose of defraying the costs of food, beverages, and printed materials that are provided to the attendees. These are the only expenses that may be covered by the registration fee . . .
>
> When an office wishes to defray those costs in this manner, the registration fee must be calculated to cover those costs without generating a surplus, and the Member should establish a temporary, non-interest-bearing account to hold the fees collected. If a surplus is generated inadvertently, the excess funds must be either refunded on a pro rata basis to the participants, or donated to charity. Instead of establishing an account, a Member may direct the participants to send the fee directly to

> the entity that will be providing the food and beverages, but the fees should not be collected by any private third party.

House Ethics Manual, at pp.343-44.

In addition, "a key provision of the House Code of Official Conduct (House Rule 23, clause 3) generally prohibits a Member . . . from using his or her official position for personal gain." *Id.* at p.185.

### C. Congress's Enactment of Criminal Statute Made Specifically Applicable to the Legislative Branch

In *United States v. Bramblett*, the defendant was a former Member of Congress who had falsely represented to the House Disbursing Office (now the House Finance Office) that a person was entitled to compensation as his official clerk. 348 U.S. 503 (1955). He argued that he could not be convicted under 18 U.S.C. § 1001 (the false statement statute) because his false statements were directed to an office within the Legislative Branch. *Id.* at 504. The Supreme Court rejected this argument, concluding that the word "department," as used in § 1001, "was meant to describe the executive, legislative and judicial branches of the Government." *Id.* at 509. In so holding, the Court concluded that "Congress could not have intended to leave frauds such as [Bramblett's] without penalty." *Id.*

Forty years later, in *Hubbard v. United States*, the Supreme Court overruled *Bramblett* and held that the judicial branch was not a "department" under 18 U.S.C. § 1001. 514 U.S. 695, 700–15 (1995). Following *Hubbard,* there was

substantial doubt whether § 1001 covered false statements to the legislative branch.

Just one year after *Hubbard*, Congress enacted the Government Accountability Act of 1996, amending 18 U.S.C. § 1001 to make it specifically applicable to the "legislative branch[.]" Section 1001 now provides in relevant part:

> (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, *legislative*, or judicial branch of the Government of the United States, knowingly and willfully--
>
> (1) falsifies, conceals, or covers up by any trick, *scheme*, or device a material fact;
>
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
>
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title, [and] imprisoned not more than 5 years . . .
>
> * * *
>
> (c) With respect to any matter within the jurisdiction of the legislative branch, subsection (a) shall apply only to—
>
> (1) *administrative matters*, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or *regulation* to be submitted to the Congress or any office or officer within the legislative branch; . . .

(emphasis added).

In addition to its text, the legislative history of this statute makes clear Congress's intent in amending § 1001 to overrule *Hubbard* and reinstate its applicability specifically

to the legislative branch. The House Report provided that "[o]ver the last four decades, section 1001 has been used to prosecute Members of Congress who lie on their financial disclosure forms, initiate ghost employee schemes, *knowingly submit false vouchers*, and purchase *personal* goods and services with taxpayer dollars." Government Accountability Act of 1996, H. R. 104-680, at p.3 (104th Congress 2d Session) (emphasis added). The House Report further stated:

> [The amendment] explicitly limit[s] the application of section 1001 in a congressional setting to *administrative* and duly authorized investigative matters. As such, section 1001 would continue to apply--as it has in the past--to members of Congress who knowingly and willfully lie on their financial disclosure forms, initiate ghost employee schemes, *knowingly submit false vouchers, and purchase personal goods and services with taxpayer dollars.*

*Id.* (emphasis added).

**II. Indictment**

Defendant Schock is charged in the indictment with nine counts of wire fraud, in violation of 18 U.S.C. § 1343; one count of mail fraud, in violation of 18 U.S.C. § 1341; one count of theft of government funds, in violation of 18 U.S.C. § 641, two counts of making false statements, in violation of 18 U.S.C. § 1001(a)(2)(c)(1); five counts of falsifying filings with the Federal Election Commission (FEC), in violation of 18 U.S.C. § 1519; and six counts of filing false tax returns, in violation of 26 U.S.C. § 7206(1). None of the counts charge a violation of the Federal Election Campaign Act.

The charges in the indictment are grounded in repeated false statements and allege that Defendant Schock corrupted his Congressional office by engaging in a scheme to steal and unlawfully convert federal, campaign committee, and other funds,

including funds from his own constituents. Only 10 of the 24 fraud and false statement counts relate to MRA (federal) funds with the balance (14) of the counts charging fraud and false statements relating to Defendant Schock's campaign and his own constituents' funds and the filing of his federal tax returns.

**A. The MRA Counts**

**1. Mileage Reimbursement: Counts 1 – 5 (Wire Fraud)**

During his terms in Congress, Defendant Schock owned one vehicle at a time. For one of the vehicles (a 2010 Tahoe), he had a monthly car payment of just under $1,200 per month. As part of the charged scheme to defraud, he repeatedly submitted false and fraudulent mileage claims (vouchers), with little or no documentation, to the House for reimbursement of official miles that were never driven. Defendant Schock also directed his staff to falsify mileage claims to average $1,200 per month (just above his car payment) but not to make it "obvious." At the same time he was submitting false mileage claims to the House, Defendant Schock submitted false and fraudulent mileage claims to his campaign committees. As a result, he was reimbursed for more than 100,000 miles in excess of the miles he actually drove.

Counts 1 through 5 of the indictment charge House mileage payments with federal funds to Defendant Schock as executions of the charged scheme to defraud (wire fraud).

**2. Decoration of the Rayburn Congressional Office: Counts 8 (Wire Fraud) and 13 (False Statement)**

In November 2014, Defendant Schock hired the same Illinois decorator that had redecorated his Cannon Congressional Office in 2010 to redecorate his Rayburn Congressional Office, at a cost of approximately $40,000, including the purchase of a $5,000 chandelier. As part of the scheme, he caused false and fraudulent vouchers to be submitted to the House Finance Office, totaling $25,000 in payments to be made to the Illinois decorator. As part of the submission of the fraudulent vouchers, Defendant Schock, through his Executive Assistant, made false representations that the claims were "for services to assist the member in setting up our district and DC offices" and "includes using materials from our district and rearranging/designing/structuring the space to best suit the member and staff's needs," when in fact, the payments were for the decoration of his Washington office only. In an effort to conceal his fraud, Defendant Schock called a meeting with House Finance Office officials, falsely represented to them that the Executive Assistant should never have submitted the claims, and acknowledged that the decoration expenses were personal expenses. He also inquired of those same officials if the House payments would be disclosed to the public if he reimbursed his MRA.

Count 8 of the indictment charges a $15,000 payment to the Illinois decorator as another execution of the scheme to defraud. In addition, Count 13 charges Defendant Schock with submitting a false voucher to the House Finance Office for payment to the Illinois decorator of $15,000 and related oral and written statements in an

administrative matter within the legislative branch, namely a claim for payment and a document required by law, rule, or regulation to be submitted to the House.

**3. Purchase of the $29,021.45 Camera: Count 10 (Mail Fraud) and Count 12 (False Statement)**

As a further part of the charged scheme to defraud, Defendant Schock fraudulently caused the House to reimburse him for his purchase of $29,021.45 in camera equipment from B&H Photo in New York for his use and the use of a Congressional and campaign staff member, who was also Defendant Schock's personal photographer and videographer. To accomplish this part of his fraudulent scheme, Defendant Schock directed a staffer to create fraudulent invoices, falsely representing that the staffer had performed "Multimedia Services" in the amount of $29,021.45, the exact amount of the camera purchase. He then caused his Executive Assistant to submit a fraudulent voucher to the House Finance Office, attaching the staffer's false invoice, and falsely representing to the House that the services provided by the staffer were "Web Dev, HST, EMAIL & RLTD SERV." Despite the fact that the staff member never provided such services, Defendant Schock caused the voucher to be submitted under his name and certified as accurate. Following the submission of the false voucher and accompanying false invoice to the House Finance Office, it authorized a payment of $29,021.45 in federal funds to the staff member, who then made direct payments to Defendant Schock's personal credit card account for the purchase of the camera equipment.

Count 10 of the indictment charges the mailing of the camera equipment from

New York to Peoria as another execution of the scheme to defraud. In addition, Count 12 charges Defendant Schock with submitting a false voucher and accompanying false invoice to the House Finance Office for payment of $29,021.45 to the staff member for "WEB DEV HST, EMAIL & RLTD SERV" in an administrative matter within the legislative branch, namely a claim for payment and a document required by law, rule, or regulation to be submitted to the House.

**4. Theft/Conversion of Federal Funds: Count 11 (Theft/Conversion)**

Count 11 charges that from in or about 2010 to on or about March 31, 2015, Defendant Schock knowingly embezzled, stole, purloined, and converted to the use of another more than $1,000 in federal funds. To address the legal issues raised in his motion to dismiss Count 11 (as further described below), the government agrees that the conduct establishing this offense must have occurred November 10, 2011, or later, and that it will limit its proof, for purposes of this Count only, to evidence of false mileage claims and the fraudulent purchase and payment of the camera equipment.

**B. Non MRA-Related Counts**

Other parts of the scheme to defraud and other charged counts in the indictment do not involve MRA funds but rather involve Defendant Schock unlawfully converting and attempting to convert campaign committee, and other funds, including funds from his own constituents (Count 9).

**1. Retention of Fly-In Fees: Count 9 (wire fraud)**

As part of the charged scheme to defraud, Defendant Schock hosted an annual "Congressman Aaron Schock Washington, DC Fly-In" in which constituents traveled to

Washington, at their own expense, and attended various meetings with political leaders arranged by Defendant Schock and his staff. As part of the solicitation for the fly-in events, Defendant Schock publicly distributed an advertisement, in which he represented that fly-in participants would be charged a "Fly-in Conference Fee," which covered two days of events, meals, and program materials. To facilitate collection of this registration fee and to defray fly-in expenses, Defendant Schock utilized two unofficial bank accounts, one of which was in the fictitious name of "Global Travel International." He then caused staff members to deposit fly-in funds collected from constituents into, and pay fly-in expenses out of, the accounts. At no time did Defendant Schock inform his constituents or fly-in participants that he intended to personally profit from the fly-in events or their payment of registration fees.

As a further part of the scheme, and following the June 2011 fly-in event, Defendant Schock caused $4,482.21 in excess fly-in event funds to be paid to him personally. In so doing, he violated House Rules, which prohibited him from using his official position for personal gain and which required him to return any excess funds to the fly-in participants or donate such funds to charity. Defendant Schock also failed to disclose this additional income on his annual financial disclosure form.

Count 9 alleges as an additional execution of the scheme to defraud that Defendant Schock attempted to personally profit again from the fly-in event. He did so by submitting a false and fraudulent invoice via an interstate email communication in the amount of $11,000 for "Services Rendered" in the name of his limited liability

corporation, Menards Peoria LLC, for payment from excess fly-in funds and directing that a check for $11,000 be mailed to him at his residence in Peoria.

#### 2. The Remaining Non-MRA Counts

The remaining non-MRA counts involve allegations that the charged scheme to defraud included Defendant Schock's fraudulent conversions of campaign funds (Counts 6-7) (payment for Chicago Bears trip and purchase of Super Bowl tickets); falsifying of campaign records and FEC filings related to the expenditure of campaign funds (Counts 14 -18); and filing of false federal income tax returns from 2010 through 2015 (Counts 19 -24).

### C. Charged Statutes – False Statement as an Element of Each Offense

With the exception of Count 11 of the indictment, which charges theft of government funds (18 U.S.C. § 641), each of the remaining 23 counts of the indictment has as an essential element a materially false statement.

To establish the offenses of wire or mail fraud (Counts 1 – 10), the government must prove that the defendant: "(1) was involved in a scheme to defraud; (2) had an intent to defraud; and (3) used the [mails or] wires in furtherance of that scheme. *United States v. Weimert*, 819 F.3d 351, 355 and 356 (7th Cir. 2016) (outlining the elements of mail and wire fraud). "To prove a scheme to defraud, the government must show that [the defendant] made a material false statement, misrepresentation, or promise, or concealed a material fact." *Id.* This conduct "reach[es] not only false statements of fact but also misleading half-truths and knowingly false promises." *Id.* at 355.

To establish the false statement offenses involving the House Finance Office (Counts 12 and 13), the government must prove that the defendant made a "materially false, fictitious, or fraudulent statement or representation" involving "administrative matters, including a claim for payment, . . . . or a document required by law, rule, or regulation to be submitted . . . within the legislative branch[.]" 18 U.S.C. § 1001(a)(2), (c)(1); *see Pattern Criminal Jury Instructions of the Seventh Circuit* (2012), 18 U.S.C. § 1001, at p.272.

To prove the offenses involving falsification of internal campaign records and documents submitted to the FEC (Counts 14 – 18), the government must prove that the defendant "knowingly falsified documents and did so with the intent to impede, obstruct, or influence the investigation or proper administration of any matter that happens to be within federal jurisdiction." *United States v. Moyer*, 674 F.3d 192, 209 (3d Cir. 2012); *see also United States v. Rowland*, 826 F.3d 100, 109-11 (2d Cir. 2016); *United States v. Kernell*, 667 F.3d 746 (6th Cir. 2012); *United States v. Yielding*, 657 F.3d 688, 710-11 (8th Cir. 2011); *United States v. Hunt*, 526 F.3d 739, 743 (11th Cir. 2008).

Finally, to prove the filing of false federal income tax return offenses (Counts 19 - 24), the government must prove that the defendant filed a tax return that was "false [or incomplete] as to a material matter," and that he knew that he had a legal duty to file a truthful [or] [complete] tax return, but when he signed the return, he did not believe that it was truthful [or complete] as to a material matter[.]" *Pattern Criminal Jury Instructions of the Seventh Circuit* (2012), 26 U.S.C. § 7206(1), at p.683.

## ARGUMENT

In his first motion to dismiss, Defendant Schock declares himself immune from criminal responsibility for defrauding the United States, in triplicate form: under the Speech or Debate, Rulemaking, and Due Process Clauses of the Constitution. In his motion and memorandum, Defendant Schock careens back and forth from Clause to Clause, repeating his declarations of immunity for defrauding the public and others over and over again. All of these claims are meritless.

### I. Legal Standard for Review of Motion to Dismiss Indictment

Rule 12(b)(1) of the Federal Rules of Criminal Procedure provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed.R.Crim.P. 12(b)(1). When considering a motion to dismiss, a court assumes all facts in the indictment are true and "must view all facts in the light most favorable to the government." *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999). "To successfully challenge the sufficiency of an indictment, a defendant must demonstrate that the indictment did not satisfy one or more of the required elements and that he suffered prejudice from the alleged deficiency." *United States v. Vaughn*, 722 F.3d 918, 925 (7th Cir. 2013). "[A]n indictment must state each element of the crimes charged, provide the defendant with adequate notice of the nature of the charges so that the accused may prepare a defense, and allow the defendant to raise the judgment as a bar to future prosecutions for the same offense." *United States v. Nayak*, 769 F.3d 978, 979–80 (7th Cir. 2014). An indictment also may be dismissed "if subject to a defense that raises a purely legal question." *United States v.*

*Boender*, 691 F.Supp.2d 833, 837 (N.D. Ill. 2010) (citing *United States v. Labs of Virginia, Inc.*, 272 F.Supp.2d 764, 768 (N.D. Ill. 2003)). "The test for validity is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *Vaughn*, 722 F.3d at 925.

In addition, "arguments raised in a motion to dismiss that rely on disputed facts should be denied." *United States v. Caputo*, 288 F.Supp.2d 912, 916 (N.D. Ill. 2003) (citing *United States v. Shriver*, 989 F.2d 898, 906 (7th Cir. 1992)). But "[a]n indictment, or a portion thereof, may be dismissed if it is otherwise defective or subject to a defense that may be decided solely on issues of law." *Labs of Virginia, Inc.*, 272 F.Supp.2d at 768. Courts should review a challenged indictment "on a practical basis and in [its] entirely, rather than in a 'hypertechnical manner.'" *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000).

## II. The Speech or Debate Clause Does Not Provide Immunity to a Member of Congress to Lie or Engage in a Scheme to Defraud to Obtain Federal Taxpayer Funds

Defendant Schock argues that the Speech or Debate Clause (combined with separation-of-powers principles and the Rulemaking Clause) requires dismissal of the indictment. He is incorrect.

### A. Legal Framework

Article I, Section 6 of the Constitution provides:

> The Senators and Representatives . . . shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or

> Debate in either House, they shall not be questioned in any other Place.

Where it applies, the Clause affords Members of Congress three protections. First, it grants civil and criminal immunity for legislative acts. *Doe* v. *McMillan,* 412 U.S. 306, 311-312 (1973); *United States* v. *Johnson,* 383 U.S. 169, 184-185 (1966). Second, it guarantees that Members "may not be made to answer" questions about their legislative acts. *Gravel,* 408 U.S. at 616. And third, it bars the use of legislative-act evidence against a Member. *Helstoski,* 442 U.S. at 487. These protections apply not only to a Member of Congress "but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself." *Gravel*, 408 U.S. at 618. This case is primarily concerned with the first of these protections.

The Speech or Debate Clause "does not purport to confer a general exemption upon Members of Congress from liability or process in criminal cases." *Gravel v. United States*, 408 U.S. 606, 626 (1972). "Indeed, implicit in the narrow scope of the privilege of freedom from arrest is . . . the judgment that legislators ought not to stand above the law they create but ought generally to be bound by it as are ordinary persons." *Id.* at 615.

In short, the "speech or debate privilege was designed to preserve independence, not supremacy." *United States v. Brewster*. 408 U.S. 501, 508 (1972). A court's task, therefore, is "to apply the Clause in such a way as to insure the independence of the legislature without altering the historic balance of the three co-equal branches of Government." *Id.*

Although "the Speech or Debate Clause must be read broadly to effectuate its purpose of protecting the independence of the Legislative Branch," it "has not been extended beyond the legislative sphere" or to matters not involving "legislative acts." *Gravel*, 408 U.S. at 624-25; *see, e.g., United States v. Helstoski*, 442 U.S. 477, 488 (1979) ("the Speech or Debate Clause was designed to preclude prosecution of Members for legislative acts"); *United States v. Rose*, 28 F.3d 181, 187 (D.C. Cir. 1994) ("the Supreme Court has restricted congressional speech immunity to 'legislative acts'") (quoting *Gravel*). "Legislative acts[, however,] are not all-encompassing." *Gravel*, 408 U.S. at 625. "The heart of the Clause is speech or debate in either House[,]" *id.* at 625, and includes core legislative acts—how a Member spoke, how he debated, how he voted, or anything he did in the chamber or in committee. *Brewster*, 408 U.S. at 526. "Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625. The Speech or Debate Clause "does not prohibit inquiry into illegal conduct simply because it has some *nexus* to legislative functions," *Brewster*, 408 U.S. at 528 (emphasis added), or because it is merely "related to," as opposed to "part of," the "due functioning" of the "legislative process[.]" *Id.* at 513, 516. And "it does not prohibit inquiry into activities that are casually or incidentally related to legislative affairs but not a part of the legislative process itself." *Id.* at 528. As the Supreme Court has stated:

> In no case has this Court ever treated the Clause as protecting all conduct relating to the legislative process. In every case thus far before this Court, the Speech or Debate Clause has been limited to an act which was clearly a part of the legislative process—the due functioning of the process. Appellee's contention for a broader interpretation of the privilege draws essentially on the flavor of the rhetoric and the sweep of the language used by courts, not on the precise words used in any prior case, and surely not on the sense of those cases, fairly read.
>
> We would not think it sound or wise, simply out of an abundance of caution to doubly insure legislative independence, to extend the privilege beyond its intended scope, its literal language, and its history, to include all things in any way related to the legislative process. Given such a sweeping reading, we have no doubt that there are few activities in which a legislator engages that he would be unable somehow to 'relate' to the legislative process.

*Brewster*, 408 U.S. at 515-16.

Thus, "[t]he key consideration, Supreme Court decisions teach, is the act presented for examination, not the actor." *Walker v. Jones*, 733 F.2d 923, 929 (D.C. Cir. 1984). "Activities integral to the legislative process may not be examined, . . . but peripheral activities not closely connected to the business of legislating do not enjoy Speech or Debate shelter." *Id.*; *see also Reeder v. Madigan,* 2014 WL 1632145, at *5 (C.D. Ill. Apr. 24, 2014) ("Whether an activity is legislative and therefore subject to absolute legislative immunity turns on the nature of the act itself"), *aff'd.* 780 F.3d 799, 803 (7th Cir. 2015).

In applying these principles, the Supreme Court has made clear that the "purpose" of the Speech or Debate Clause is not "to make Members of Congress super-citizens, immune from criminal responsibility." *Brewster*, 408 U.S. at 516. "It can hardly be thought that the Speech or Debate Clause totally protects what the sentence

preceding it has plainly left open to prosecution, i.e., all criminal acts." *Id.* at 521. As a result, the Court has "emphasized" that the Clause "does not purport to confer a general exemption upon Members of Congress from liability or process in criminal cases." *Gravel*, 408 U.S. at 626.

In fact, "[q]uite the contrary is true." *Id.* "While the Speech or Debate Clause recognizes speech, voting, and other legislative acts as exempt from liability that might otherwise attach, it does not privilege either [a Member of Congress] or aide to violate an otherwise valid criminal law in preparing for or implementing legislative acts." *Id.*; *see Helstoski*, 442 U.S. at 487-88 ("a Member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts"). Thus, "[t]he Supreme Court has drawn a key distinction . . . between 'legislative speech or debate and associated matters such as voting and committee reports and proceedings,' on the one hand, and '*executing a legislative order*,' or '*carrying out [legislative] directions*,' on the other hand." *Jones*, 733 F.2d at 931 (quoting *Gravel*, 408 U.S. at 620–21) (emphasis added) (brackets in original); *see also Doe,* 412 U.S. at 314–15. "The former, the Supreme Court has emphasized, is what the Speech or Debate Clause shields." *Jones*, 733 F.2d at 931-32. "But its precedent, the Court has cautioned, 'reflect[s] a decidedly jaundiced view toward extending the Clause' to shield the latter." *Id.* (quoting *Gravel,* 408 U.S. at 620) (brackets in original).

Finally, the Supreme Court has noted that Congressional intent and authorization to the Executive Branch to investigate and prosecute and to the Judiciary to punish conduct that Congress has proscribed by criminal statute is relevant to

whether a criminal prosecution of a Member of Congress conflicts with the purposes and scope of the Speech or Debate Clause. In *Brewster*, the Court noted that the defendant had not "cited to any cases in which the bribery statutes, which have been applicable to Members of Congress for over 100 years, have been abused by the Executive Branch." *Brewster*, 408 U.S. at 524. "Congress, of course, is free to exempt its Members from the ambit of federal bribery laws, but it has deliberately allowed the instant statute to remain on the books for over a century." *Id.* Rather than police bribery by Congressmen itself, Congress "deliberately delegated this function to the courts" through the bribery statutes. *Brewster*, 408 U.S. at 524-25; *see also United States v. Rose*, 28 F.3d 181, 190 (D.C. Cir. 1994) ("by codifying these [disclosure] requirements in a statute, Congress has empowered the executive and judicial branches to enforce them").

"A party asserting a legislative privilege, as [Defendant Schock] does here, bears the burden of establishing the applicability of legislative immunity by a preponderance of the evidence." *United States v. Menendez*, 132 F.Supp.2d 610 (D. N.J. 2015) (citing *Government of Virgin Islands v. Lee*, 775 F.2d 514, 524 (3d Cir. 1985)); *see also Reeder v. Madigan*, 2014 WL 1632145, at *5.

**B. Analysis**

**1. Lying and Submitting False Vouchers to the House Are Not "Legislative Acts"**

"An examination of the indictment brought against [Defendant Schock] and the statutes on which it is founded reveals that no inquiry into legislative acts or motivation for legislative acts is necessary for the Government to make out a prima facie case."

*Brewster*, 408 U.S. at 525. Repeatedly lying and defrauding the government and the public—like taking a bribe--are "obviously, no part of the legislative process or function," are "not [] legislative act[s], and are "not, by any conceivable interpretation, [] act[s] performed as a part of or even incidental to the role of a legislator." *Id.* The prosecution of Defendant Schock is therefore consistent with settled law that Members of Congress may be prosecuted for actions involving bribery, fraud, and false statements that were taken in their official capacity but that did not involve legislative acts. *See, e.g., Brewster*, 408 at 502, 512 ("a Member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts"); *United States v. Johnson*, 383 U.S. 169 (1966) (conspiracy to defraud the United States and federal conflict of interest violations); *Burton v. United States*, 202 U.S. 344, 365-370 (1906) (rejecting argument that prosecution of a Senator was "repugnant to the Constitution"); *United States v. Menendez*, 831 F.3d 155 (3d Cir. 2016) (pending prosecution of Senator for bribery and falsification of financial disclosure forms), *cert. denied*, 137 S. Ct. 1332 (2017); *United States v. Myers*, 635 F.2d 932 (2d Cir. 1980) (bribery); *United States v. Fattah*, 170 F.Supp.3d 761 (E.D. Pa. 2016) (prosecution of Congressman for bribery and wire fraud); *United States v. Renzi*, 769 F.3d 731 (9th Cir. 2014) (prosecution of Congressman for conspiracy, honest-services fraud, extortion, money laundering, making false statements to insurance regulators, and racketeering); *United States v. Jefferson*, 546 F.3d 300 (4th Cir. 2008) (prosecution of Congressman for various crimes, including bribery and wire fraud); *United States v. Kolter*, 71 F.3d 425 (D.C. Cir. 1995) (prosecution of Congressman for misappropriation of

government funds); *United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995) (same); *United States v. Durenberger*, 48 F.3d 1239 (D.C. Cir. 1995) (same); *United States v. Rose*, 28 F.3d 181 (D.C. Cir. 1994) (enforcement action against Congressman for false statements on financial disclosure forms); *United States v. Hansen*, 566 F.Supp. 162 (D.D.C. 1983) (prosecution of Congressman for false statements on financial disclosure forms), *aff'd.* No. 83–1689 (D.C. Cir. Aug. 1, 1983) (unpublished order).[2]

### 2. Defendant Schock's Sweeping Claims of Absolute Immunity for His Criminal Acts Are Meritless

Faced with this dispositive precedent, Defendant Schock simply ignores it and pretends it does not exist. (Def.Mem. 1-54) Instead, he reaches for the Rulemaking Clause of Article I ("Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member," U.S. Const. art. I, § 5, cl. 2), and claims that it provides a broader absolute immunity through the back door for false statements to the House and defrauding the public that the Speech or Debate Clause plainly does not extend from the front.

Specifically, Defendant Schock argues that legislating and Rulemaking are synonymous, and that "Rulemaking enjoys the protections of legislative immunity as a result." (Def.Mem. at 12) He then makes the leap to claiming that the House Finance

---

[2] *See also Government of Virgin Islands v. Lee,* 775 F.2d 514, 522 (3d Cir. 1985) ("In general, however, the cases interpreting the Speech or Debate Clause in which legislative immunity has been triggered have involved manifestly legislative acts"); *United States v. Eilberg*, 507 F.Supp. 267 (E.D. Pa. 1980) (enforcement action against Congressman seeking reimbursement for numerous "unofficial" phone calls that were certified as "official" and paid by his Congressional office account).

Office and the CAO engage in Rulemaking in administering a Member of Congress's reimbursement claims for federal funds from his MRA, and that this Rulemaking even further extends to the vouchering or claims process and even to Defendant Schock's discussions with his staff and their discussions with the House Finance Office. (Def.Mem. at 1-26) Thus, the argument goes, the entire MRA process--from Defendant Schock submitting or causing his staff to submit a false claim to the House Finance Office and continuing on to his receipt of federal funds and his after-the-fact attempts to conceal his fraud--falls within the legislative sphere of Rulemaking or Speech or Debate, and therefore what is fraud is now transformed into conduct protected by constitutional immunity. Defendant Schock then repeatedly declares this absolute immunity as if repeating it to the Court gives it merit. (Def.Mem. 1-51) It does not.

Defendant Schock's claim to Speech or Debate immunity is belied by the text of the Constitution itself. Article I, Section 6 of the Constitution expressly provides that Members of Congress are both: (1) not exempt from prosecution for "Felony" offenses, U.S. Const. Art. I, § 6, cl. 1, but (2) protected against being "questioned in any other place for any speech or debate in either House." *Gravel*, 408 U.S. at 615. As the Supreme Court has made clear, "[i]t can hardly be thought that the Speech or Debate Clause totally protects what the sentence preceding it has plainly left open to prosecution, i.e., all criminal acts." *Brewster*, 408 U.S. at 516. But that is precisely what Defendant Schock declares: "a general exemption upon Members of Congress from liability or process in criminal cases." *Gravel*, 408 U.S. at 626.

Defendant Schock's claim is also only possible, albeit meritless, if he ignores, selectively cites, or completely mischaracterizes controlling Supreme Court and other precedent. For example, his central premise that "the Speech or Debate privilege includes . . . all matters that Article I assigns to Congress[,]" and that therefore "Rulemaking enjoys the protections of legislative immunity as a result[,]" (Def.Mem. at 12), is completely wrong. The Supreme Court has made clear that "legislative acts are not all encompassing," *Gravel*, 408 U.S. at 625, and it has stated the exact opposite of what Defendant Schock declares:

> In no case has this Court ever treated the Clause as protecting all conduct relating to the legislative process. In every case thus far before this Court, the Speech or Debate Clause has been limited to an act which was clearly a part of the legislative process—the due functioning of the process.

*Brewster*, 408 U.S. at 515-516; *Oshea v. Littleton*, 414 U.S. 488, 503 (1974) ("we have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivations of constitutional rights"). And, in doing so, the Supreme Court has rejected "sweeping claims" of "super-citizen[ship]" and their attendant "rhetoric" (like those repeatedly made here by Defendant Schock) that are "not [based] on the precise words used in any prior case, and surely not on the sense of those cases, fairly read[,]" *Brewster,* 408 U.S. at 516, 520, but that "would render Members of Congress virtually immune from a wide range of crimes simply because the acts in question were peripherally related to their holding office." *Id.* at 520; *see also, e.g., United States v. Isaacs*, 493 F.2d 1124, 1144 (7th Cir. 1974) ("We conclude that whatever immunities or privileges the Constitution confers

for the purpose of assuring the independence of the co-equal branches of government they do not exempt the members of those branches from the operation of the ordinary criminal laws. Criminal conduct is not part of the necessary functions performed by public officials").

Moreover, just as the Supreme Court has refused to extend the Speech or Debate Clause beyond the "due functioning" of the "legislative process," it has never held that legislating and Rulemaking are synonymous. No court has. *See Hansen v. Bennett*, 948 F.2d 397, 400 (7th Cir. 1991) ("To the best of our knowledge, no court has held that enforcing such rules [of parliamentary procedure] is a legislative act"). Rather, courts have rejected this claim.

In *United States v. Diggs*, the court held that "Article I, § 5 [the Rulemaking Clause] does not immunize a member of Congress from the operations of the criminal laws." 613 F.2d 988, 1001 (D.C. Cir. 1979). In addition, although Defendant Schock selectively cites *Rostenkowski* in support of his separation of powers (non-justiciability) argument, he omits entirely from his memorandum that the D.C. Circuit in *Rostenkowski* once again rejected the argument that Rulemaking is a legislative act protected by the Speech or Debate Clause. There, the court held that the "Rules" governing the "Clerk Hire Allowance[,]" now the MRA, "have no direct connection to the legislative process—they govern only the internal payment of staff salaries and office expenses." 59 F.3d at 1295, 1306.

And finally, just last year, the Third Circuit held that "the Rulemaking Clause does not bar Congress from legislating ethics." *Menendez*, 831 F.3d at 174. "To say

otherwise would immunize from prosecution by the Executive Branch any conduct that is incorporated into the Senate Rules, however offensive to the laws of the United States." *Id.* Separation of powers requires no such result." *Id.*; *see also id.* at 175 ("Ethics Act filings are not legislative acts protected by the Speech or Debate Clause").

**3. Rulemaking is Not Legislating**

Defendant Schock asserts that "the execution of internal legislative rules is so identified with the legislative process that Rulemaking is just as much a legislative act as voting on bills[.]" (Def.Mem. at 12) As the sole support for this pronouncement and his Rulemaking equals legislating argument, he cites *Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n*, 515 F.2d 1341 (D.C. Cir. 1975), *Gravel*, and later *Reeder v. Madigan*, 780 F.3d 799, 803 (7th Cir. 2015) (Def. Mem. at 13, 21), and further declares that "*Gravel* and *Consumers Union* teach that communications by a Member in furtherance of the House's constitutional prerogative to make and enforce its own Rules enjoy legislative privilege, just as floor speeches do." (Def.Mem. at 13) These declarations are also completely wrong.

As noted above, *Gravel* neither stated nor "teache[s]" any such thing but the exact opposite of what Defendant Schock further declares. Moreover, "*Consumers Union* held that arrangements for seating the press in the House and Senate galleries were 'integral' to the 'legislative machinery,' . . . and thus were immune from judicial review by virtue of the Speech or Debate Clause." *Jones*, 733 F.3d at 930 (D.C. Circuit's explanation of its prior holding in *Consumers Union*). "*Consumers Union*, in short, involved . . . regulation of the very atmosphere in which lawmaking deliberations occur." *Jones*, 733 F.2d at 930

(holding that hiring and firing of House food service manager was not a legislative act), Similarly, in *Reeder v. Madigan*, the Seventh Circuit, in affirming this Court, 2014 WL 1632145 (C.D. Ill. Apr. 24, 2014), held that the Illinois legislature's "decision whether to confer media credentials . . . was legislative in nature, and integrally so [because] control of access to the legislative floor [i]s a core legislative function." 780 F.3d 799, 803 (7th Cir. 2015) (citing *Consumers Union)* No court, including the Supreme Court, has ever said that all Rulemaking beyond "regulation of the very atmosphere in which lawmaking deliberations occur[,]" *Jones*, 733 F.2d at 930, is the equivalent of legislating and therefore protected by Speech or Debate immunity.

In fact, courts have held to the contrary. In *Jones*, the D.C. Circuit noted that "[i]t would demean the high purpose of the Speech or Debate privilege to extend it to official activities of Congress members and their aides in mundane fields outside the legislative core." 733 F.2d at 929. After describing its holding in *Consumers Union* as limited to "regulation of the very atmosphere in which lawmaking deliberations occur[,]" it held that the hiring and firing of a House food service manager was not a legislative act. *Jones*, 733 F.2d at 930-31. It further held that to describe such "[a]uxiliary services" or "personnel actions . . . as 'legislative' in character . . . is to stretch the meaning of the word beyond sensible proportion[,]" and that attempts to do so were "far fetched." *Id.* at 931, 930. Finally, the court held that "[s]electing, supervising, and discharging a food facilities manager, we believe, is not reasonably described as work that significantly informs or influences the shaping of our nation's laws." *Id.* at 931.

Following *Jones* and in the specific context of a Congressman's use of what is now the MRA, the D.C. Circuit, as noted above, later held in *Rostenkowski* that the "Rules" governing the MRA "have no direct connection to the legislative process—they govern only the internal payment of staff salaries and office expenses." 59 F.3d at 1295, 1306. In short, a Member of Congress's use of federal funds through his MRA has nothing to do with "a core legislative function[,]" *Reeder,* 780 F.3d at 803, or "the shaping of our nation's laws." *Jones,* 733 F.2d at 931. Neither *Jones* or that portion of *Rostenkowski* rejecting a Speech or Debate claim, however, are mentioned anywhere in Defendant Schock's memorandum. These omissions of, selective citations to, and mischaracterizations of precedent undermine the merits of his motion.

**4. The MRA Process is Administrative, Not Legislative**

In any case, the Supreme Court and other courts have also consistently held that "administrative" rules and actions are not entitled to official immunity. In *Forrester v. White*, 484 U.S. 219 (1988), a judge who was sued for demoting and discharging a probation officer claimed to be absolutely immune. The Supreme Court rejected this claim, concluding that his decisions "were not judicial acts." *Id.* at 221. It noted that "[a]dministrative decisions, even though they may be essential to the very functioning of the courts, have not similarly been regarded as judicial acts." *Id.* at 228. Although the suit arose under 42 U.S.C. § 1983, the Court recognized that comparable issues are presented under the Speech or Debate Clause. *Forrester,* 484 U.S. at 224 (noting that "the Court has been careful not to extend the scope of the [Speech or Debate] protection further than its purposes require").

There was no doubt that Forrester "performed functions that were inextricably tied to discretionary decisions that have consistently been considered judicial acts." *Id.* at 222. The Court focused, however, not on the duties of the employee, but rather on the function the judge was performing:

> Those acts - like many others involved in supervising court employees and overseeing the efficient operation of a court - may have been quite important in providing the necessary conditions of a sound adjudicative system. The decisions at issue, however, were not themselves judicial or adjudicative.

*Id.* at 229. Thus, the Court concluded that "Judge White was acting in an administrative capacity when he demoted and discharged Forrester." *Id.* As a result, he "was not entitled to absolute immunity." *Id.* at 230. Following *Forrester*, the Seventh Circuit has held that "[a]dministrative or executive acts of legislators are not protected." *Rateree v. Rockett*, 852 F.2d 946, 950 (7th Cir. 1988); *see also Hansen v. Bennett*, 948 F.2d 397, 402-04 (7th Cir. 1991) (following *Rateree* and holding that "city council meeting included a mixture of legislative, executive, and administrative functions").

Similarly, just as the Supreme Court has distinguished between legislative/judicial acts and non-legislative/judicial administrative acts, it has also "drawn a key distinction . . . between 'legislative speech or debate and associated matters such as voting and committee reports and proceedings,' on the one hand, and 'executing a legislative order,' or 'carrying out [legislative] directions,' on the other hand." *Jones*, 733 F.2d at 931 (quoting *Gravel*, 408 U.S. at 620–21) (emphasis added) (brackets in original). "The former, the Supreme Court has emphasized, is what the Speech or Debate Clause shields." *Jones*, 733 F.2d at 931-32. "But its precedent, the Court

has cautioned, 'reflect[s] a decidedly jaundiced view toward extending the Clause' to shield the latter." *Id.* (quoting *Gravel*, 408 U.S. at 620) (brackets in original).

Here, Congress has codified in federal law that a House Member's use of his MRA and reimbursement with federal funds involve "administrative matters[.]" 18 U.S.C. § 1001(c)(2). And Defendant Schock himself has described the process as involving "administrative minutiae." (Def.Mem. at 2; *id.* at 52 ("administrative 'violations' of ambiguous rules")) In light of Supreme Court and other precedent and Congress's enactment of § 1001(c), the government submits that a Member of Congress's use of his MRA and statements made to the House Finance Office related to it are never protected by the Speech or Debate Clause. In any event, Defendant Schock's scheme to defraud and false statements to obtain federal funds in connection with this administrative process and thus his repeated violations of legislative directions, like the "'carrying out [of legislative] directions,'" *Jones*, 733 F.2d at 931 (quoting *Gravel*, 408 U.S. at 620–21), are simply not protected by the Constitution.

### 5. Congress Has Made Clear that Making False Statements and Submitting False Vouchers to the House is a Criminal Offense

Finally, Congress has not only broadly proscribed mail and wire fraud (without a carve-out for members of Congress) but it has also made it a criminal offense to make a false statement in a claim for payment submitted to the legislative branch. 18 U.S.C. § 1001(a), (c)(2). As noted by the Supreme Court in *Brewster*, Congressional intent in making non-legislative conduct a criminal offense is relevant to whether it is protected by Speech or Debate immunity. *Brewster*, 408 U.S. at 524-25 (noting that bribery has

been unlawful for more than 100 years). Defendant Schock points out that this is not a bribery case, arguing that bribery "takes place outside the space reserved for the House," whereas "the charges in the Indictment implicate conduct that occurred in the internal confines of the administrative processes of the House of Representatives." (Def. Mem. at 5) But this is a distinction without a difference. By Defendant Schock himself defrauding and making false statements to the House to receive federal funds, he corrupted his Congressional office no less than if had taken a bribe from a third party with non-federal funds. Even if this dubious distinction were valid, Congress has indicated its intent to open up the administrative process of Congressional reimbursement requests to criminal liability and judicial enforcement where a person requesting reimbursement makes false statements or engages in a scheme to cover up such statements. *See* § 1001(a), (c). Defendant Schock cannot distinguish this case from *Brewster* or Congress's clear intent.

## III. The Rulemaking Clause Likewise Does Not Provide Immunity to a Member of Congress to Lie or Engage in a Scheme to Defraud to Obtain Federal Taxpayer Funds

Defendant Schock further argues that the Rulemaking Clause and separation of powers principles additionally provide him with absolute immunity for repeatedly lying and submitting and engaging in a scheme to submit false vouchers to the House for reimbursement with federal funds. If this extreme immunity argument were accepted, it would mean that no Member of Congress could be prosecuted for defrauding the government or stealing government funds, including for violations of the very false statement statute that Congress has specifically made applicable to itself. That is simply not the law.

### A. Legal Framework

The Rulemaking Clause in Article I of the Constitution provides: "Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member." U.S. Const. art. I, § 5, cl. 2. Under the Rulemaking Clause, "[t]he Constitution commits to the [House] the power to make its own rules; and it is not the function of [a] Court to say that another rule would be better." *United States v. Smith*, 286 U.S. 6, 48 (1932); *see Vander Jagt v. O'Neill*, 699 F.2d 1166, 1173 (D.C. Cir. 1983) ("Art. I simply means that neither we nor the Executive Branch may tell Congress what rules it must adopt").

The Supreme Court, however, has drawn an important distinction between Congress's choice of its governing rules and a court interpreting those rules and statutes and the Constitution itself. This is because interpreting statutes and rules and, where

necessary, declaring them unconstitutional is the function of the Judicial Branch. As the Supreme Court held long ago, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). Thus, "[i]t has been long settled . . . that rules of Congress and its committees are judicially cognizable." *Yellin v. United States*, 374 U.S. 109, 114 (1963); *United States v. Menendez*, 831 F.3d 155, 174 (3d Cir. 2016) ("The Judicial Branch is generally capable of interpreting congressional rules"); *United States v. Rostenkowski*, 59 F.3d 1291, 1305 (D.C. Cir. 1995) ("it is perfectly clear that the Rulemaking Clause is not an absolute bar to judicial interpretation of the House Rules"), *cert. denied,* 137 S. Ct. 1332 (2017). In the context of interpreting Congressional rules, "[t]he question is [not] what rules Congress may establish for its own governance . . . The question is rather what rules the House has established and whether they have been followed." *Christoffel v. United States*, 338 U.S. 84, 88-89 (1949). In performing its duty, a court may determine whether such "rules ignore constitutional restraints or violate fundamental rights." *United States v. Ballin,* 144 U.S. 1, 5 (1892). Such scrutiny, however, is not limited to constitutional review. In *United States v. Smith,* for example, "[t]he question primarily at issue relate[d] to the construction of the applicable rules, not to their constitutionality." 286 U.S. at 33. Thus, "[a]s the construction to be given to the rules affect[ed] persons other than members of the Senate, the question presented [was] of necessity a judicial one." *Id.*

In addition, as noted in response to Defendant Schock's Speech or Debate argument, "Article I, § 5 [the Rulemaking Clause] does not immunize a member of Congress from the operations of the criminal laws." *United States v. Diggs*, 613 F.2d 988,

1001 (D.C. Cir. 1979); *see Rostenkowski,* 59 F.3d at 1305 (noting that "if Rostenkowski's [Rulemaking] argument were accepted it would effectively insulate every Member of Congress from liability under certain criminal laws. Neither the Rulemaking Clause nor the doctrine of the separation of powers requires that result"); *see United States v. Nixon,* 418 U.S. 683, 707 (1974) ("the separate powers [of government] were not intended to operate with absolute independence"). As the Supreme Court stated more than 100 years ago, "[n]o man in this country is so high that he is above the law." *Diggs*, 613 F.2d at 1001 (quoting *United States v. Lee*, 106 U.S. 196, 220 (1882)).

Similarly, "[t]he mere fact that Congress may provide some internal inquiry or sanction for certain misconduct of its members does not thereby insulate its members from all possible criminal liability for such actions." *United States v. Hansen*, 566 F.Supp. 162, 171 (D. D.C.) (rejecting argument based in part on Article I, § 5), *aff'd.* No. 83–1689 (D.C. Cir. Aug. 1, 1983) (unpublished order); *see also United States v. Myers*, 635 F.2d 932, 937-938 (2d Cir. 1980) (the Supreme Court decision in *Brewster* "necessarily rejected any contention that Congressional punishment power in such matters was exclusive").

Finally, just as Congressional intent is relevant to Speech or Debate immunity, it is also equally relevant to whether judicial interpretation of Congressional rules implicates Rulemaking Clause or separation of powers concerns. As the Third Circuit stated last year, "the Rulemaking Clause does not bar Congress from legislating ethics." *Menendez*, 831 F.3d at 174. "To say otherwise would immunize from prosecution by the Executive Branch any conduct that is incorporated into the Senate Rules, however offensive to the laws of the United States." *Id.* "Separation of powers requires no such

result." *Id.* Stated again another way, when Congress has codified requirements of a rule or regulation in a statute, it "has empowered the executive and judicial branches to enforce them[.]" *United States v. Rose*, 28 F.3d 181, 190 (D.C. Cir. 1994) ("by codifying these requirements in a statute, Congress has empowered the executive and judicial branches to enforce them"); *see United States v. Eilberg*, 507 F. Supp. 267, 287 (E.D. Pa. 1980) ("the prevailing congressional practice has for several decades been to delegate much of the policing of the behavior of Senators and Representatives to the executive and the judiciary. And such delegation has been uniformly sustained by the Supreme Court"). Thus, when the Executive Branch brings an action to enforce such a statute, it is "fulfilling its constitutional responsibilities, not encroaching on Congress's." *Rose*, 28 F.3d at 190.

**B. Analysis**

**1. This Case is Justiciable**

Defendant Schock is charged with wire fraud, mail fraud, theft of government funds, and making false statements to the House, his constituents, the FEC, and on his federal tax returns. The charges allege that Defendant Schock corrupted his Congressional office by engaging in a scheme to steal and unlawfully convert federal, campaign committee, and other funds, including funds from his own constituents. Only 10 of the 24 counts in the indictment relate to MRA (federal) funds, with the balance of the counts charging fraud and false statements that do not depend on House rules and regulations. The MRA-related charges, both the mail and wire fraud and the false statement charges, are grounded in repeated false statements. The fraudulent scheme

and false statements include claims for (1) non-existent mileage; (2) non-existent "Multimedia Services" services for reimbursement of a camera purchase; and (3) for services relating to Defendant Schock's "district and DC offices," when in fact, the payments were for the redecoration of Defendant Schock's Washington office only. The prosecution of the MRA-related counts therefore involves enforcement of an unambiguous rule contained in the criminal law, including a criminal law that Congress made specifically applicable to itself more than 20 years ago: *Do not lie, submit a false voucher, or engage in a fraudulent scheme to obtain federal funds*. 18 U.S.C. § 1001(a), (c).

Defendant Schock, however, ignores this indisputable rule, now long codified in federal law, and again substitutes extended rhetoric for applicable precedent and any acknowledgement that Congress, in addition to the general wire and mail fraud statutes, has specifically made it a criminal offense to submit false vouchers and make false statements to the legislative branch. He argues that this entire prosecution (even the false statements to the House counts and the non MRA-related counts) is non-justiciable because it "usurp[s] the constitutional prerogative of the House to make and interpret its own rules[.]" (Def.Mem. at 1) Defendant Schock further argues that the MRA regulations are "ambiguous." He also claims that they "establish[ed] few specific requirements with respect to the House's internal finances"-- in other words, federal funds, and that this exclusive House "prerogative" provided him with "significant discretion and autonomy to determine what is appropriately reimbursed" to him with federal funds. (Def.Mem. at 13, 15) Finally, he argues that "Congress, and Congress alone, possesses the constitutional power to create and enforce House rules[; and that a

criminal prosecution cannot be premised on judicial (or prosecutorial) interpretation of ambiguous House rules." (Def.Mem. at 2) As with his Speech or Debate claims, Defendant Schock attempts to transform what is plainly lying and fraud into conduct protected by absolute constitutional, now Rulemaking and separation of powers, immunity. (Def.Mem. 1-51) This argument is equally meritless.

The plain response to Defendant Schock's labored argument is to repeat: "Article I, § 5 [the Rulemaking Clause] does not immunize a member of Congress from the operations of the criminal laws." *Diggs*, 613 F.2d at 1001. And it certainly does not immunize Defendant Schock from the very criminal law Congress has made applicable to itself. Moreover, his arguments have repeatedly been rejected. *See id.* at 997-1003; *United States v. Durenberger,* 48 F.3d 1239, 1240 (D.C. Cir. 1995); *Rostenkowski*, 59 F.3d at 13-04-05; *Menendez*, 831 F.3d at 174; *Diggs*, 613 F.2d at 997-1003.

Most relevant to this case, in *Durenburger*, Senator Durenberger was charged with conspiracy to make and present false claims and submitting false claims totaling $3,825 for reimbursement for travel expenses. At that time, 2 U.S.C. § 59(e) entitled a Senator "to reimbursement for actual travel expenses not exceeding a per diem amount." *Id.* at 1243. Regulations of the Senate Committee on Rules and Administration (Committee), in turn, required that "[i]n order to be reimbursed, a Senator must sign and submit to the [Committee] travel vouchers with hotel bills or other evidence of lodging costs." *Id.* at 1241. In addition, Committee "regulations instructed persons traveling on Senate business to record their expenditures [and] . . . [w]henever possible, such travel vouchers were to be supported by receipts." *Id.* at 1243-44. Durenberger was

charged with falsifying his travel vouchers by representing that a condominium which he owned and at which he stayed was owned by "someone else[.]" *Id.* at 1241.

In moving to dismiss the indictment pursuant to the Rulemaking Clause and on separation of powers grounds, Durenberger argued that his false statements about ownership of the condominium were not material because the Senate rules as to whether a Senator could be reimbursed for "out-of-town lodgings in which the Senator had an ownership interest . . . were ambiguous[.]" *Id.* Thus, he further argued that [t]he district court could resolve the ambiguity in the Senate rules . . . only if it transgressed principles of separation of powers prohibiting the judiciary from intruding on the Senate's prerogative [under the Rulemaking Clause]." *Id.* In short, Durenberger argued, like Defendant Schock does here, that he "cannot be held to answer criminal charges when his liability depends on judicial usurpation of the Senate's exclusive right to formulate its internal rules." *Id.*

The D.C. Circuit rejected this argument. It first held:

> The[] [Senate] rules contemplate that persons travelling on Senate business will support their requests for reimbursement with truthful vouchers and accurate supporting receipts. They impose a duty of honesty and necessarily operate on the assumption that those submitting vouchers will not lie. Drawing this distinction requires no resolution of ambiguities in the Senate's internal rules.

*Id.* at 1244.

The court concluded that "[t]he question is not whether Durenberger was entitled to reimbursement if he had submitted truthful vouchers, but whether the false

statements in his vouchers were material because they were capable of influencing the Senate's reimbursement decision." *Id.* at 1244. To that question, the court held that:

> "[t]he answer quite clearly is yes, it was material to the *amount* of reimbursement. In giving that answer a court does not impose on the Senate its version of what is and what is not reimbursable. Even if Durenberger is correct that in 1987 Senators could be reimbursed for staying in property they owned, the Senate rules demanded vouchers that were truthful about this.

*Id.* (emphasis in original).

Thus, the court further held that Durenberger's prosecution:

> [d]oes not require the district court to develop rules of behavior for the Legislative Branch, . . . nor does it ask the court to interject itself into practically every facet of a coordinate Branch of the federal government, on a continuing basis . . . Rather, the district court is called upon simply to determine whether untruths in a Senator's travel vouchers could influence the Senate's reimbursement decision[, which was a] judicial role.

*Id.* at 1245.

Durenberger further argued that a false claims "prosecution against a Senator is nonjusticiable whenever liability can be measured only by internal congressional rules, rather than substantive federal statutes." *Id.* "Because no statute made ownership relevant to a Senator's claim for reimbursement, Durenberger [argued] that the government may not maintain its prosecution against him." *Id.*

In also rejecting this argument, the court held:

> [t]his argument warrants little discussion . . . Durenberger's prosecution is grounded in a substantive federal statute . . . which permits a Senator's reimbursement only for *actual* travel expenses. To repeat, Durenberger has not been charged with obtaining reimbursement for . . . violation of an internal Senate rule. He has been indicted for making false statements regarding his ownership of that condominium in travel vouchers. Since a Senator travelling on Senate business is only entitled to reimbursement of

> actual costs . . . his ownership is relevant to determining the amount of those costs . . . [And] by codifying the requirements in a statute, Congress has empowered the executive and judicial branches to enforce them.

*Id.* at 1245-46 (emphasis in original).

Similarly, in *Diggs*, Congressman Diggs was charged with mail fraud and making false statements (by falsifying [] payroll authorization forms) as a result of using the House "Clerk-Hire Allowance" (now the MRA) to inflate the salaries for employees in order to pay his personal, business, and House expenses and to pay employees "who performed no work." 613 F.2d at 991-95, 999. He argued that the government improperly predicated its prosecution on a violation of a House advisory opinion, which "suggest[ed] that it is improper to levy, as a condition of employment, any responsibility on any clerk to incur personal expenditures for the primary benefit of the Member or of the Member's congressional office operations, because it "unconstitutionally cast[ed] th[e] court into the role of interpreting the internal rules of the House." *Id.* at 1001. The court easily rejected this argument, noting that it "confuses the purpose for which the advisory opinion was introduced in evidence and thus misconceives our role." *Id.* The advisory opinion was properly admissible in evidence because "[t]he opinion was admitted as evidence relevant to the defendant's intent, and not as a legal standard to which the defendant's conduct was required to conform." *Id.* Thus, the court held that [t]he defendant clearly was tried not for violating the internal rules of the House of Representatives but for violating the mail fraud and false statements statutes." *Id.* The court further held that the Diggs' false representations on payroll forms submitted to the House Finance Office and diversion of government

funds for an improper purpose was sufficient evidence to sustain his convictions for mail fraud and making false statements to the House Finance Office. *Id.* at 997-1003.

Here, as in *Durenberger, Rostenkowski*, and *Diggs*, Defendant Schock's argument rests entirely "upon the mistaken premise that the Government seeks to impose criminal liability upon him for violating the House Rules themselves." *Rostenkowski*, 59 F.3d at 1305. "That is not the case, however." *Id.* Defendant Schock is clearly being prosecuted "not for violating the internal rules of the House of Representatives but for violating the mail fraud and false statements statutes." *Diggs*, 613 F.2d at 1001. The indictment is grounded in repeated false statements and substantive federal statutes, which permitted reimbursements from his MRA only for actual expenses, and which specifically prohibited a House Member from submitting a false voucher or claim for payment. The House regulations in the Handbook that provided for the manner in which MRA claims were made required that Defendant Schock support his requests for reimbursement with truthful vouchers and accurate documentation.

Put simply, the Handbook and federal laws Congress has made applicable generally to all persons and specifically to itself impose a duty of honesty and both necessarily operated on the assumption that Defendant Schock "would not lie" in submitting and certifying his vouchers, including for non-existent mileage and multimedia services and the redecoration of his Washington Congressional office. *Rostenkowski*, 55 F.3d at 1305; *Durenberger*, 48 F.3d at 1244. Drawing this distinction requires no resolution of ambiguities in the House's regulations.

Moreover, as in *Durenberger*, "[t]he question is not whether [Defendant Schock] was entitled to reimbursement if he had submitted truthful vouchers, but whether the false statements in his vouchers [which totaled significantly more than the $3,825 in *Durenberger*] were material because they were capable of influencing the [House's] reimbursement decision." *Id.* at 1244. To that question, "[t]he answer quite clearly is yes, it was material to the *amount* of reimbursement." *Id.* Even if Defendant Schock is correct that any of the relevant MRA regulations are ambiguous about what he could be reimbursed for, "the [regulations] demanded vouchers that were truthful about this." *Id.* Neither the general mail and wire fraud statutes, nor the specific false statement statute, require an actual loss or a successful scheme. *See United States v. Leahy*, 464 F.3d 773, 786-87 (7th Cir. 2007) (mail and wire fraud "statutes do not require the government to prove either contemplated harm to the victim or any loss"). And by making it a criminal offense to submit "any materially false, fictitious, or fraudulent statement" or to cover[] up by any scheme . . . a material fact . . . including a claim for payment . . . or a document required by law, rule, or *regulation* to be submitted to . . . any office or officer within the legislative branch[,]" 18 U.S.C. § 1001(a), (c), Congress has left no doubt that "it has empowered the executive and judicial branches to enforce" the law. *Durenberger*, 48 F.3d at 1246 (quoting *Rose*, 28 F.3d at 1246); *see also United States v. Jefferson*, 623 F.Supp.2d 678, 682 (E.D. Va. 2009) (Under the "authorization" in the Ethics in Government Act, "Congress indicated its intent not to be the exclusive interpreter of the particular House Rules implicated by the required answers to the financial disclosure statements") (citing *Rose*).

Although Defendant Schock quite clearly is not being prosecuted purely for violations of House regulations, that does not mean such regulations are irrelevant to his case. To the contrary, "[t]he legal standard is the law and rules Congress has passed." *Diggs*, 613 F.2d at 996 n.41. Federal criminal laws are not so detailed and specific that one may determine from the face of a statute whether a defendant has made materially false statements or wrongfully taken property or used it without authorization. For example, the mail, wire, and bank fraud statutes do not purport to describe all the schemes, from small to large, that they prohibit. Thus, it is often the case that:

> in a prosecution for fraud or embezzlement, the Government must show that the defendant diverted the funds of an institution—such as his employer—from an authorized to an unauthorized purpose. In order to make that showing it is typically necessary to enter into evidence the institution's internal rules governing the expenditure of funds . . . A congressman's prosecution for fraud and embezzlement of official funds is no different[.]

*Rostenkowski*, 59 F.3d at 1305; *see also, e.g.*, *Carpenter v. United States*, 484 U.S. 19, 23-24, 27 (1987) (determining misappropriation of property by reference to official policy and practice at Wall Street Journal; rejecting argument that reporter's conduct "in revealing prepublication information was no more than a violation of workplace rules and did not amount to fraudulent activity that is proscribed by the mail fraud statute"); *United States v. Richman*, 944 F.2d 323, 333 (7th Cir. 1991) (mail fraud and wire fraud; legal and ethical standards well known to attorney defendant and to whole community prohibited conduct).

In this prosecution, in order to prove the charged counts against Defendant Schock, the government will be required to establish the materiality of his repeated false statements to the House, his intent to defraud, or that "he diverted congressional funds from authorized to unauthorized purposes." *Rostenkowski*, 59 F.3d at 1305. "As the regulations governing the use of official funds by a congressman, the House [MRA Handbook regulations] are necessary and proper evidence to make that showing." *Id.* Congress has confirmed this necessity by also codifying the terms "regulation" and "rule," pursuant to which a "claim for payment" (voucher) or "document" is "required" to be "submitted . . . within the legislative branch[.]" 18 U.S.C. § 1001(c)(1).

Thus, Defendant Schock's broad claims of ambiguity in the House regulations may be relevant to the weight given to this evidence, but they are not a basis for attacking the justiciability of this entire criminal matter. And, as evidence, the regulations certainly will not require, as he claims, that this Court convert them to equivalent instructions of law other than to instruct the jury that violations of House regulations by themselves do not establish the charged offenses. Defendant Schock's argument erroneously equates a Congressman's "significant discretion and autonomy to determine what is appropriately reimbursed," (Def.Mem. at 13), as he self-servingly puts it, "with the unfettered power to divert monies intended for one purpose to another, completely unauthorized purpose[,]" *Diggs*, 613 F.2d at 996, or to make repeated false statements and defraud the House at his choosing. Defendant Schock's real complaint and the source of his rhetoric, therefore, is not that House regulations will be interpreted in this prosecution, but rather that they are being applied to him at

all. This, however, is a question of immunity, not judicial competence. In reality, Defendant Schock is attempting to use the Rulemaking Clause to intrude upon the powers of the Judicial and Executive Branches. That argument has no merit. *See Rostenkowski*, 59 F.3d at 1305 (noting that "if Rostenkowski's [Rulemaking] argument were accepted it would effectively insulate every Member of Congress from liability under certain criminal laws. Neither the Rulemaking Clause nor the doctrine of the separation of powers requires that result").

Finally, it is of no consequence that Defendant Schock is charged with both mail and wire fraud and violations of the false statement statute made applicable to Congress. Even when Congress has passed legislation addressing specific conduct, that action does not render general criminal statutes inapplicable. *United States v. Hansen*, 772 F.2d 940, 944 (D.C. Cir. 1985) ("It was not necessary for the Congress that enacted the EIGA [Ethics in Government Act] to authorize criminal punishment, for that authorization had been conferred by an earlier Congress, and remained on the statute books"; referring to 18 U.S.C. § 1001), *abrogated on other grounds, Hubbard v. United States,* 514 U.S. 695 (1995). The Supreme Court "has long recognized that when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." *United States v. Batchelder*, 442 U.S. 114, 123-24 (1979). Here, the mail and wire fraud and false statement counts involve the same conduct – a scheme to defraud involving repeated false statements; the mail and wire fraud charges simply allow for charging the conduct as a whole, rather than just some of its individual parts.

### 2. The House Finance Office's Acceptance of Defendant Schock's False Vouchers Does Not Render This Prosecution Non-Justiciable

Defendant Schock further argues that [t]he Finance Office's determination that a certain voucher was reimbursable means that it deemed there was adequate documentation, an act of Rulemaking that may not be the basis of a prosecution." (Def.Mem. at 29) This is yet another argument that has been rejected. This prosecution does not involve any challenge to or second-guessing of the House Finance Office's acceptance of Defendant Schock's fraudulent vouchers. Nor does it involve any question whether the House Finance Office should have processed the payments for the vouchers or whether the House should pay the money back to the federal treasury. "For all the [House Finance Office] knew, the vouchers truthfully reported" his mileage, multimedia services, district and Washington office, and other expenses. *See Durenberger*, 48 F.3d at 1247 ("For all the Committee knew, the vouchers truthfully reported where he had stayed and the expenses he incurred"). Its acceptance of the vouchers "did not mean that members were free to obtain payments from the [House Finance Office] by fraud or deceit." *Id.* at 1246-47 (citing *United States ex rel. Hollander v. Clay*, 420 F.Supp. 853, 858 (D. D.C. 1976)). The question for trial is whether Defendant Schock made repeated false statements to and defrauded the House. That question is for this Court and a federal jury to resolve; it has nothing to do with the Rulemaking Clause.

### 3. *Rostenkowski* Was Wrongly Decided In Part or At Least Has Been Rendered Inapplicable By Congress's Enactment of 18 U.S.C. § 1001(c)

For his non-justiciability argument, Defendant Schock relies entirely on only part of the holding in *Rostenkowski*. There, Congressman Rostenkowski was charged with "seventeen separate violations of six federal statutes—six of which are associated with the general scheme to defraud and eleven of which are each associated with one of four subsidiary 'schemes' to misappropriate funds[.]" *Rostenkowski*, 59 F.3d at 1294. After rejecting Rostenkowski's Speech or Debate and Rulemaking arguments, *id.* at 1302-06, identical to those made here by Defendant Schock, the court found certain allegations of the indictment to be non-justiciable. *Id.* at 1310-11. In so doing, the court quoted its earlier decision in *United States ex rel. Joseph v. Cannon*, where it held that "[i]n the absence of any discernible legal standard or even of a congressional policy determination that would aid consideration and decision of the question raised . . ., we are loathe to give . . . an interpretation that would require the judiciary to develop rules of behavior for the Legislative Branch." 642 F.2d 1373, 1385 (D.C. Cir. 1981).

Following *Cannon*, the *Rostenkowski* court concluded that "judicial interpretation of an ambiguous House Rule runs the risk of the court intruding into the sphere of influence reserved to the legislative branch under the Constitution . . . [and] interpreting the Rule differently than would the Congress itself." *Id.* at 1306. Thus, the court held that "unless we can determine that the facts set out in a particular allegation could not be authorized under any reasonable interpretation of the House Rules, we must find that allegation non-justiciable." *Id.* at 1310. Applying that standard, the court further

held certain allegations of the indictment that required a distinction in the House regulations between "official" and "personal" use to be ambiguous and therefore non-justiciable. *Id.* at 1307-11. In other words, because the court concluded that the House Rules were ambiguous as to this distinction, it was not reasonably clear that there could be any embezzlement or conversion. *Id.*

As to other counts of the indictment, including "submitting postage stamps to get cash[,]" or the submission of "fraudulent lease agreements" that falsely represented that Rostenkowski sought reimbursement from the House for the leasing of a car that he actually purchased and owned, the court found that those charges "require[d] no interpretation of ambiguous House Rules" (postage stamps for cash) or "no judicial interpretation of any House Rule at all" (fraudulent lease payments). *Id.* at 1312. The court held that: (1) "under no reasonable interpretation of that Rule (or of any other of which we are aware) would a congressman be authorized to submit a voucher for postage stamps and get cash in exchange"; and (2) "[a] court is well able to discern the difference between 'leasing' a vehicle and 'purchasing' (or 'owning') a vehicle, and there is no need to determine whether Rostenkowski used the purchased vehicles for 'official' or for 'personal' purposes." *Id.* The court further held that "no section of the House Rules that could be interpreted to authorize a Congressman to cause the Government to pay for his purchase of a vehicle (by falsely representing that he is leasing the vehicle, no less) for use as a mobile district office." *Id.*

Defendant Schock selects only a small part of the holding of *Rostenkowksi* in support of his central argument that the entire indictment in this case should be

dismissed, with *prejudice* no less. (Def.Mem. at 54) Before addressing this unsupported argument, we first submit that the *Rostenkowski* court's non-justiciability holding was incorrect or, at the very least, was rendered inapplicable after Congress's overruling of *Hubbard* and enactment of 18 U.S.C. § 1001(c) just one year after *Rostenkowski* was decided.

First, the Speech or Debate Clause is the constitutional provision expressly precluding the use of certain types of evidence in prosecutions of Congressmen. As noted in the previous argument, recognizing that this Clause was not intended "to make Members of Congress super-citizens, immune from criminal responsibility," *United States v. Brewster*, 408 U.S. 501, 516 (1972), "the Supreme Court has restricted congressional speech immunity to 'legislative acts.'" *Rose*, 28 F.3d at 187. The *Rostenkowski* court rightly rejected all of Rostenkowski's Speech or Debate Clause claims, but then extended to him an unprecedented form of immunity extending far beyond "legislative acts." In doing so, it was the first court to narrow or dismiss part of a criminal indictment because of the Rulemaking Clause. Moreover, the notion that the doctrine of non-justiciability may be used to expand the protections afforded by the Speech or Debate Clause has been rejected by the Supreme Court itself. *See Davis v. Passman*, 442 U.S. 228, 235 n. 11 (1979) (in rejecting Congressman Passman's non-justiciability argument, the Court stated: "Since the Speech or Debate Clause speaks so directly to the separation-of-powers concerns raised by [Passman]," if the congressman were not shielded by that Clause, adjudication of the plaintiff's discrimination claim against him would fall "within the traditional role accorded courts to interpret the

law."); *see also Diggs*, 613 F.2d at 1001 (in rejecting non-justiciability arguments nearly identical to those made in *Rostenkowski*, the court stated that "Article I, § 5 does not immunize a member of Congress from the operations of the criminal laws.").

Nor is there any textual basis for concluding that the Rulemaking Clause was intended to serve an immunizing function. It is found amid other provisions of Article I, Section 5, which address procedural matters such as the determination of membership and establishment of a quorum. It speaks of rules of proceedings, rather than freedom from arrest or from being questioned in any other place (as does Article I, Section 6). Thus, the Rulemaking Clause "simply means that neither [the Courts] nor the Executive Branch may tell Congress what rules it must adopt." *Vander Jagt*, 699 F.2d at 1173. The prosecution of Defendant Schock plainly does not seek to impose rules upon the House or to invalidate rules or regulations that it has adopted, but rather it involves his making repeated false statements and defrauding the House pursuant to those regulations, which Congress has established is a criminal offense.

Second, the "Rules and Regulations" in *Rostenkowski,* 59 F.3d at 1296, and the "regulations" here in the MRA Handbook (Def.Ex. C), are not "Rules of [House] Proceedings" under Article I. They are substantive "regulations" that Congress has established in federal law to govern the internal payment of office and staff expenses with federal taxpayer funds, *see* 2 U.S.C. §§ 5341(d), pursuant to which a false claim or document submitted to Congress for payment is a criminal offense. 18 U.S.C. § 1001(a), (c). Congress has specifically distinguished between "rules" and "regulations" in those statutes. *See id.* Thus, it does not make sense to conclude that Congress's use of the term

"regulations" is merely surplusage. *Arlington Central School Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 299 n. 1 (2006) ("[I]t is generally presumed that statutes do not contain surplusage"). Moreover, when the Supreme Court has considered the effect of the Rulemaking Clause, the issue has involved rules of parliamentary procedure. *See Yellin*, 374 U.S. 109 (1963) (rules for conducting committee hearings); *Christoffel*, 338 U.S. 84 (1949) (rules for determining a quorum at committee hearing); *Smith*, 286 U.S. 6 (1932) (Senate rules for reconsideration of vote confirming or rejecting nomination by President); *Ballin*, 144 U.S. 1 (1892) (validity of House rules for determining a quorum reviewed in order to decide whether "[an] act was legally passed").

Third, the centerpiece of the holding in *Rostenkowski* is the premise that "a sufficiently ambiguous House Rule is nonjusticiable." 59 F.3d at 1306. Yet, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury*, 5 U.S. (1 Cranch) at 177. There is nothing peculiar about the present context that prevents a court from performing its traditional role. Indeed, as the *Rostenkowski* court itself recognized, "'[i]t has been long settled . . . that rules of Congress and its committees are judicially cognizable.'" 59 F.3d at 1305 (quoting *Yellin*, 374 U.S. at 114). The *Rostenkowski* court concluded that this well-settled principle must yield in the case of ambiguous rules. 59 F.3d at 1306-1307, 1309-1310. "Where . . . a court cannot be confident that its interpretation [of a House rule] is correct," the court reasoned, "there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making the Rules . . ." 59 F.3d at 1306-1307.

The Supreme Court, however, has never applied the Rulemaking Clause in this manner and instead has not hesitated to interpret Congressional rules and has even gone so far as to disagree with Congress's own interpretation of rules relating to important Congressional functions. In *Smith*, 286 U.S. 6 (1932), the Court disagreed with the Senate's interpretation of its own rules concerning reconsideration of a vote confirming or rejecting a Presidential nomination. Acknowledging that it was "a serious and delicate exercise of judicial power . . . [t]o place upon the standing rules of the Senate a construction different from that adopted by the Senate itself," *id.* at 48, the Court nevertheless recognized that "[a]s the construction to be given to the rules affects persons other than members of the Senate, the question presented is of necessity a judicial one." *Id.* at 33; *see also Yellin*, 374 U.S. 109 (Court disagreed with staff director's application of rules governing conduct of committee hearings). Moreover, the *Rostenkowski* court's aversion to the interpretation of ambiguous House rules was inconsistent with the D.C. Circuit's earlier observations that the Rulemaking Clause "is not analytically different from many other constitutionally enumerated powers" and that it is therefore "not evident why we must treat congressional rules with 'special care,' or with more than the customary deference we show other legislative enactments." *Vander Jagt*, 699 F.2d at 1173.

Finally, since the legislative process was not being threatened in the Rostenkowski prosecution (nor in this prosecution), the only sense in which the separation of powers was at issue there was that the government was attempting to prosecute a former legislator. However, it is the duty of the Executive Branch to enforce

the laws (Article II, § 3) and, because the issues of interpretation presented in *Rostenkowski* arose in the regular course of a federal criminal prosecution, they were within the traditional scope of Article III power. *See Nixon*, 418 U.S. 683, 697 (1974). Neither the general doctrine of separation of powers nor the political question doctrine prevents the interpretation of House rules, any more than they precluded the Judiciary from adjudicating a claim of Executive Privilege. *Id.* at 692-697, 703-705; *Nixon v. Sirice*, 487 F.2d 700, 714-715 (D.C. Cir. 1973) (en banc).

Fourth, even assuming *Rostenkowski* was correctly decided in 1995, it was rendered inapplicable by Congress's enactment of 18 U.S.C. § 1001(c) in 1996. More than 50 years ago, the Supreme Court stated in *United States v. Bramblett*, "Congress could not have intended to leave frauds [on the House Disbursing (now Finance) Office] without penalty." 348 U.S. 503, 509 (1955). Just one year after *Hubbard* overruled *Bramblett* in 1995, and following *Rostenkowski,* Congress enacted the Government Accountability Act of 1996, amending 18 U.S.C. § 1001 to make it specifically applicable to the "legislative branch[.]" § 1001(c). In addition to its plain text, which provides that it involves "administrative matters, including a claim for payment, . . . or a document required by law, rule, or *regulation* to be submitted to the Congress or any office or officer within the legislative branch[,]" § 1001(c), the legislative history of this statute makes clear Congress's intent. The House Report provided that:

> [The amendment] explicitly limit[s] the application of section 1001 in a congressional setting to *administrative* and duly authorized investigative matters. As such, section 1001 would continue to apply--as it has in the past--to members of Congress who knowingly and willfully lie on their financial disclosure forms, initiate ghost employee schemes, *knowingly*

> *submit false vouchers, and purchase personal goods and services with taxpayer dollars.*

Government Accountability Act of 1996, H. R. 104-680, at p.3 (104th Congress 2d Session) (emphasis added).

Thus, Congress has established in law the judicial standard found missing in *Rostenkowski* by codifying the terms "regulation" and "rule," pursuant to which the submission of a false "claim for payment" or "document" to the House, which is an "administrative matter[]," is now a criminal offense. And by doing so, Congress has left no doubt that "it has empowered the executive and judicial branches to enforce" the law. *Durenberger*, 48 F.3d at 1246 (quoting *Rose*, 28 F.3d at 1246). As the court in *Jefferson* most recently stated in interpreting the Ethics in Government Act, "Congress indicated its intent not to be the exclusive interpreter of the particular House Rules implicated . . ." *Jefferson*, 623 F.Supp.2d at 682. In light of Congress's enactment of § 1001(c), the government submits that a Member of Congress's submission of false and fraudulent claims for payment of federal funds under his MRA and false statements made to the House Finance Office related to such claims are never protected by the Rulemaking Clause or non-justiciable.

**4. The Fraud and False Statement Charges Are In Any Event Valid Under *Durenberger*, *Rostenkowski*, and 18 U.S.C. § 1001(c)**

In any case, the fraud and false statement charges in the indictment are valid under *Durenberger*, *Rostenkowski*, and 18 U.S.C. § 1001(c). Defendant Schock, however, ignores *Durenberger* and § 1001(c), selectively cites *Rostenkowski*, and argues that "courts have consistently held that the requirements of [House MRA regulations] must be

absolutely clear before the government can utilize the rules in a prosecution." (Def.Mem. at 8) Once again, he makes an assertion that is completely wrong and that reflects the absence of merit in his motion. As demonstrated above, the MRA regulations are "necessary and proper evidence" of the House's "internal rules governing the expenditure of funds[,]" *Rostenkowski*, 59 F.3d at 1305, and, as *Durenberger* and Congress's codification of the regulations in § 1001(c) make clear, they are relevant to "the *amount* of reimbursement[,]" regardless of "what is and what is not reimbursable." *Durenberger*, 48 F.3d at 1244. On the question of what is reimbursable under the House regulations, *Rosetenkowski* held only that "unless we can determine that the facts set out in a particular allegation could not be *authorized* under any reasonable interpretation of the House Rules, we must find that allegation non-justiciable." 59 F.3d at 1310 (emphasis added). What is "abundantly clear" (Def.Mem. at 8), however, from the House regulations, *Durenberger*, *Rostenkowski*, and all other cases is the unambiguous rule in criminal law that Congress has made specifically applicable to itself and that is the basis for this prosecution of Defendant Schock: *Do not lie, submit a false voucher, or engage in a fraudulent scheme to obtain federal funds*.

**a. The MRA Counts**

**i. Mileage Reimbursement: Counts 1 – 5 (Wire Fraud)**

As part of the charged scheme to defraud, Defendant Schock repeatedly submitted false and fraudulent mileage claims (vouchers), with little or no documentation, to the House for reimbursement of official miles that were never

driven. In doing so, he directed his staff to falsify mileage claims to average $1,200 per month (just above his car payment) but not to make it "obvious." At the same time he was submitting false mileage claims to the House, Defendant Schock submitted false and fraudulent mileage claims to his campaign committees. As a result, he was reimbursed for more than 100,000 miles in excess of the miles he actually drove.

Counts 1 through 5 of the indictment charge House mileage payments with federal funds to Defendant Schock as executions of the charged scheme to defraud (wire fraud). These counts will "require no interpretation of ambiguous House Rules" and "no judicial interpretation of any House Rule at all." *Rostenkowski*, 59 F.3d at 1312. This Court and a jury will be "well able to discern the difference between" claims for actual miles driven and fraudulent claims for non-existent miles, "and there is no need to determine whether [Defendant Schock] used [his] vehicles for 'official' or for 'personal' purposes." *Id.* "[N]o section of the House [regulations can] be interpreted to authorize a Congressman to cause the Government to pay for" mileage "by falsely representing that" such mileage was actually driven. *Id.* (holding that fraudulent lease payments were valid charges).

**ii. Decoration of the Rayburn Congressional Office: Counts 8 (Wire Fraud) and 13 (False Statement)**

In November 2014, Defendant Schock hired the same Illinois decorator that had redecorated his Cannon Congressional Office in 2010 to redecorate his Rayburn Congressional Office, at a cost of approximately $40,000, including the purchase of a $5,000 chandelier. As part of the scheme, Defendant Schock caused false and fraudulent

vouchers to be submitted to the House Finance Office, totaling $25,000 in payments to be made to the Illinois decorator. As part of the submission of the fraudulent vouchers, Defendant Schock, through his Executive Assistant, made false representations that the claims were "for services to assist the member in setting up our district and DC offices" and "includes using materials from our district and rearranging/designing/structuring the space to best suit the member and staff's needs," when in fact, the payments were for the decoration of his Washington office only. In an effort to conceal his fraud, Defendant Schock called a meeting with House Finance Office officials, falsely represented to them that the Executive Assistant should never have submitted the claims, and acknowledged that the decoration expenses were personal expenses. He also inquired of those same officials if the House payments would be disclosed to the public if he reimbursed his MRA.

Count 8 of the indictment charges a $15,000 payment to the Illinois decorator as another execution of the scheme to defraud. In addition, Count 13 charges Defendant Schock with submitting a false voucher to the House Finance Office for payment to the Illinois decorator of the $15,000 and related oral and written statements to cause the payment. Like the mileage counts, Counts 8 and 13 are based on false statements in the submitted vouchers and false oral and written statements to the House Finance Office. "Drawing this distinction requires no resolution of ambiguities in the [House's] internal rules. *Durenberger*, 48 F.3d at 1244. The "question" for trial "is not whether [Defendant Schock] was entitled to reimbursement if he had submitted truthful vouchers [or made truthful statements], but whether the false statements in his vouchers [and to the House

Finance Office] were material because they were capable of influencing the [House's] reimbursement decision." *Id.* at 1244. "The answer quite clearly is yes, it was material to the *amount* of reimbursement." *Id.* Even if Defendant Schock is correct that the relevant MRA Office regulations as to the $25,000 decoration expense (including a $5,000 chandelier expense) of his Washington office are ambiguous about what he could be reimbursed for, "the [regulations and federal law] demanded vouchers [and statements] that were truthful about this." *Id.* In short, repeatedly lying is not "*authorized* under any reasonable interpretation of the House Rules[.]" *Rostenkowski*, 59 F.3d at 1310.

Moreover, the MRA regulations unambiguously did not allow for the federal government to reimburse Defendant Schock for an extravagant redecoration of his Washington office. Although he struggles mightily and obviously to parse words such as nominal value, decorations, furniture, furnishings, equipment, meetings, and even oriental rugs, etc., the MRA Office regulations clearly did not authorize reimbursement for furniture, which was already "supplied and maintained by the CAO," and "decorations [above a] nominal value" for his Washington office. The word "nominal" is not ambiguous and means "[n]ot substantial; very small in relation to an expected or required amount; token." *See Oxford English Dictionary*, (definition of "nominal"), available at www.oed.com/view/Entry/127734?redirectedFrom=nominal#eid. And the selected grand jury testimony of the CAO cited in Defendant Schock's memorandum confirms that it means "not a lot" to the House. (Def.Mem. at 41) Like lying, no "reasonable interpretation of the House Rules[,]" *Rostenkowski*, 59 F.3d at 1310, authorized Defendant Schock to seek reimbursement from the federal government for

$25,000 in expenses (including a $5,000 chandelier expense) for the redecoration of his Washington office. Defendant Schock confirmed this lack of ambiguity when he called a meeting with House Finance Office officials, falsely represented to them that the Executive Assistant should never have submitted the claims, and acknowledged that the decoration expenses were personal expenses. His self-serving argument after-the-fact does not create a non-justiciable ambiguity in the House regulations. *See United States v. Kolter*, 1995 WL 25346, at *2 (D. D.C. Jan. 9, 1995) ("The Court cannot credit the interested statements of certain individuals affiliated with the legislative branch as reliable evidence that the intended use of House Rules in this prosecution would offend the Fifth Amendment"), *aff'd.* 71 F.3d 425 (D.C. Cir. 1995).

**iii. Purchase of the $29,021.45 Camera: Count 10 (Mail Fraud) and Count 12 (False Statement)**

As a further part of the charged scheme to defraud, Defendant Schock fraudulently caused the House to reimburse him for his purchase of $29,021.45 in camera equipment from B&H Photo in New York for his use and the use of a Congressional and campaign staff member, who was also Defendant Schock's personal photographer and videographer. To accomplish this part of his fraudulent scheme, Defendant Schock directed a staffer to create fraudulent invoices, falsely representing that the staffer had performed "Multimedia Services" in the amount of $29,021.45, the exact amount of the camera purchase. He then caused his Executive Assistant to submit a fraudulent voucher to the House Finance Office, attaching the staffer's false invoice, and falsely representing to the House that the services provided by the staffer were

"Web Dev, HST, EMAIL & RLTD SERV." Despite the fact that the staff member never provided such services, Defendant Schock caused the voucher to be submitted under his name and certified as accurate. Following the submission of the false voucher and accompanying false invoice to the House Finance Office, it authorized a payment of $29,021.45 in federal funds to the staff member, who then made direct payments to Defendant Schock's personal credit card account for the purchase of the camera equipment.

Count 10 of the indictment charges the mailing of the camera equipment from New York to Peoria as another execution of the scheme to defraud. In addition, Count 12 charges Defendant Schock with submitting a false voucher and accompanying false invoice to the House Finance Office for payment of $29,021.45 to the staff member for "WEB DEV HST, EMAIL & RLTD SERV."

In short, Counts 10 and 12 charge that Defendant Schock repeatedly lied, knowingly caused others to lie, and submitted false statements concerning non-existent multimedia services to cause the federal government to reimburse him for the purchase of camera equipment. The question is not, as Defendant Schock argues, whether he could have purchased a camera for his office or the choice of the transaction code used on the voucher, but whether he acted with the intent to defraud, knowingly made false statements, and knowingly submitted a false voucher. Like fraudulent mileage and lease payments, this requires "no judicial interpretation of any House Rule at all." *Rostenkowski*, 59 F.3d at 1312.

**b. Non MRA-Related Counts**

Other parts of the scheme to defraud and other charged counts in the indictment do not involve MRA funds but rather involve Defendant Schock unlawfully converting and attempting to convert campaign committee, and other funds, including funds from his own constituents (Count 9).

**i. Retention of Fly-In Fees: Count 9 (wire fraud)**

As part of the charged scheme to defraud, Defendant Schock hosted an annual "Congressman Aaron Schock Washington, DC Fly-In" in which constituents traveled to Washington, at their own expense, and attended various meetings with political leaders arranged by Defendant Schock and his staff. As part of the solicitation for the fly-in events, Defendant Schock publicly distributed an advertisement, in which he represented that fly-in participants would be charged a "Fly-in Conference Fee," which covered two days of events, meals, and program materials. To facilitate collection of this registration fee and to defray fly-in expenses, Defendant Schock utilized two unofficial bank accounts, one of which was in the fictitious name of "Global Travel International." He then caused staff members to deposit fly-in funds collected from constituents into, and pay fly-in expenses out of, the unofficial accounts. At no time did Defendant Schock inform his constituents or fly-in participants that he intended to personally profit from the fly-in events or their payment of registration fees.

As a further part of the scheme, and following the June 2011 fly-in event, Defendant Schock caused $4,482.21 in excess fly-in event funds to be paid to him personally. In so doing, he violated House Rules, which prohibited him from using his

official position for personal gain and which required him to return any excess funds to the fly-in participants or donate such funds to charity. Defendant Schock also failed to disclose this additional income on his annual financial disclosure form.

Count 9 alleges as an additional execution of the scheme to defraud that Defendant Schock attempted to personally profit again from the fly-in event. He did so by submitting a false and fraudulent invoice via an interstate email communication in the amount of $11,000 for "Services Rendered" in the name of his limited liability corporation, Menards Peoria LLC, for payment from excess fly-in funds and directing that a check for $11,000 be mailed to him at his residence in Peoria.

In challenging Count 9, Defendant Schock erroneously contends that the government is attempting to criminalize a House rule concerning outside income. On the contrary, he is charged again with fraud and lying, only this time to his own constituents by fraudulently soliciting funds from them for registration fees and diverting the excess funds to his personal use and fraudulently sending a false invoice to the holder of his unofficial account for additional excess constituent funds. The references to the House Rules in the indictment, which clearly prohibited Defendant Schock from using his official position for personal gain and generating and personally receiving a surplus from an unofficial account, are relevant to his knowledge and intent to defraud. This is entirely appropriate. *See Rostenkowski*, 59 F.3d at 1305; *Carpenter*, 484 U.S. at 23-24, 27; *Richman*, 944 F.2d at 333. They alone, however, do not establish mail fraud, and the government expects the jury will be so instructed. Even in the absence of the referenced rules, the charge clearly alleges that Defendant Schock lied to and

defrauded his own constituents. It simply raises no issue concerning the justiciability of House rules.

**c. The Remaining Non-MRA Counts**

The remaining non-MRA counts involve allegations that the charged scheme to defraud included Defendant Schock's fraudulent conversions of campaign funds (Counts 6-7) (payment for Chicago Bears trip and purchase of Super Bowl tickets); falsifying of campaign records and FEC filings related to the expenditure of campaign funds (Counts 14 -18); and filing of false federal income tax returns from 2010 through 2015 (Counts 19 -24). As with Count 9, these charges do not involve government funds and raise no issues concerning ambiguous House regulations or rules.

## IV. This Prosecution Does Not Violate the Due Process Clause

In the third leg of his constitutional arguments, Defendant Schock argues that "because the fraud and false statement charges are premised on ambiguous rules, the relevant statutes are unconstitutionally vague as applied." (Def.Mem. at 51) He further complains that "the fraud and false statement counts are predicated on violations of House rules that, as construed by these prosecutors after-the-fact in the Indictment, could not provide fair notice to Mr. Schock that his conduct would violate them." (Def.Mem. at 51-52) Finally, Defendant Schock claims that "[t]he House rules at issue here could plausibly be interpreted ninety-three different ways by each of the U.S. Attorneys across the country, leaving the prosecution of Members for administrative 'violations' of ambiguous rules to the whim of the executive branch." (Def.Mem. at 52)

Defendant Schock's arguments and his constant rhetoric are self-evidently without merit. No court addressing a criminal case involving a Member of Congress has accepted such broad and unsupported claims. In any event, as demonstrated extensively in this response, this prosecution is based on an unambiguous rule in the criminal law, applicable to laborer and Congressmen alike: do not lie or engage in a scheme to lie to obtain government or other funds. It does not depend on *any* ambiguous rule, from the House or otherwise. Nor, despite Defendant Schock's rhetoric, does the Department of Justice establish standards of criminal law. *United States v. Hsia*, 176 F.3d 517, 526 (D.C. Cir. 1999) ("the Department of Justice has no authority to develop substantive standards of its own. As a criminal enforcer, it brings cases in federal court, where judges interpret the underlying statutes without deference to the Department").

Moreover, as described in the background section of this response, each of the charged offenses have as an essential element that Defendant Schock knowingly made a false statement and acted willfully, or with the intent to defraud, impede, obstruct, or influence. The constitutionality of an allegedly vague statutory standard "is closely related to whether that standard incorporates a requirement of *mens rea*." *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) (citations omitted). Due process concerns about notice are "ameliorated" when a statute contains a scienter requirement. *See Hill v. Colorado*, 530 U.S. 703, 732 (2000).

Finally, an as-applied vagueness challenge in a motion to dismiss is inappropriate because the government's proof at trial will further demonstrate that

there was adequate notice. *See United States v. Turner*, 842 F.3d 602, 605 (8th Cir. 2016). Defendant Schock's as-applied challenge to the entire indictment as this pre-trial stage should therefore be denied.

## V. Defendant Schock's Motion to Dismiss the Indictment Should Be Denied

Defendant Schock requests that this Court dismiss the indictment with prejudice. As established in this response, there is no basis to dismiss the indictment and certainly no basis to do so with prejudice. Even if the Court determines that some allegations in the indictment are non-justiciable, it should not dismiss the entire indictment. *Rostenkowski* did not conclude that the charges resting on ambiguous standards had to be dismissed in their entirety. Instead, it directed the district court to "disregard the allegations of the indictment that we have determined are non-justiciable." 59 F.3d at 1313. *United States v. Johnson*, 383 U.S. 169, 185 (1966) (Noting that the government "should not be precluded from a new trial on this count, thus wholly purged of elements offensive to the Speech or Debate Clause").

Thus, if this Court concludes that some of the allegations in the indictment are non-justiciable, it should simply strike those allegations. At the very least, Defendant Schock is incorrect that the indictment should be dismissed with prejudice. If the Court were to dismiss the indictment, the law does not preclude the government from superseding the indictment to correct any errors and provide additional details establishing that the House regulations are sufficiently clear.

## VI. Defendant Schock's Motion to Dismiss Counts 14 to 18 of the Indictment Should Be Denied

In his second motion to dismiss, Defendant Schock argues that Counts 14 to 18 of the indictment should be dismissed. This motion should likewise be denied.

### A. Background

Counts 14 through 18 of the indictment charge Defendant Schock with violating 18 U.S.C. § 1519 by causing the making of false campaign committee records and the filing of false reports with the Federal Election Commission (FEC).[3] More specifically, each count charges that he did the following "with the intent to impede, obstruct, or influence the proper administration of a matter within the FEC's jurisdiction and in relation to and contemplation of such matter":

(1) knowingly caused Schock Victory Committee's records on an April 15, 2014, FEC filing to falsely report that a payment of $10,025 to the National Football League was a "[Joint Fundraising Committee] Event Tickets" expense of the Schock Victory Committee, and that a payment of $3,861.92 was a "JFC Airfare" expense of the Schock Victory Committee (count 14);

---

3 Section 1519 provides:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

(2) knowingly caused GOP Generation Y's Fund's records on a May 20, 2014, FEC filing to falsely report that a payment of $7,500 to Schock and a Washington D.C. law firm was for a "PAC Legal Fees" expense of the GOP Generation Y Fund (count 15);

(3) knowingly caused Schock for Congress's records on an August 14, 2014, FEC filing to falsely report that a payment of $4,192.50 was a "Transportation" expense of Schock for Congress (count 16);

(4) knowingly caused Schock for Congress's records on an October 15, 2014, FEC filing to falsely report that a payment for a Chevrolet Tahoe for Schock in the amount of $73,896.96 and the payment of a vehicle for his district chief of staff in the amount of $27,533.41 were "transportation expense[s]" of Schock for Congress and a payment to Schock in the amount of $9,433.20 was a "mileage reimbursement" expense of Schock for Congress (count 17); and

(5) knowingly caused GOP Generation Y Fund's records on an October 20, 2014, FEC filing to falsely report that a payment to Schock in the amount of $8,921.36 was a "PAC mileage reimbursement" expense of GOP Generation Y Fund (count 18).

In his motion to dismiss, Defendant Schock contends that counts 14 through 18 of the indictment must be dismissed because (1) charging him under 18 U.S.C. § 1519 with his false FEC filings upsets the balance Congress created in the Federal Election Campaign Act (FECA) for the reporting of campaign finances, (Def.Mem. at 7-19); (2) § 1519 does not apply to a federal agency's passive receipt of documents because serving as a mere clearinghouse does not involve a 'matter' or its 'proper administration, (*id.* at 24-36); and (3) absent what Defendant Schock claims is a proper

construction of § 1519, the statute is unconstitutional as applied to him. (*Id.* at 19-24, 36-37) We address these arguments in turn.

**B. Analysis**

**1. When Multiple Statutes Apply To The Same Conduct, The Government Has Discretion To Choose Under Which Statute To Proceed**

Defendant Schock's argument (Def.Mem. at 7-15) that applying § 1519 to the conduct charged in counts 14 through 18 would undermine or "displace" FECA runs headlong into the established principle that "when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants. . . . Whether to prosecute and what charges to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion." *United States v. Batchelder*, 442 U.S. 114, 123-24 (1979) (citations omitted). When Congress passed § 1519 as part of the Sarbanes-Oxley Act of 2002, Pub. L. 107-2014, 116 Stat. 745 (July 30, 2002), it did so with a full understanding of the FECA, and nothing in the plain language of § 1519 carves out an exception for matters relating to federal campaign finances or the FEC or records kept for such purposes.

Defendant Schock's argument that applying § 1519 to his alleged conduct "would disrupt in numerous ways Congress's delicate balance between protecting First Amendment rights and enforcing campaign finance laws." (Def.Mem. at 15). Yet, nowhere does he cite any authority supporting his implied argument that he (or anyone else) has a First Amendment right to "knowingly" make (or cause to be made) false campaign committee records or false statement to the FEC with the requisite "intent" to

impede, obstruct, or influence matters or contemplated matters on which the agency has the power to act. *See United States v. Cueto*, 151 F.3d 620, 634 n.11 (7th Cir. 1998) ("Speech which is false and misleading is not protected by the First Amendment's right to freedom of speech.") (citations omitted). Contrary to Defendant Schock's contentions, knowingly false statements, with the intent to impede, obstruct, or influence a matter under a federal agency's jurisdiction do not come anywhere near "core political speech," (Def.Mem. at 17), not even for a candidate for Congress.

Equally unpersuasive is his contention that, because § 1519 has only a "knowingly" *mens rea*, "[t]he substitution of Section 1519 for an FECA crime would lead to the paradoxical result that a Title 18 offense aimed at corporate document shredding (1519) could be used to supply a four-fold increased sentence over that provided by FECA for conduct that could not even be criminal under the FECA." *See* 52 U.S.C. § 30109(d)(1)(A) (FECA criminal statute requiring a *mens rea* of "knowingly and willfully").

It is far from clear that § 1519 has a lesser *mens rea* than the FECA. Not only must the government prove the existence of a knowingly false FEC filing (or underlying, supporting document), but it must also prove the "intent to impede, obstruct, or influence" the agency. *See* § 1519. It is rather implausible that one who knowingly causes the filing of a false report with the intent to impede, obstruct, or influence a matter within the agency's jurisdiction would ever believe that such conduct was lawful. Nevertheless, whatever theoretical merit there may be to Defendant Schock's *mens rea* argument, *Batchelder* forecloses the relief he seeks on that theory. As *Batchelder*

recognized, Congress may pass two statutes with different elements and different penalties to address the same conduct, and the government may elect to prosecute under either (or both, consistent with double jeopardy principles). *See* 442 U.S. at 124-25. Further, the purported "four-fold increased sentence" under § 1519 "does not empower the Government to predetermine ultimate criminal sanctions." *Id.* 125. As the *Batchelder* Court concluded:

> The provisions at issue plainly demarcate the range of penalties that prosecutors and judges may seek to impose. In light of that specificity, the power that Congress has delegated to those officials is no broader than the authority they routinely exercise in enforcing the criminal laws. Having informed the courts, prosecutors, and defendants of the permissible punishment alternatives available under each Title, Congress has fulfilled its duty.

*Id.* at 126.

Notably, in support of his argument that the conduct alleged in counts 14 through 18 cannot (or should not) be charged under § 1519, Defendant Schock refers to 26 U.S.C. § 7206 of the tax code, which he accurately describes as "a targeted statute" that criminalizes fraud and false statements relating to federal income tax returns. (Def.Mem. at 13) That statute, as he points out, has a statutory maximum penalty of "only three years." *Id.* It is not uncommon, however, for fraudulent tax schemes to also be prosecuted under, for example, the federal wire fraud statute, which carries a statutory maximum penalty of 20 years in prison, or nearly a seven-fold increase above that provided by § 7206. *See* 18 U.S.C. § 1343. *See also, e.g., United States v. Patridge*, 507 F.3d 1092 (7th Cir. 2007). In other words, despite the heavily-codified and regulated, intricate, and nuanced tax code, as well as the administrative and civil enforcement

authority of the IRS, broader and more general criminal statutes may apply and are used by the government to prosecute tax-related offenses. This, in turn, further undermines Defendant Schock's argument that his alleged conduct is not prosecutable under the more general provision of § 1519. *See Batchelder*, 442 U.S. at 125 ("defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment").

**2. Campaign Records and FEC Reports Relate to a "Matter" Within The Jurisdiction of the FEC**

Defendant Schock further argues that the term "matter" found in § 1519 requires the "'confined interpretation'" of "a 'formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." (Def.Mem. at 26) (quoting *McDonnell v. United States*, 136 S. Ct. 2355, 2369, 2372 (2016)). Similarly, he contends that the phrase "proper administration" supports the same conclusion. (Def.Mem. at 29-30-34) He further argues that the rule of lenity requires this Court to apply his purported reasonable reading of the statute. His contentions are not meritorious.

"The phrase "matter within the jurisdiction of" a federal department or agency comes directly from 18 U.S.C. § 1001, *see* S. Rep. No. 107-146, 15 n.15, where it has an established meaning. "The most natural, nontechnical reading of the statutory language is that it covers all matters confided to the authority of an agency or department." *United States v. Rogers*, 466 U.S. 475, 479 (1984). "A department or agency has

jurisdiction, in this sense, when it has the power to exercise authority in a particular situation." *Id.* (citation omitted).

Defendant Schock's reliance (Def.Mem. at 26-28) on the *McDonnell* Court's construction of the term "matter" in 18 U.S.C. § 201 is misplaced. *McDonnell*'s holding that the term "matter" in the federal bribery statute requires "a formal exercise of governmental power that is similar in nature to a lawsuit, administrative determination, or hearing" came directly from § 201's text, which included "matter" as a general term in a list that included the more specific and related terms of "cause, suit, proceeding or controversy." 136 S. Ct. at 2368-70 (applying the construction cannon of *noscitur a sociis*). *See also* 18 U.S.C. § 201(a)(3). In contrast, § 1519 does not contain a similar list whose "company ['any matter'] keeps." *Id.* at 2368.

In *Ali v. Federal Bureau of Prisons*, 552 U.S. 214 (2008), the Supreme Court interpreted 28 U.S.C. § 2680(c), which provides that the general waiver of sovereign immunity found in the Federal Tort Claims Act does not apply to claims arising from the detention of property by "any officer of customs or excise or *any other law enforcement officer*." The question in *Ali* was whether the emphasized phrase applies only to law enforcement officers enforcing customs or excise laws, or if it is applies literally to "all" other law enforcement officers. In concluding the phrase "any other law enforcement officer" means just what it says and is not informed by "any officer of customs or excise," the Court rejected Ali's reliance on the related interpretive principles of *noscitur a sociis* ("a word is known by the company it keeps") and *ejusdem generis* ("when a general term follows a specific one, the general term should be

understood as a reference to subjects akin to the one with specific enumeration"). *Id.* at 223-26.

Concerning the *ejusdem generis* canon, the Court concluded that "the structure of the phrase 'any officer of customs or excise or any other law enforcement officer' does not lend itself to application of the canon" because "[t]he phrase is disjunctive, with one specific and one general category, not . . . a list of specific items separated by commas and followed by a general or collective term." *Id.* at 225. The same is true with respect to the phrase "the investigation or proper administration of any matter" found in § 1519. "The absence of a list of specific items undercuts the inference embodied in *ejusdem generis* that Congress remained focused on the common attribute when it used the catchall phrase." *Id.*

Addressing the interpretive principle of *noscitur a sociis*, the *Ali* Court similarly concluded that there were insufficient "contextual clues" to overcome the plain meaning of the phrase "any other law enforcement officer." *Id.* at 227. Here, and perhaps even more so than in *Ali*, the clearly diverse, purported contextual clues on which Defendant Schock relies—*i.e.*, "investigation" and "any case filed under [the bankruptcy code]"—are insufficient to narrow the plain meaning of § 1519's phrase "or proper administration of any matter."

Additionally, while this Court need not rely on legislative history to interpret the plain language of § 1519, the history of that statute does not support Defendant Schock's "'confined interpretation'" of "matter": "a 'formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an

agency, or a hearing before a committee." (Def.Mem. at 26) Instead, the history supports the conclusion that § 1519 is to be neither tied "to a pending judicial proceeding" or to the "type of government function [that is] obstructed." S. Rep. 107-146, 14. The statute's legislative history further provides:

> Section 1519 is meant to apply broadly to any acts to destroy or fabricate physical evidence so long as they are done with the intent to obstruct, impede or influence the investigation or proper administration of any matter, and such matter is within the jurisdiction of an agency of the United States, or such acts done either in relation to or in contemplation of such a matter or investigation. This statute is specifically meant not to include any technical requirement . . . to tie the obstructive conduct to a pending *or imminent proceeding* or matter. It is also sufficient that the act is done "in contemplation" of or in relation to a matter or investigation. It is also meant to do away with the distinctions . . . between court proceedings, investigations, regulatory or administrative proceedings (whether formal or not), *and less formal government inquiries, regardless of their title*.

*Id.* at 14-15 (emphasis added).

Defendant Schock's argument that Congress's use of the term "matter" connotes "an actual concrete matter for agency action" and that the FEC itself uses the term "matter" to mean a "matter under review" reads out of § 1519 one of its critical features: the prosecution of a defendant who, in contemplation of a federal matter, acts with intent to impede, obstruct, or influence the administration of the matter. *See United States v. Yielding*, 657 F.3d 688, 711 (8th Cir. 2011) (discussing three scenarios the intent element of § 1519 encompasses); *id.* at 715 ("sufficiency on one of the theories is enough to sustain the conviction"). Plainly stated, by criminalizing a knowingly false statement made with the intent to impede, obstruct or influence the administration of a matter the defendant contemplates, § 1519 is not limited to "an actual concrete matter for agency

action." A contemplated matter is not "concrete." *See id.* at 714 ("'Contemplation' is commonly understood as 'an act of the mind in considering with attention,' as well as 'the act of looking forward to an event' and 'the act of intending or considering a future event.'"). *See also United States v. Gray*, 642 F.3d 371, 379 (2d Cir. 2011) ("§ 1519 does not require the existence or likelihood of a federal investigation").

Further, this Court cannot conclude at this phase of the criminal proceedings that, as a matter of law, Defendant Schock, for example, did not contemplate a matter within the jurisdiction of the FEC and act with the intent to impede, obstruct, or influence the administration of the matter, when he allegedly knowingly caused false campaign committee records and the filing of false FEC reports. It was not some mere formality that his political committees had to keep track of expenditures and file reports with the FEC concerning those expenditures. The law required such records and reports, and those items were subject to review and audit by the FEC, as well as civil enforcement action upon meeting FEC thresholds. *See, e.g.*, 52 U.S.C. §§ 30102(c) and (d) (record retention), 30104 (required reports), 30109 (enforcement actions), 30111 (administrative provisions, providing that the FEC "may conduct audits and field investigations of any political committee required to file a report under section 3104"). *See also* 11 C.F.R. §§ 102.9, 104.14, 104.16.

Taking as true the allegations in the indictment, the records and FEC reports specified in counts 14 through 18 were false, and Defendant Schock knowingly caused those false records and reports with the intent to, among other things, influence a contemplated matter within the jurisdiction of the FEC. Such conduct falls within the

plain reading of § 1519, and it should be for a jury to decide whether, for example, he did so to influence a possible review or audit by the FEC.[4] Defendant Schock's attempt to limit § 1519 to "investigations, formal administrative proceedings, and bankruptcy cases" finds insufficient textual support from the statute.

Lastly, the rule of lenity does not apply. "The rule . . . is designed to help resolve ambiguities, not create them." *United States v. Marcotte*, 835 F.3d 652, 656 (7th Cir. 2016). Defendant Schock, through reliance on unnecessary principles of statutory construction in the face of plain language, has done nothing more than attempt to create an ambiguity where none exists. Given that the phrase "matter within the jurisdiction of" in § 1519 comes directly from 18 U.S.C. § 1001, where it has an established meaning, there is no ambiguity that permits this Court to apply the rule of lenity. *See United States v. Balint*, 201 F.3d 928, 935 (7th Cir. 2000) (rule of lenity unavailable when "plain language of the statute construed to effect the intent of the drafters leaves . . . no choice regarding the conduct Congress has criminalized").

**3. Section 1519 Does Not Violate The Due Process Clause or Any Other Constitutional Provision or Principle, As Applied To Defendant Schock**

Defendant Schock argues that, absent his proffered narrow construction of § 1519, the statute is unconstitutional as applied to him under the Due Process Clause of the Fifth Amendment. (Def.Mem. at 19-24, 36-37). A statute is void for vagueness if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct

[4] As charged in counts 14 through 18, the theory of criminal liability is not limited to such circumstance.

is forbidden by the statute" or if "it encourages arbitrary and erratic arrests and convictions." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972).

The constitutionality of an allegedly vague statutory standard "is closely related to whether that standard incorporates a requirement of *mens rea*." *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) (citations omitted). Due process concerns about notice are "ameliorated" when a statute contains a scienter requirement. *See Hill v. Colorado*, 530 U.S. 703, 732 (2000).

The intent element of § 1519 encompasses three possible scenarios: "(1) a defendant acts with intent to impede, obstruct, or influence the investigation or proper administration of a federal matter, (2) a defendant, in contemplation of a federal matter, acts with intent to impede, obstruct, or influence the investigation or proper administration of the matter, and (3) a defendant, in relation to a federal matter, acts with intent to impede, obstruct, or influence the investigation or proper administration of the matter." *Yielding*, 657 F.3d at 711 (citing *United States v. Hunt*, 526 F.3d 739, 743 (11th Cir. 2008)).

Section 1519's requirements of demonstrating (1) the knowing falsification of campaign records and/or knowing falsification of reports to a federal agency (or, in this case, the knowingly causing of such acts), and (2) the requisite intent does not, as Defendant Schock contends, "allow[ ] [for] arbitrary and discriminatory enforcement" or "cast a net large enough to catch all possible offenders while leaving it to the courts to step inside and say who could be rightfully detained," or permit the "arbitrar[y]

suppress[ion] [of] First Amendment liberties." (Def.Mem. at 20-21) (citations and quotation marks omitted).

Moreover, given the *mens rea* requirements of § 1519, simple "errors and omissions" or "occasional misstatements" in FEC reports are not prosecutable under the statute, just as they are not under any other federal criminal statute. Further, the plain text of § 1519 does not permit the government (or any individual prosecutor) to create "individualized reporting standards." (Def.Mem. at 23) *See also United States v. Hsia*, 176 F.3d 517, 526 (D.C. Cir. 1999) ("As a criminal enforcer, [the Department of Justice] brings cases in federal court where judges interpret the underlying statute without deference to the Department."). Additionally, because of § 1519's intent requirement, the mere "knowing provision of inaccurate data that finds its way into a report submitted to a federal agency" is also not prosecutable under the statue. (Def.Mem. at 24) In fact, such conduct is not even prosecutable under 18 U.S.C. § 1001 absent the inaccurate data being "material."

Finally, Defendant Schock's hypotheticals concerning reports from farmers, manufacturers, small businesses, local police departments, and local weather stations, (Def.Mem. at 24, 28), to demonstrate the alleged vagueness of § 1519 are irrelevant to his as-applied challenge. *See United States v. Phillips*, 645 F.3d 859, 863 (7th Cir. 2011) ("when we are presented with an as-applied challenge, we examine only the facts of the case before us and not any set of hypotheticals"). So, too, are his purported concerns with federalism (Def.Mem. at 24, 27, 29) in a case that involves candidate for federal office and reports to a federal agency.

Defendant Schock also repeatedly asserts that a prosecution under § 1519 relating to his campaign committees' FEC filings and related records violates the separation of powers principle as applied to him. Beyond asserting this as fact, he develops no meaningful separation of powers argument. He fails to explain how prosecuting him for knowingly causing the making of false campaign committee records and/or the filing of false reports with an agency of the executive branch on which that agency might act, with intent to influence a matter in the agency's jurisdiction, violates the separation of powers doctrine. His bald statement that such a prosecution constitutes "excessive meddling in the minutiae of a member of Congress's FEC reporting" is insufficient to conclude there is a separation-of-powers issue that results in the dismissal of Counts 14 through 18. (Def.Mem. at 22)

If his argument is that a prosecution under § 1519 violates the separation of powers principle because the FECA was meant as the sole means to prosecute a false FEC report, that argument is mistaken for the reasons already argued. *See Batchelder*, 442 U.S. at 123-26. Moreover, as Defendant Schock acknowledges, the filing and causing of the filing of false FEC filings have been prosecuted under, for example, 18 U.S.C. § 1001, thus demonstrating that the FECA does not have some unspoken preemptive force over other federal criminal statutes in the context of campaign finance. (Def.Mem. at 19 n.10) *See also Hsia*, 176 F.3d at 523 (noting that "the application of [18 U.S.C. § 2(b)] to a conduit contribution scheme has been several times upheld") (citations omitted).

In summary, the alleged parade of horribles on which Defendant Schock relies in arguing that § 1519 is void for vagueness as applied to him -- that the statute infringes

on core political speech as a result of its alleged vagueness or violates the separation of powers doctrine -- do not exist. The statute, as written, and without need for any limiting interpretation, places Defendant Schock on fair notice of what the statute criminalizes and is not otherwise unconstitutional under the additional theories he advances. Accordingly, Defendant Schock's motion should be denied.

## VII. Defendant Schock's Motion to Dismiss Count 11 Should Be Denied

Finally, in his third motion to dismiss, Defendant Schock argues that Count 11, which charges him with theft of government funds, in violation of 18 U.S.C. § 641, should be dismissed. Relying on *United States v. Yashar,* 166 F.3d 873 (7th Cir. 1999), he argues that theft of government funds is not a continuing offense, and that Count 11 is duplicitous and does not provide him with fair notice of the charged offense. Even assuming any of these arguments are correct, dismissal of Count 11 is not the appropriate remedy. *United States v. Powell*, 99 F.Supp.3d 262, 268 (D. R.I. 2015) ("Neither party in their memoranda have cited any cases that dismissed the entire Indictment, and this Court has found none"). "[A]ggregation of multiple transactions into a single Count is permissible." *Id.*

To address Defendant Schock's claims, however, the government agrees to limit its evidence as to Count 11 only to conduct that occurred after November 10, 2011 (within five years of the indictment), and that it will further limit its proof of Count 11 to evidence of false mileage claims and the fraudulent purchase of and payment for the camera equipment in 2014. "[A]ny legitimate concerns about unanimity in the verdict may be addressed at a later time if the case proceeds to trial." *Id.*

Accordingly, Defendant Schock's motion to dismiss Count 11 should be denied.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that Defendant Schock's motions be denied.

Respectfully submitted,

PATRICK D. HANSEN
ACTING UNITED STATES ATTORNEY

BY: s/Timothy A. Bass
Timothy A. Bass, Bar No. MO 45344
Assistant United States Attorney
318 S. Sixth Street
Springfield, IL 62701
Phone: 217/492-4450
Fax: 217/492-4044
tim.bass@usdoj.gov

BY: *s/Eugene L. Miller*
Assistant United States Attorney
201 S. Vine Street, Suite 226
Urbana, IL 61802
Phone: 217/373-5875
Fax: 217/373-5891
eugene.miller@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of June 2017, I filed the foregoing directly with the Clerk of Court using the CM/ECF system, which will send notice to the following:

Counsel of record

s/Timothy A. Bass
Timothy A. Bass, Bar No. MO 45344
Assistant United States Attorney
318 S. Sixth Street
Springfield, IL 62701
Phone: 217/492-4450
Fax: 217/492-4044
tim.bass@usdoj.gov