E-FILED
Friday, 23 June, 2017  04:32:39 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 16-cr-30061-CSB-TSH |
| AARON J. SCHOCK, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT AARON SCHOCK'S CONSOLIDATED REPLY MEMORANDUM IN
SUPPORT OF HIS MOTIONS TO DISMISS THE INDICTMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ..................................................................................................................... 6

I.    The government's Rulemaking Clause arguments hinge on overturning years of
      uniform precedent and do not seriously dispute the ambiguity of the rules at issue ......... 7

      A.    There can be no dispute as to the viability of *Rostenkowski's* holding that a
            criminal prosecution may not imprecate ambiguous House rules ........................... 9

            1.    *Rostenkowski* was correctly decided ............................................. 10

            2.    18 U.S.C. § 1001(c) did not displace *Rostenkowski* ...................................... 13

      B.    Criminal statutes are not exemptions from constitutional protections such as
            the Rulemaking Clause, and the Indictment is non-justiciable because it was
            based on alleged violations of ambiguous House rules .......................................... 14

      C.    The government leaves unrefuted the bulk of Mr. Schock's contentions
            under the Rulemaking Clause .................................................................... 17

            1.    Counts 1-5 (Mileage) call upon the Court to interpret ambiguous
                  House Rules regarding how much documentation of mileage is
                  required and whether mileage is driven for personal, official, or
                  campaign reasons ......................................................................... 18

            2.    Counts 8 and 13 (Decorator and Furnishings) call upon the Court to
                  interpret ambiguous House Rules regarding what "nominal" value
                  means and the definition of furniture .................................................... 20

            3.    Counts 10 and 12 (Camera and Services) call upon the Court to
                  interpret ambiguous House Rules regarding how media services should
                  be described .............................................................................. 21

            4.    Count 9 (Fly-In) calls upon the Court to interpret what it means to
                  improperly exert influence ............................................................... 21

II.   The Speech or Debate Clause applies to exercises of the Rulemaking function
      pursuant to Supreme Court and Court of Appeals precedent ......................................... 22

      A.    *Gravel* clearly brings acts of Rulemaking within the ambit of the Speech or
            Debate Clause ............................................................................. 23

      B.    A criminal statute is not an automatic exemption from Speech or Debate
            protections ................................................................................ 25

      C.    Speech or Debate Clause immunity applies to Mr. Schock's interactions
            with the House administrative apparatus .................................................. 27

III.  The relevant statutes are unconstitutionally vague as applied, violating the Due
      Process Clause. .................................................................................. 29

IV.   Section 1519 does not apply, by its terms, to an agency's passive receipt of
      campaign disclosure reports and Counts 14-18 should therefore be dismissed ............... 30

i

A.    There is no reason Congress would have courts stretch the text of Section 1519 to effectively supersede the careful balance of the FECA ............................ 31

B.    The government's novel application of Section 1519 here would deprive Mr. Schock of due process ......................................................................... 33

C.    The Indictment does not allege any "matter" or its "proper administration" within the meaning of Section 1519 ....................................................... 34

V.    Count 11's undisputed duplicity requires dismissal ...................................... 37

CONCLUSION.................................................................................................... 38

CERTIFICATE OF SERVICE .................................................................................. 41

ii

Defendant Aaron J. Schock, through undersigned counsel, hereby submits this Reply Memorandum in Support of his (1) Motion to Dismiss the Indictment for Violations of the Constitution's Rulemaking, Speech or Debate, and Due Process Clauses and Supporting Memorandum (hereinafter, "Schock Br."), Docket Nos. 76 & 77, (2) Motion to Dismiss Counts 14-18 for Failure to State an Offense and Supporting Memorandum (hereinafter, "MTD Counts 14-18"), Docket Nos. 78 & 79, and (3) Motion to Dismiss Count 11 as Duplicitous and Supporting Memorandum, Docket Nos. 86 & 87.  The government filed a consolidated Response to these three motions.  Docket No. 97 (hereinafter, "Govt. Br.").

## INTRODUCTION

The government's response to Mr. Schock's Motions to Dismiss takes the stunning step of asking this Court to change the law *and* the Indictment in order to allow this prosecution to proceed.  In so doing, the government would tear down the separation of powers so painstakingly built up by the Founding Fathers, usurp the power of the grand jury, and trammel Mr. Schock's constitutional rights.  The government's arguments must be rejected and the defective Indictment *that the government crafted* and that the grand jury returned must be dismissed.

Rulemaking Clause – The Government Argues that *Rostenkowski* Must Be Overruled for this Case to Proceed.  In his opening brief, Mr. Schock explained how the Indictment explicitly referenced various House rules as grounds for assessing criminal liability.  Because those House rules are ambiguous, they would require judicial interpretation for this prosecution to proceed. *United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995), and every case to subsequently consider the issue over the last 20-odd years, has held that judicial interpretation of ambiguous House rules in a criminal proceeding is foreclosed by separation of powers immunity.  The government argues in response that this Court should be *the first in the country* to hold that

1

*Rostenkowski* was wrongly decided, apparently recognizing that the holding of *Rostenkowski* presents an insurmountable hurdle to this Indictment.

In so arguing, the government necessarily posits that a Member of Congress can be criminally prosecuted based on *ambiguous* rules of the House of Representatives.  One must wonder *why* the government would seek to prosecute any individual, much less a Member of Congress, based on ambiguous standards and rules.  Indeed, the government takes that proposition a giant leap further and argues that the rules in the Handbook, which it likes to call "regulations"— terminology that is substantively irrelevant and further invades the House's Rulemaking authority—are simply "evidence" and that any ambiguity in those rules is a matter for the jury to "weigh," *i.e.*, interpret.  So, under the government's view, it is the twelve jurors who can decide what the House rules mean and hold Mr. Schock – or any other Member of Congress – criminally accountable.  The government's assault on *Rostenkowski* must be rejected; the Constitution vests the power to pass House rules in Congress and neither judge, jury, nor prosecutor may wrest that power from the legislative branch.

On the critical issue of whether the House rules included in the Indictment are ambiguous, the government offers essentially no rebuttal to Mr. Schock's arguments.   How much documentation is required for mileage vouchers?  Ambiguous.  When is travel official as opposed to personal?  Ambiguous.  What does "nominal" value mean?  Ambiguous.  Indeed, the then-Chief Administrative Officer ("CAO") testified in the grand jury that most of the exact rules the Indictment now relies upon are "gray areas."  (Grand Jury Testimony of Ed Cassidy (former CAO) 123:23-24 (June 2, 2016), Schock Br., Ex. A.)   Rather than confront these ambiguities, the government instead reimagines this Indictment as one that alleges simply a series of false

statements.  The government may now wish it had sought such an indictment, but the fact is it did not.

The Indictment returned by the grand jury contains lengthy introductory allegations describing the purported scheme to defraud.  That scheme to defraud is a required element of the fraud charges and is also expressly incorporated into every ensuing count (excepting only the tax counts).  These introductory allegations regarding the purported scheme clearly allege, for example, that the documentation supporting Mr. Schock's mileage vouchers was insufficient, and these very charges are alleged to be part of the charged mail and wire fraud schemes.  Indeed, only two counts of the Indictment are for false statements.  The government's choice to craft a scheme that depends on interpretation of ambiguous rules (as well as material privileged under the Speech or Debate Clause), and then to incorporate that scheme throughout the Indictment, is why the entire Indictment must be dismissed, not because Mr. Schock is seeking to be a "super-citizen" immune from criminal liability.  Rather, it is the government that attempts to be a super-enforcer that can target a Member of Congress for prosecution, use improper means to investigate him, and then narrowly confine important separation of powers principles so as to run roughshod over the Constitution.[1]

_Speech or Debate Clause – The Government Ignores_ Gravel, _Would Foreclose Application of the Speech or Debate Clause to the Rulemaking Clause, and Misapprehends the Scope of Mr. Schock's Arguments_.  To read the government's response, one would hardly know that the Supreme Court in _Gravel v. United States_, 408 U.S. 606, 625 (1972), ruled that the Speech or

---

[1] The government also at times describes Mr. Schock's conduct without any caveat of it being charged or alleged, improperly "undermin[ing] the presumption of innocence" and "infring[ing] upon a specific constitutional right."  _Pagano v. Allard_, 218 F. Supp. 2d 26, 34 (D. Mass. 2002).  (_E.g._, Govt. Br. 39 (Schock lacks absolute immunity "for repeatedly lying"); _id._ at 65 ("repeatedly lying" is unauthorized)).

Debate Clause applies not only to floor speeches or votes, but also to "other matters which the Constitution places within the jurisdiction of either House." Assuredly, the Constitution places rulemaking power within the jurisdiction of the House of Representatives; the Rulemaking Clause says as much. So, why, consistent with *Gravel*, would Rulemaking activity not be entitled to Speech or Debate protection? The government offers no answer.

Rather, the government simply asserts that "administrative" matters fall outside the scope of the Speech or Debate Clause. The government's primary support for that assertion is to point to Section 1001, which does in fact contemplate false statement criminal jurisdiction over claims for payment on certain administrative matters in the legislative branch. The government argues that Section 1001's scope is inconsistent with Mr. Schock's arguments. Not so. Section 1001's proscription has many applications that are not implicated by the Speech or Debate Clause. If an independent contractor submits a false voucher to the House administrative office, such independent contractor is certainly subject to Section 1001. If a non-legislative employee of the House submits a false voucher for payment, Section 1001 applies. Or, if a staff member of a Member submits a false voucher on her own behalf, Section 1001 applies. But when Speech or Debate Clause immunity covers the relevant conduct – as it does here – then Section 1001 cannot overcome that *constitutional* immunity.

The primary precedent that the government cites for this "administrative" distinction is, tellingly, wholly inapposite case law regarding judicial immunity. As with its argument to reject *Rostenkowski*, the government asks this Court to break new ground and hold that "administrative" matters—even those within the House's constitutional authority—are outside the protection of the Speech or Debate Clause notwithstanding *Gravel*. This case captures perfectly why *Gravel*'s reservation of matters within the House's jurisdiction is critically important. By the government's

4

reckoning, there is no limit to how deeply into the administrative relationship between Members and the House that the Executive may probe and charge what it determines to be criminal conduct. The chaos that would result in snatching Rulemaking authority from the House and handing it to 93 U.S. Attorney's offices is obvious.

Due Process Clause – The Charges are Premised on Ambiguous and Invented Rules and Standards, Rendering the Relevant Statutes Unconstitutionally Vague As Applied.  Were the government's constitutional overreach just described not egregious enough to warrant dismissal, the manner in which the Indictment tramples on the fundamental Due Process principles of notice and curbing discriminatory enforcement provides a clear basis for doing so.  Here, the government has transformed House rules that were written to leave significant discretion to the Members and the House, and similar FEC reporting standards, into the government's own criminal code based on the government's standards for reimbursement and reporting, demonstrating the very dangers that the Due Process Clause was designed to prevent.

Section 1519 – This Is the First Case that Has Ever Charged a Section 1519 Violation Based Solely on the Federal Election Commission's Passive Receipt of a Disclosure Report.  The government's defense of the Section 1519 charges in Counts 14-18 fares no better.  There is no dispute that the allegations in those counts are right in the Federal Election Commission's wheelhouse, nor any question that Congress wrote the Federal Election Campaign Act (FECA) to balance the public interest in disclosure against the risk of overzealous prosecutions that would deter the best and brightest from running for office.  The government offers no reason why Congress would effectively eliminate the FECA's carefully designed safeguards for core political speech protected by the First Amendment by allowing Section 1519 to cover alleged misstatements in campaign disclosure reports filed with the FEC.  Nor does the government acknowledge that

springing a U.S. Attorney's never-before-revealed standards for campaign reporting in this unprecedented application of Section 1519 poses serious due process problems.  Those indicia of congressional intent and the need to avoid serious constitutional doubts favor what is already the better reading of Section 1519: it does not apply to an agency's passive receipt of reports created in the ordinary course.  Because that is the only alleged basis for applying Section 1519 here, those counts must be dismissed.

Section 641 – The Government Does not Contest that the Charge Is Duplicitous and Improper but Asserts the Power to Unilaterally Rewrite the Indictment.  Last, the government does not dispute that the Section 641 violation alleged in Count 11 is a non-continuing offense, nor does it resist the conclusion that Count 11 is duplicitous.  Instead, the government proposes a post-hoc narrowing of Count 11 in recognition of that undisputed duplicity.  But the grand jury did not return an indictment for that re-written count.  The proper remedy for the facially duplicitous Count 11 is dismissal.

# ARGUMENT

To appreciate the depth of error in the government's arguments, one only needs to consider at the outset that it invites this Court to be the first in the nation to contradict three decades of precedent and rule that, notwithstanding the Constitution's separation of powers provisions, the Executive Branch, through prosecutors, and the Judicial Branch, through this Court, have plenary authority to interpret and apply rules made by the co-equal Legislature and that such rulemaking authority is not "a matter which the Constitution places within the jurisdiction" of the House of Representatives.  Because both holdings are necessary to upholding the Constitutional intrusions that the Indictment in this case embodies, the Court should decline this invitation to err.

6

I.      **The government's Rulemaking Clause arguments hinge on overturning years of uniform precedent and do not seriously dispute the ambiguity of the rules at issue.**

The government's Rulemaking Clause arguments are significant for both what they admit and what they dispute.  Turning first to what they admit, the government does not dispute that the Indictment's allegations regarding House rules are contained in the description of the scheme to defraud.  The government does not dispute that the scheme to defraud is a necessary element of the mail and wire fraud charges.  The government also does not dispute that in order to prove those fraud charges as well as the false statement charges, it must show an intent to divert funds from an authorized to an unauthorized use.  (Govt. Br. 51 ("[I]n order to prove the charged counts against Defendant Schock, the government will be required to establish the materiality of his repeated false statements to the House, his intent to defraud, or that 'he diverted congressional funds from authorized to unauthorized purposes.'" (quoting *Rostenkowski*, 59 F.3d at 1305)).)

*Rostenkowski* holds that if any reasonable reading of the relevant House rules would have authorized the conduct at issue, the charged conduct is non-justiciable.  "[U]nless we can determine that the facts set out in a particular allegation could not be authorized *under any reasonable interpretation* of the House Rules, we must find that allegation non-justiciable."  *Id.* at 1310 (emphasis added).  Therefore, if any reasonable reading of the rules would have authorized the conduct charged as part of the Indictment's alleged scheme, that scheme is non-justiciable and all counts relying on it must be dismissed.

In his opening brief, Mr. Schock identified in detail the numerous reasonable interpretations of the rules that would support the reimbursements in question, (Schock Br. 28-51), as further summarized below.  The government does not generally take substantive issue with those interpretations or make any sustained argument that the rules are unambiguous.  Instead, it contends that *Rostenkowski* was wrongly decided.  But because the scheme, which incorporates

7

ambiguous rules, is an essential element of the fraud charges, the rules are an integral part of the offenses charged and as such would have to be interpreted by the court in jury instructions and found unanimously to have been violated. *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016) (scheme to defraud is an essential element of a fraud charge).

Before addressing the arguments that the government *does* make in detail, it is necessary to first address a straw man. The government argues that it is charging Title 18 offenses and not violations of House rules, and therefore, it asserts, Mr. Schock's assertions that the prosecution threatens imposition of criminal liability based on ambiguous House rules are beside the point. There is of course no dispute that the Indictment literally charges violations of several federal criminal statutes, just as did the indictment in *Rostenkowski*. Nevertheless, *Rostenkowski* and the decisions that have uniformly followed it hold that when a Title 18 offense would require interpretation of an ambiguous House Rule, the offense is non-justiciable and dismissal is required. A criminal statute cannot trump the Constitution. Therefore the government cannot escape *Rostenkowski* simply by parroting the "in violation of" sections of the Indictment.

The straw man aside, the government deploys essentially two arguments in response to Mr. Schock's Motion to Dismiss based on the Rulemaking Clause. First, the government urges this Court to be the first court in the country to reject *Rostenkowski*.[2] In so arguing, the government necessarily advances the oft-rejected claim that a Member of Congress could be tried and convicted *of a crime* based on executive and judicial interpretations of ambiguous House rules. That is a stunning claim and was rightly rejected in *Rostenkowski* and every decision that has reached the

---

[2] *Rostenkowski* is not binding precedent on this Court, of course. Nevertheless, Mr. Schock respectfully submits that it is persuasive precedent for the reasons explained in the opinion and as reflected in the fact that its relevant holding has been followed by every court to subsequently address the issue.

issue since. Indeed, it says much about the nature of this prosecution and Indictment that the government apparently feels the need to stake out the territory that Mr. Schock can be guilty of a federal crime based on ambiguous House rules.

Second, lacking a persuasive defense on the face of the Indictment, the government attempts to disclaim reliance on House rules and to recast the Indictment as in essence a series of false statement allegations. The Indictment is rife, however, with allegations that Mr. Schock violated such rules, and those allegations are incorporated explicitly into every count save only the tax counts. The government crafted this Indictment and it is bound by *its own charging decision*. The reason for all of these attempts to evade the application of the Rulemaking Clause is made clear by the government's inability to effectively refute the showing in Mr. Schock's Motion to Dismiss that nearly all of the implicated rules are in fact ambiguous. This barely-challenged ambiguity mandates the dismissal of all affected counts. "The only way to remedy the defects in the indictment would be to rewrite it, and that [the Court] may not do." *United States v. Lang*, 732 F.3d 1246, 1249–50 (11th Cir. 2013).

### A. There can be no dispute as to the viability of *Rostenkowski*'s holding that a criminal prosecution may not implicate ambiguous House rules.

Asking this Court to depart from accepted precedent, the government remarkably contends that this Court should not apply the holding of *Rostenkowski* that the Rulemaking Clause prohibits criminal charges based on ambiguous House rules. It argues that the case was wrongly decided or, in the alternative, overruled by the enactment of 18 U.S.C. § 1001(c) in 1996. (Govt. Br. Pt. III(B)(3), at 54-61). In so doing, the government invites this Court to deviate from an unbroken line of approval of the decision from courts across the country. Numerous federal courts—both before and after the enactment of Section 1001(c)—have applied or cited *Rostenkowski* for the premise that, in order to preserve the separation of powers, a House rule must be absolutely clear

9

to be a component of a criminal prosecution.  Counsel for Mr. Schock has not found *any* case that

questions this holding—nor did the government refer to any.

### 1.   *Rostenkowski* **was correctly decided**

As Mr. Schock explained in his opening brief, (Schock Br. 10), other courts have

consistently followed the D.C. Circuit's holding in *Rostenkowski* in the years since that decision

was issued.  As to the Courts of Appeals, the D.C. Circuit has continued to adhere to *Rostenkowski*

and the Third Circuit has cited it with approval as well.  *See, e.g.*, *United States v. Menendez*, 831

F.3d 155, 175 (3d Cir. 2016) (citing *Rostenkowski* for the principle that "some Senate Rules may

be non-justiciable because they are so vague that the Judicial Branch would essentially make rules

for the Senate (and thereby violate the Rulemaking Clause) if it tried to interpret them"); *Boehner*

*v. McDermott*, 484 F.3d 573, 580 (D.C. Cir.) (citing *Rostenkowski* for the principle that "'a

sufficiently ambiguous House Rule is nonjusticiable'"), *cert. denied*, 552 U.S. 1072 (2007); *United*

*States v. Kolter*, 71 F.3d 425, 431-35 (D.C. Cir. 1995).  Various district courts have also applied

or discussed *Rostenkowski*'s holding with approval over the years.  *See, e.g.*, *United States v.*

*Jefferson*, 623 F. Supp. 2d 678, 682 (E.D. Va. 2009) (noting that a justiciability problem "arises

when a court must interpret a House Rule that is ambiguous as applied to the facts of that case");

*United States v. Oakar*, 924 F. Supp. 232, 236 (D.D.C. 1996) (dismissing a Section 641 charge

where "the House has not been able or willing to formulate a[n applicable] Rule"), *rev'd in part*

*on other grounds*, 111 F.3d 146 (D.C. Cir. 1997).

The Government's primary argument is that *Rostenkowski* was wrongly decided, for three

reasons.  First, it contends that the Speech or Debate Clause is the Constitution's sole source of

immunity for legislators.  (Govt. Br. 56-57.)  No court has drawn this distinction; nor is there any

apparent basis in the Constitution for this argument that there may only be one source of legislative

immunity.  It may very well be that because of its express prohibition against "question[ing]," U.S. Const. art. I, § 6, cl. 1, the Speech or Debate Clause provides immunizing protection on a broader variety of fronts than the Rulemaking Clause, barring, for example, the use of *all* legislative act evidence against a Member, *United States v. Helstoski*, 442 U.S. 477, 487 (1979), while the separations of powers principles embodied by the Rulemaking Clause are threatened only in the prosecution's use of ambiguous House rules (but not unambiguous ones).  But this hardly means that the Rulemaking Clause, or numerous other constitutional provisions embodying the separation of powers, does not also constrain the government in a prosecution of a member of the legislative branch.

Second, in yet another intrusion into the prerogative of the legislative branch, the government maintains that Congress's authority to "determine the Rules of its Proceedings," U.S. Const. art. I, § 5, c. 2, does not include the authority of the Committee on House Administration to enact the Members' Congressional Handbook because the Handbook contains "regulations." (Govt. Br. 57-58.)  Again, this argument is without support in any case law.  Quite to the contrary of the government's position, courts have recognized that Congress' Rulemaking power extends beyond the Rules of the House of Representatives, (Schock Br., Ex. D), to Committees or other entities that Congress has delegated the authority to create directions, whether termed rules or regulations, that govern its Members.  For example, in *Boehner* the Court found an Ethics Committee rule to be within the scope of the Rulemaking Clause.  484 F.3d at 580.  All of the other cases cited above applying *Rostenkowski* have agreed.  As the Handbook explains, the rules therein were created by the Members of the Committee on House Administration.  *See* Schock Br., Ex. C at 1 ("The Handbook is a collection of regulations issued by a vote of the Members of the

Committee [on House Administration].  In drafting these regulations, the Committee consults with other committees of the House . . . .").

The labels "rule" and "regulation" are distinctions without a difference that have no constitutional significance.  The terms have synonymous ordinary meanings.  *Compare Black's Law Dictionary* (10th ed. 2014) (defining a "rule" as "an established and authoritative standard or principle" or "[a] regulation governing a court's or an agency's internal procedures"); *id.* (defining "regulation" as "[a]n official rule or order, having legal force, usually issued by an administrative agency").  The government says that by labeling the Handbook a "regulation" and enacting Section 1001(c) which uses the same term, Congress intended to exempt the Handbook entirely from the protections of the Rulemaking Clause.  But Section 1001(c) also uses the term "rule," and surely Congress did not intend to subject all of the proceedings covered by the House Rules to oversight by the executive.  Nor could it, for a statute cannot supersede a provision of the U.S. Constitution.  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).  Further, this argument does not apply at all to the numerous instances where the government seeks to rely upon the Rules of the House of Representatives in addition to the rules in the Handbook.

The government's third reason for asking this Court to diverge from *Rostenkowski* is that failing to interpret ambiguous House rules conflicts with a court's traditional duty to interpret the law.  But House rules are not "law."  *See Marbury*, 5 U.S. at 177 (referring to "an act of the legislature").  While it is true that "[o]rdinarily, a court may supply the missing standard based upon the common understanding . . . where a criminal statute is to be enforced against a Member of Congress, the rulemaking clause is uniquely a constraint."  *Kolter*, 71 F.3d at 432.  The government offers no reason why the judicial branch's duty to interpret the law as expressed in *Marbury v. Madison* should supersede the legislative branch's sole authority to enact its own rules.

12

The correctness of *Rostenkowski*'s holding that an ambiguous House rule is nonjusticiable is demonstrated by the Supreme Court's decision in *Nixon v. United States*, 506 U.S. 224 (1993). There, the Supreme Court refused to adjudicate a former U.S. District Court Judge's challenge to his impeachment in the Senate.  While it held that "the courts must, in the first instance, interpret the text in question and determine whether and to what extent the issue is textually committed," *id.* at 228, it ultimately concluded that the Constitution's Impeachment Trial Clause lacked sufficiently clear language to allow a court to interpret it without violating the separation of powers.  *Id.* at 235.  Given the constitutional language, the Court reasoned that "[j]udicial involvement in impeachment proceedings, *even if only for purposes of judicial review*, is counterintuitive."  *Id.* (emphasis added).  The reasoning in *Nixon*, as well as in other cases, conclusively refutes the government's argument that the broad principle in *Marbury v. Madison* stands as an obstacle to *Rostenkowski*.

### 2.  18 U.S.C. § 1001(c) did not displace *Rostenkowski*

As an alternative to its position that *Rostenkowski* was wrongly decided, the government maintains that Congress acted to repeal the decision when it enacted 18 U.S.C. § 1001(c) to make it apply to "a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch."  (Govt. Br. 60-61.)  But the government posits earlier in its brief that the 1996 amendment to Section 1001 was designed to resolve "substantial doubt whether § 1001 covered false statements to the legislative branch" *at all*.  (Govt. Br. 11-12.)[3]  Therefore, this revision has little to say about the specific holding in *Rostenkowski*, which held that a prosecution may not implicate unambiguous House rules but did not prohibit any

---

[3] Counsel has found no mention of the *Rostenkowski* decision in the legislative history, which would be unusual if the purpose of the statutory revision was to overrule that decision.

prosecution implicating Congress' exercise of its Rulemaking power.  That 1996 amendments to Section 1001 overruled the relevant holding of *Rostenkowski* would certainly be news to the various circuit and district courts that have followed *Rostenkowski* in the years since 1996.  *Supra* at 8.  Even if the 1996 amendments, which again did not specifically address *Rostenkowski* or its relevant holding, could be read to implicate *Rostenkowski*, the *statutory* amendments could not defeat the *constitutional* rule of *Rostenkowski*.  Congress cannot delegate its Rulemaking authority to another branch, nor can it waive a Member's constitutionally-granted immunities and privileges.  *See Helstoski*, 442 U.S. at 493 ("Assuming, *arguendo*, that the Congress could constitutionally waive the protection of the Clause for individual Members, such waiver could be shown only by an explicit and unequivocal expression.").

### B. Criminal statutes are not exemptions from constitutional protections such as the Rulemaking Clause, and the Indictment is non-justiciable because it is based on alleged violations of ambiguous House rules.

The government also contends that the MRA counts are justiciable regardless of any constitutional protections because they involve an unambiguous mandate in Section 1001 to not make a false statement.  (Govt. Br. Pt. III.B.1, at 42-52.)  First, it must be reiterated that although the lynchpin of most of the government's arguments in its brief is Section 1001, only two of the twenty-four charges in the Indictment are Section 1001 counts.  Further, any suggestion that the charges in the Indictment are based solely on Section 1001 and are *not* based in significant part on House rules should be rejected in light of the Indictment's reference on at least 30 occasions to House rules and incorporation of those same allegations into almost every count.  (Schock Br. 6.)  The government's brief is similar, containing an extended nine-page discussion of internal House rules and standards.  (Govt. Br. 3-11.)

These references to the House rules are no mere background; as the government itself acknowledges, they are "necessary" evidence, (Govt. Br. 51), to prove materiality (and may also be relevant for other elements such as intent), which is an element of both the alleged scheme to defraud and of a false statement charge.  (Govt. Br. 19-20.)  "In general, a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed."  *Neder v. United States*, 527 U.S. 1, 16 (1999).  A claim for reimbursement where a Member could plausibly be entitled to reimbursement pursuant to the Handbook, even if the claim were written otherwise, could not satisfy the element of materiality.

It is therefore inescapable that this prosecution calls upon the court and the jury to interpret these ambiguous House rules because without such post-hoc interpretation there is no way to assess whether Mr. Schock allegedly committed a crime.  For example, the indictment alleges Mr. Schock's mileage reimbursement vouchers were improper because they lacked sufficient documentation.  *E.g.*, Indict. at 6, 12-13.  In order to assess whether that is the case, one must resort to the House rules, just as the Indictment does.  And because those House rules provide no clear answer to that question, (Schock Br. 30-33), any answer supplied in this case by the court or the jury must necessarily be an interpretation of the rules as to whether the documentation was sufficient.  This result flows from the government's own overbroad charging decisions, and to argue, as the government does, that it actually only charged a series of individual false statements is to refer to the indictment the prosecution wishes it had sought instead of the one the grand jury actually returned.

The government's repeated contention that Section 1001 creates some sort of blanket exception to the application of the Rulemaking Clause is simply wrong because a criminal statute

15

cannot displace a provision of the U.S. Constitution.  *Matter of New York Times Co.*, 828 F.2d 110, 115 (2d Cir. 1987) ("Obviously, a statute cannot override a constitutional right.").  The government forcefully suggests that it is unheard of that a consequence of constitutional protections like the Rulemaking Clause (and of the Speech or Debate and Due Process Clauses) may be that the government is unable to prosecute certain conduct at all or be constrained in the methods by which it may prove its case.  The government's arguments are unprecedented, but Mr. Schock's invocation of constitutional protections like the Rulemaking Clause is not.  As this Court is undoubtedly well aware, the Constitution contains a host of important constitutional protections that make it more difficult for a prosecutor to prove or even bring its desired charges.  For example, a court may exclude critical evidence under the Fourth Amendment, or may prohibit the government from bringing charges at all where the conduct is clearly prohibited under a criminal statute but prosecution would violate the First Amendment.  The Rulemaking Clause is no different from these other constitutional protections.

Finally, in arguing that the Indictment is generally justiciable despite the Rulemaking Clause, the government relies heavily on *United States v. Durenberger*, 48 F.3d 1239, 1240 (D.C. Cir. 1995) and *United States v. Diggs*, 613 F.2d 988, 1001 (D.C. Cir. 1979), cases decided by the D.C. Circuit Court of Appeals prior to its decision in *Rostenkowski*.  Both cases simply stand for the proposition reiterated in *Rostenkowski*: the Rulemaking Clause is not an absolute bar to all charges that implicate House rules.  Mr. Schock does not dispute or rely upon this part of *Rostenkowski*, and the Court can therefore ignore the government's repeated assertions that Mr. Schock is claiming general blanket immunity based on the Rulemaking Clause.  But neither case has anything calling into question *Rostenkowski*'s holding that a criminal charge must be dismissed if it would require a court to interpret *ambiguous* House rules.  *Durenberger*, for example, noted

that resolving the charges in that case "requires no resolution of *ambiguities* in the Senate's internal rules." 48 F.3d at 1244 (emphasis added). Indeed, the case primarily involved the interpretation of 2 U.S.C. § 58(e). As the *Rostenkowski* court explained, the court in *Diggs* "never had to determine whether the work performed by the employees was 'official'" at all. *Rostenkowski*, 59 F.3d at 1309.

### C. The government leaves unrefuted the bulk of Mr. Schock's contentions under the Rulemaking Clause.

It is no wonder that the government resorts to sweeping and unprecedented arguments regarding the Rulemaking Clause and whether longstanding precedent was wrongly decided. It has no apparent meaningful, let alone persuasive, response to the critical arguments that form the bulk of Mr. Schock's motion to dismiss: that the House rules on which the Indictment relies are ambiguous. (Schock Br. 26-53.) In his brief, Mr. Schock explained at great length why each and every one of the false statement and fraud charges were premised on ambiguous House rules, many of which were amended after Mr. Schock left office in order to "tighten up . . . some gray areas in the rules." (Schock Br., Ex. A (Cassidy Grand Jury Testimony) 123:23-24.) The government's response to these specific showings does nothing other than reiterate the same tired, and fundamentally erroneous, argument that the existence of Section 1001 somehow makes the rampant ambiguity irrelevant. (Govt. Br. 62.)

Mr. Schock includes in the headings below references to some of the overarching ambiguities implicated in this case, and then responds specifically to the government's limited arguments. Without repeating his lengthy and largely unchallenged arguments regarding ambiguity from his opening brief, (Schock Br. 28-51), Mr. Schock provides the following abbreviated summary of those arguments:

- **Counts 1-5 (Mileage)** (Schock Br. 28-38):

- o  Whether or not any supporting documentation at all is required for mileage claims, and if so, what qualifies as sufficient, under both the Handbook and the Voucher Documentation Standards.

- o  What makes a given mile "personal" or "political" rather than "official," and how to determine the "primary purpose" of a given mile.

- **Counts 8 & 13 (Decorator and Furnishings)** (Schock Br. 38-44, 50-51):

  - o  How to determine what qualifies as non-reimbursable "furniture."

  - o  What it means for a "decoration" to be of "nominal" value.

- **Counts 10 & 12 (Camera and Services)** (Schock Br. 46-49, 50-51):

  - o  The meaning of the descriptive category of "WEB Dev HST, EMAIL & RLTD SERV."

  - o  Whether contractors may be reimbursed for purchases of items like a camera.

- **Count 9 (Fly-in)** (Schock Br. 44-46):

  - o  What it means to "receive compensation," "the receipt of which would occur by virtue of influence improperly exerted from the position of such individual in Congress."

1. <u>**Counts 1-5 (Mileage) call upon the Court to interpret ambiguous House Rules regarding how much documentation of mileage is required and whether mileage is driven for personal, official, or campaign reasons.**</u>

As to the mileage counts, the government argues first that the ambiguity in the rules and standards regarding the level of documentation required and the House Finance Office's acceptance of Mr. Schock's vouchers and their accompanying documentation may be disregarded because "[t]his prosecution does not involve any challenge to or second-guessing of the House Finance Office's acceptance of Defendant Schock's fraudulent vouchers." (Govt. Br. Pt. III.B.2.) But it is the government's own Indictment that made this an issue in this prosecution, stating that MRA reimbursements "must be supported with specific documentation," (Indict. at 6), and that Mr. Schock's mileage vouchers contained "incomplete documentation" and had "little or no

18

documentation." (Indict. at 12-13; *see also* Govt. Br. 62.) Not only are the rules regarding the level of required documentation ambiguous, but the House Finance Office's acceptance of the vouchers in an exercise of its Rulemaking power refutes the government's assertion that the documentation was insufficient, or at least supports that there is significant ambiguity in the applicable rules. This is so because it demonstrates that the House has one interpretation that resulted in proper reimbursement and now the prosecutor posits some other interpretation that it claims would support conviction for a fraud. *Rostenkowski*, 59 F.3d at 1307 ("[F]or a court to interpret a House Rule in the absence of judicially discoverable and manageable standards would require the court to make an initial policy determination of a kind clearly for nonjudicial discretion, and would run the risk of intrusion into the legislative sphere." (quotation omitted)).

The government's second argument regarding the mileage counts is similarly that the House rules that the government chose to incorporate in the Indictment are irrelevant because they involve a distinction only between miles actually driven and not driven, and not the interpretation of any House rule. But the Indictment mixes together this allegation with arguments regarding insufficient documentation and the distinction between personal, official, and campaign miles. (*See, e.g.*, Indict. ¶ 26.) The government cannot now disregard its own language in the Indictment and have the Court—and the jury—disentangle the constitutional and unconstitutional bases of the charges in the indictment.

Notably, the government offers no response to Mr. Schock's arguments regarding the ambiguity in House rules regarding what qualifies as official, personal, or political with respect to automobile mileage. As a House financial counselor explained in his grand jury testimony, the Finance Office generally accepts Members' own determinations of what qualifies as "official"

travel.  (Grand Jury Testimony of Andrew Caulk 14:19-15:8, 40:7-12 (Jan. 21, 2016), Schock Br., Ex. J.)

**2.**  **Counts 8 and 13 (Decorator and Furnishings) call upon the Court to interpret ambiguous House Rules regarding what "nominal" value means and the definition of furniture.**

As to the office redecorating charges, the government largely reiterates the allegations in the indictment without explaining why the House rules at issue are not ambiguous, falling back on its general argument that Section 1001 is some sort of exception to the Rulemaking Clause.  (Govt. Br. 63-66.)  It actually engages only with one aspect of Mr. Schock's argument, regarding the meaning of the word "nominal," but the government is unable to offer any clarifying definition of that term.  One definition it offers is "very small in relation to an expected or required amount"— a circular definition that only begs the question of what amount is "expected" in this context.  Even its alternate definition "not substantial" helps little as it invokes a relative inquiry.  As Mr. Schock explained in his opening brief, the Handbook was subsequently amended to confirm that the purchase of any individual furnishing item worth up to $5,000 is permissible, and that a member is now required to seek prior written approval only when purchasing a single item that exceeds that amount.  Thus, this change strongly suggests that "nominal value" per item is at a minimum $5,000, but quite possibly more than that given the potential for approval above that amount.  (Schock Br. 42.)

Moreover, the new language also raises ambiguity as to whether a per-item, or per-voucher, analysis is required—particularly relevant here because the government identifies no individual item other than the chandelier.  (Schock Br., Ex. F, at 14 ("Prior to the purchase of any furnishing exceeding $5000 *per item*, written approval must be obtained from the Committee on House Administration.").)  Therefore, even if the term "nominal" were not ambiguous, the

20

government's lack of the detail in the Indictment is fatal because it leaves open the potential that the decorating expenses were an aggregation of a number of nominal items.

It is also clear that what is "substantial," and therefore what is nominal, varies widely with context.  Indeed, the government elicited testimony from the House's Director of Financial Counseling in the grand jury that "nominal is a very ambiguous term, so it could mean different [things] to different people." (Grand Jury Testimony of John Nadeau 45:4-5 (Jan. 20, 2016), Schock Br., Ex. B.)

> **3.  Counts 10 and 12 (Camera and Services) call upon the Court to interpret ambiguous House rules regarding how media services should be described.**

As to the counts regarding the camera and photographer, the government makes no attempt to argue that the rules at issue are unambiguous in response to Mr. Schock's arguments regarding ambiguity.  Instead, the government claims that no House rule is implicated at all.  (Govt. Br. 67.) But the Indictment turns in large part on the labeling of the expense as "WEB Dev HST, EMAIL & RLTD SERV;" for that to be a material misrepresentation, however, it must be a label choice that is inaccurate under the applicable Voucher Documentation Standards.  (Schock. Br. 47-48.) Yet the government offers no clear meaning of this category that would render Mr. Schock's description inaccurate—nor does it offer a category that would have been a more accurate representation.

> **4.  Count 9 (Fly-In) calls upon the Court to interpret ambiguous House rules regarding what it means to improperly exert influence.**

In the charge regarding "Fly-In" conference fees, the indictment expressly alleges that Mr. Schock "violated the House Rules, which prohibited him from using his official position for personal gain and which required him to return any excess funds to the fly-in participants or donate such funds to charity."  (Indict. at 35 ¶ 4.)  As to using an "official position for personal gain"--a

21

materially inaccurate paraphrase the government repeats in its Brief--Mr. Schock explained the ambiguity in this Rule, (Schock Br. 45-46) and will not repeat that here as the government makes no argument to the contrary.

In its Brief the government also asserts that another relevant House Rule is one prohibiting a Member from "receiving a surplus from an unofficial account."  (Govt. Br. 69.)   In the indictment, this was not raised as a basis for the charge in Count 9 specifically, so the government should be precluded from relying upon it now.  Even if the government may rely upon it, that purported restriction is ambiguous as well.  The House Rules defines an "unofficial office account" as "an account or repository in which funds are received for the purpose of defraying otherwise unreimbursed expenses allowable under section 162(a) of the Internal Revenue Code of 1986 as ordinary and necessary in the operation of a congressional office."  (Schock Br., Ex. D, at 42 Rule XXIV(3).)  The Handbook defines an "unofficial account" as one for "defraying or reimbursing ordinary and necessary expenses incurred in support of a Member's official and representational duties."  (Schock Br., Ex. C at 6; *id.* Ex. D at 40.)  It is at least ambiguous whether the account described in the Indictment was an "unofficial account" in that it is at worst ambiguous regarding whether the account was designed to "support" Mr. Schock's "official and representational duties." As the Ethics Manual explains, the purpose of these rules is to eliminate the appearance of impropriety that results from the private financing of a Member's official expenses.  (Ethics Manual at 327).

## II.      The Speech or Debate Clause applies to exercises of the Rulemaking function pursuant to Supreme Court and Court of Appeals precedent.

The government's arguments regarding why this Indictment does not run afoul of the Speech or Debate Clause fail as a matter of law and logic.  The government simply ignores the Supreme Court's holding in *Gravel v. United States*, 408 U.S. 606, 625 (1972) that the Speech or

Debate Clause applies to all "matters which the Constitution places within the jurisdiction of either House." The Rulemaking Clause is such a matter. And the government argues that criminal statutes are exemptions from the Speech or Debate Clause, when in fact that clause is a recognized *immunity* from prosecution. Immunity that is defeated by the mere existence of a criminal statute is no immunity at all.

Finally, the government attempts to argue that Mr. Schock's Speech or Debate Clause arguments would swallow criminal statutes such as Section 1001. This argument ignores the critical genesis of Speech or Debate Clause immunity: protected activity by a Member of Congress. The Speech or Debate Clause is designed to protect the activities of the members of the Article I legislative branch. As a result, its immunity flows to those Members, and to their staff when acting on the Members' behalf. The immunity does not flow to a host of actors who may petition the House for payment, such as independent contractors, non-legislative House employees, and even Member staffers who are acting on their own account and not on behalf of the Member. Under the Speech or Debate Clause, Members would also not generally be immunized for a variety of acts external to the House, such as bribery. Here, however, the conduct charged is (1) by an Article I actor (2) acting within the House and (3) with respect to a matter committed to the House's jurisdiction; therefore, it is immunized from prosecution by the Speech or Debate Clause.

## A. *Gravel* clearly brings acts of Rulemaking within the ambit of the Speech or Debate Clause

Not only does the government contend that this Court should reject the unquestioned holding of *Rostenkowski* in the context of the Rulemaking Clause, but it also invites this Court to disregard the clear language of the U.S. Supreme Court in *Gravel*. (Govt. Br. Pts. II.B.2-3, at 29-35.) As Mr. Schock explained in his motion to dismiss, *Gravel* held that the Speech or Debate Clause protects not only speeches on the floor of the House, but also that the legislative sphere

23

further encompasses matters that the Constitution commits to Congress, such as Rulemaking.  In

*Gravel*, the Supreme Court stated that:

> The heart of the Clause is speech or debate in either House.  Insofar as the Clause
> is construed to reach other matters, they must be an integral part of the deliberative
> and communicative processes by which Members participate in committee and
> House proceedings with respect to the consideration and passage or rejection of
> proposed legislation *or with respect to other matters which the Constitution places
> within the jurisdiction of either House*.

408 U.S. at 625 (emphasis added).[4]

Ignoring this clear language, the government inexplicably declares that "rulemaking is not

legislating."  Without addressing this critical part of *Gravel*, the government even goes so far as

to assert that *Gravel* stands for "the exact opposite" of Mr. Schock's argument that Rulemaking is

protected by the Speech or Debate Clause.  (Govt. Br. 33.)  The Rulemaking Clause "is a classic

example of a demonstrable textual commitment to another branch of government."  *Rangel v.

Boehner*, 20 F. Supp. 3d 148, 168-69 (D.D.C. 2013).  Accordingly, contrary to the government's

argument, in reliance on this language in *Gravel*, *Consumers Union of U.S., Inc. v. Periodical

Correspondents' Ass'n*, 515 F.2d 1341, 1351 (D.C. Cir. 1975) applied the Speech or Debate Clause

to the "execution of internal rules."  Courts have also applied the Speech or Debate Clause to

matters committed to the House's jurisdiction by the Discipline Clause.  *Rangel*, 20 F. Supp. 3d at

177-78.  The government offers no rationale or support for its assertion that the Rulemaking Clause

should be an exception from *Gravel*, and counsel has found no case law that so holds.

The government discusses *Walker v. Jones*, 733 F.2d 923 (D.C. Cir. 1984) and

*Rostenkowski*, but neither addresses the Speech or Debate Clause's application to exercises of the

---

[4] Much of the precedent subsequently applying *Gravel* has focused on the other categories of
protected Speech or Debate activity it sets forth, rather than the pertinent language here regarding
matters committed by the Constitution to the jurisdiction of either House.  Though discussion in
these cases can inform, it does not ultimately govern the issue here.

Rulemaking Clause.  *Walker* involved an employment discrimination suit brought by the former general manager of congressional food service facilities.  The decision does not once mention Rulemaking and does not involve House rules.  Instead, it rejected Speech or Debate protection because "[a]uxiliary services attending to human needs or interests not peculiar to a Congress member's work qua legislator may advance a member's general welfare," but to "characterize personnel actions relating to such services as 'legislative' in character, however, is to stretch the meaning of the word beyond sensible proportion."  733 F.2d at 931.  As to *Rostenkowski*, it is true that the decision rejected the defendant's Speech or Debate arguments.  59 F.3d at 1302-04.  But the decision did not make any pronouncement as to the Speech or Debate Clause's general application to exercises of Rulemaking, and it primarily concerned the Clause's inapplicability to staffing decisions tangentially related to the legislative sphere addressed in *Jones*.

### B.  A criminal statute is not an automatic exemption from Speech or Debate protections.

Echoing its arguments in the context of the Rulemaking Clause, the government states that false statement and fraud charges are automatically exempt from the protection of the Speech or Debate Clause because such acts can never be a "legislative act."  (Govt. Br. Pts. II.B.1 & 5, at 27-29, 37-38.)  The government's argument is plainly inconsistent with the Speech or Debate Clause.  If the mere existence of a criminal statute were sufficient to defeat the immunity, then Congress could (theoretically) make it a crime for a Member to make a false statement on the floor when debating a bill.  Yet such a crime is at the core of what the Speech or Debate Clause protects, and obviously its constitutional protection would trump any contrary statute of Congress.[5]

_____

[5] Grasping, the government attempts to rely on cases involving judicial immunity, such as *Forrester v. White*, 484 U.S. 219 (1988).  But judicial immunity is unlike Speech or Debate Clause immunity in that it does not flow from an express grant of immunity in the Constitution.

The appropriate constitutional analysis examines whether the Indictment necessarily charges conduct that is immunized by the Speech or Debate Clause, not whether the Indictment charges conduct that is a crime.[6]   A criminal offense such as wire fraud is assuredly not unconstitutional on its face, but it would just as assuredly violate the Speech or Debate Clause if a wire fraud indictment alleged that a Member of Congress carried out a wire fraud scheme by making a series of allegedly fraudulent statements on the floor of the House.   Contrary to the government's argument, however, Mr. Schock does not seek to set himself up as a "super-citizen."   Members of Congress are subject to Section 1001, and various other generally applicable federal criminal statutes, in a whole range of conduct that occurs outside the scope of the Speech or Debate Clause.   For example, if a Member of Congress were to lie to an FBI agent about who provided political contributions to the Member in the course of that agent's investigation, that could be a Section 1001 offense.   If a Member conspires with others to evade campaign contribution limits, that is a federal offense.   Bribery charges of course can be brought against Members (though they may not rely on privileged Speech or Debate evidence).   The examples abound.

One common characteristic of many of the offenses for which a Member could be prosecuted that do not implicate the Speech or Debate Clause is that they involve conduct of the Member *outside* of Congress.   Such outward-facing conduct likely (though not always) will not implicate the Speech or Debate Clause.   Here, the offenses charged relate to the *inward* looking dealings of a Member and the organs of the House with respect to Rulemaking, a matter committed

---

[6] As described in Mr. Schock's memorandum in support of his motion to dismiss, the Speech or Debate Clause also prohibits the evidentiary use of speech or debate material.   This Motion is focused on immunity from the indictment, and Mr. Schock reserves all rights to object to the evidentiary use of any speech or debate material in this prosecution.

to the jurisdiction of the House alone.  A Member of Congress can be prosecuted for the *external* act of taking a bribe, *United States v. Brewster*, 408 U.S. 501 (1972), but that prosecution could not rely on the Member's protected speech or debate activity *internal* to the House.  Here, examination of the Indictment demonstrates that on its face it charges activities internal to the House by Mr. Schock (then a Member of Congress), or his staff on his behalf, that are accordingly protected by the Speech or Debate Clause.  (Schock Br. 10-25.)

Because Mr. Schock was exercising the powers specifically conferred on him as a Member, he was not acting as a super-citizen, but merely in that special capacity as an elected representative and Member of the legislative branch of government, upon whom certain privileges and immunities are conferred by the Constitution.  Perhaps most relevant for this case, the D.C. Circuit in *In re Grand Jury Subpoenas* held that a Member's statements to an Ethics Committee regarding the nature of a trip he had taken were protected by the Speech or Debate Clause.  571 F.3d 1200 (D.C. Cir. 2009).  A concurrence by Judge Kavanaugh noted that the government "would prefer to balance the protections of the Clause against the interest in preventing and punishing corruption and false statements.  But especially in separation of powers cases . . . the Supreme Court has repeatedly stressed that the precise words of the Constitution control and that courts must not relax the enduring structure protections contained in the document's text."  *Id.* at 1207.

**C.  Speech or Debate Clause immunity applies to Mr. Schock's interactions with the House administrative apparatus.**

The government argues that Mr. Schock's communications and interactions with the House administrative office are not immunized because "administrative" matters are not entitled to immunity.  The government's "administrative" label is of no constitutional significance for purposes of the Speech or Debate Clause.  Otherwise, every internal communication between Members with offices of the House performing administrative functions would be potentially

27

subject to oversight by the executive branch through prosecutions for fraud and false statements. The pertinent question under *Gravel* is whether the acts in question are ones committed to the legislative branch by the Constitution. Rulemaking is such a matter, and as *Rostenkowski* and other cases hold, the application of rules binding House members—including those pertaining to the MRA—are exercises of the Rulemaking function, and accordingly immunized from prosecution by the Speech or Debate Clause.

The government argues that applying the Speech or Debate Clause to "administrative" matters in the House would eviscerate Section 1001. That is hardly the case. Section 1001 includes in its proscription supplying false claims for payment to the House administrative office. Though that proscription is unconstitutional as applied to Mr. Schock in this case, this does not mean that there are not numerous constitutional applications that remain. Speech or Debate Clause immunity flows from a Member's status as a part of a co-equal branch of government. The Speech of Debate Clause prohibits intimidation of the legislature by the threat of prosecution from the executive. As such, it is a privilege and an immunity that is owned by the individual Member. An independent contractor who submitted a falsified voucher to the House for payment – imagine a company hired by the House to paint one of its office buildings – would be subject to Section 1001. The independent contractor has no immunity and no constitutional role in the Rulemaking functions of the House, unlike a Member. The same is true of a non-legislative House employee (a person employed directly by the House versus a Member). And the same is true even of a Member's staff if the staff member acts on his own behalf as opposed to acting as an agent of the member. Therefore, Section 1001 and other similar criminal statutes can easily be applied to remedy false claims for payment submitted to the House by entities, unlike Mr. Schock, that do not possess constitutional immunity.

28

III.    **The relevant statutes are unconstitutionally vague as applied, violating the Due Process Clause.**

As Mr. Schock explained in his original brief, the Due Process Clause stands as an equal obstacle to this prosecution of Mr. Schock as do the Speech or Debate and Rulemaking Clauses. (Schock Br. 25-26.)  The crux of the due process problem the Indictment creates is encapsulated by *Rostenkowski*'s posing of the question "Are the House Rules involved in this case *too vague for judicial interpretation*?" and its affirmative answer to that question.  59 F.3d at 1306.  Here, not only are the House rules too vague, but so are the underlying bases of the Section 1519 counts. As this Court is well aware, "vagueness" is an insurmountable problem in a prosecution, as it means the government seeks to penalize an individual for conduct as to which he lacked fair notice of any illegality and as it allows the government to arbitrarily enforce the law at issue.  The purpose of the Due Process Clause is demonstrated by this very prosecution, where the government has sought to enforce standards that it has created out of thin air and that are the prerogative of a co-equal branch.

The government briefly raises several arguments in response to Mr. Schock's arguments that the indictment should be dismissed for violating the Due Process Clause because it is based on impermissibly vague House rules and invented election reporting requirements.  First, the government argues yet again that the prosecution "does not depend on *any* ambiguous rule" but only on an unambiguous mandate in criminal statutes to not lie.  (Govt. Br. 71.)  As discussed above, this is not a reason to deny Mr. Schock's motions because the government *did* choose to base its indictment on ambiguous rules, and because criminal statutes are not carve outs to constitutional protections.  Second, the government argues that the scienter requirements in the applicable statutes "ameliorate" due process concerns.  (*Id.*)  However, "[a] scienter requirement cannot eliminate vagueness . . . if it is satisfied by an 'intent' to do something that is in itself

29

ambiguous." *Nova Records, Inc. v. Sendak*, 706 F.2d 782, 789 (7th Cir. 1983).  Finally, the government states that an as-applied vagueness challenge is inappropriately brought at the pre-trial stage.  (Govt. Br. 71-72.)  The case it cites as support, however, states that pretrial motions "should be ruled on unless there is good cause to defer a ruling," and that such good cause would exist "if disposing of the pretrial motion requires making factual determinations that fall within the province of the ultimate finder of fact."  *United States v. Turner*, 842 F.3d 602, 605 (8th Cir. 2016) (punctuation and citation omitted).  The only disputed factual determination the government references is whether Mr. Schock had actual notice of what the law prohibits, but it offers no further information to support this conclusory assertion and does not show why this determination would be one left to the jury.

For all of these reasons, the government has failed to effectively refute Mr. Schock's argument for dismissal based on the Due Process Clause, and the indictment should be dismissed on that basis.

## IV. Section 1519 does not apply, by its terms, to an agency's passive receipt of campaign disclosure reports and Counts 14-18 should therefore be dismissed.

The government does not dispute that this is the *first* prosecution in the country to charge a violation of Section 1519 based solely on the FEC's passive receipt of campaign disclosure reports.  *See* MTD Counts 14-18, at 18-19.  There are good reasons why other prosecutors have not tried.  For starters, applying Section 1519 here would render the FECA's criminal penalties and protections a dead letter, which Congress could not have intended.  Furthermore, the government's theory of prosecution depends on yoking Section 1519 to the government's own, undisclosed view of what is required in campaign disclosure reports, which creates serious due process problems.  In light of those problems, there is no basis for stretching the text of

Section 1519 to accommodate the government's theory here, and, even if the text can be so stretched, it would be unconstitutional as applied here.

A.   There is no reason Congress would have courts stretch the text of Section 1519 to effectively supersede the careful balance of the FECA.

The government does not dispute that Congress carefully calibrated the FECA to avoid chilling the exercise of core political speech.  In particular, Congress knew that campaign disclosure reports would often have errors, given candidates' time and resource constraints, and would present a ripe target for partisan prosecutorial misuse.  (MTD Counts 14-18, at 8, 10-11.)[7] Congress accordingly built a series of protections into the FECA to prevent prosecutorial misuse and encourage qualified candidates to run for elected office.

If permitted, the novel application of Section 1519 proposed here would gut the FECA's careful balance of incentives.  The government does not dispute most of the ways in which the FECA would be rendered a dead letter.  In particular, the FECA's monetary thresholds would be swept away by Section 1519, which allows a 20-year sentence for even penny-ante offenses.  MTD Counts 14-18, at 15, 17.  The statutory practice of honoring conciliation agreements would likewise fall away, because they do not apply to Section 1519.  *Id.* at 14-15, 17.  The ability to rely on a committee treasurer would be severely compromised.  *Id.* at 12.  And candidates would lose the benefit of the FEC's expertise before prosecutors seize the reins.

Applying Section 1519 would also debilitate the requirement of "willfulness" for FECA prosecutions.  Willfulness requires "that the offender acted in conscious disregard of a known statutory duty or prohibition."  *Federal Prosecution of Election Offenses* 135 (7th ed. May 2007).

---

[7] The government insists that First Amendment rights are not at stake here because false and misleading speech is not protected by the First Amendment.  (Govt. Br. at 75-76.)  That is a non sequitur:  Congress designed the FECA to avoid deterring campaign speech by *all* candidates for public office, for whom "the constitutional guarantee [of free speech] has its fullest and most urgent application."  *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1991).

The government suggests that this is not so far from the mens rea required for Section 1519, (Govt. Br. 76), but that is a category mistake.  Section 1519 requires only that the defendant have a specific *goal*—"to impede, obstruct or influence."  The mens rea of willfulness instead requires the highest level of culpable *awareness*: to *consciously* disregard a *known* legal duty.  As a result, ignorance of the law *is* a defense for willfulness prosecutions under this standard, *see Ratzlaf v. United States*, 510 U.S. 135, 149 (1994), but the government unsurprisingly does not propose that Mr. Schock has such a defense under Section 1519.

Furthermore, allowing Section 1519 charges to proceed to trial here would empower prosecutors to swap the FECA's maximum five-year felony with the most demanding mens rea known to the law for a 20-year felony with a relatively low mens rea requirement.  That would turn Congress's balance in the FECA on its head.  The government objects that it does not have the power "to predetermine ultimate criminal sanctions," (Govt. Br. at 77), but of course the threat of a 20-year sentence would give prosecutors "extraordinary leverage" to extract pleas.  Tr. of Oral Arg. 31, *Yates v. United States*, No. 13-7451 (Roberts, C.J.).

Despite all the ways in which applying Section 1519 here would undermine the FECA, the government nevertheless asks the Court to trust the prosecutor's discretion to choose which offenses to charge "'when an act violates more than one criminal statute.'"  (Govt. Br. 75) (quoting *United States v. Batchelder*, 442 U.S. 114, 123 (1979)).  Of course, where Congress enacts genuinely overlapping statutes, the government may choose which to charge.  But, as explained in Mr. Schock's motion to dismiss, Section 1519 does *not* genuinely overlap with the FECA's

criminal provisions because the FECA is specifically calibrated to address concerns that no other statute is designed to address.[8]  *Batchelder* is accordingly beside the point here.

   **B.      The government's novel application of Section 1519 here would deprive Mr. Schock of due process.**

   Applying Section 1519 as the government proposes here would not only wipe out the fundamental protections of the FECA, but would create serious vagueness concerns.  As explained above, *see supra* at 24-25, a mens rea requirement is not enough to save an application that is void for vagueness where the government insists on applying a criminal statute based on its own novel, post-hoc interpretation of the law.  Although the government agrees that it lacks the authority to foist its own "individualized reporting standards" on Mr. Schock in this case, (Govt. Br. 85), that is precisely what it has done.  For example, the government does not deny that Count 15 charges Mr. Schock with causing a false entry in the records of the GOP Generation Y Fund reports because that committee disclosed a disbursement for "PAC Legal Fees."  The Indictment itself admits that the payment was "for reimbursement of attorney's fees," ¶¶ 51-52, yet the government identifies no law or regulation that would make the "PAC Legal Fees" description improper.  Nor does the government identify any reason why a car purchased for a district office employee's use is not a "Transportation" expense.  *See* Indict. Count 16.  Because the only remaining explanation is the prosecutor's own, undisclosed standard for disclosing campaign expenditures, Mr. Schock did not have fair notice that the 20-year felony in Section 1519 could apply.

---

[8] The government cites the tax fraud statute, 26 U.S.C. § 7206, which has a three-year maximum, as one that can coexist with the 20-year wire-fraud felony.  (Govt. Br. 77.)  Unlike the tax fraud statute, however, the FECA was designed to accommodate First Amendment concerns and real worries about partisan prosecutorial overreach against political candidates.  The government wisely does not suggest that those same concerns apply to the tax fraud statute.

C.     **The Indictment does not allege any "matter" or its "proper administration" within the meaning of Section 1519.**

Because the government's theory of Section 1519 would do violence to Congress's carefully calibrated framework for campaign disclosures and deprive Mr. Schock of the fair notice guaranteed by the Due Process Clause, it would require clear direction from Congress to justify applying Section 1519 here.  But the text of Section 1519, properly construed, does not support the government's theory.  The government does not dispute that "proper administration" requires active enforcement or adjudicative processes, or that the FEC's passive receipt of reports does not qualify as "proper administration."  *See* MTD Counts 14-18, at 30-34.  Instead, the government only defends the Section 1519 counts on the basis that they charge a "matter" within the meaning of the statute.  But the term "matter" in Section 1519 cannot bear the weight that the government puts on it.

For the reasons in Mr. Schock's motion to dismiss (at 26-29), the Supreme Court's interpretation of the term "matter" in *McDonnell v. United States* applies here: a matter is "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee."  136 S. Ct. 2355, 2372 (2016).  The government does not dispute that the FEC's passive receipt of campaign disclosures is not a "matter" under that definition.

First, the *noscitur a sociis* canon supports this reading here (as it did in *McDonnell*) because in Section 1519, "matter" is parallel to the formal proceeding of a "case filed under Title 11."  The government's reliance on *Ali v. Federal Bureau of Prisons*, 552 U.S. 214 (2008), which declined to apply the *noscitur a sociis* canon when interpreting "any officer of customs or excise or *any other law enforcement officer*" in the Federal Tort Claims Act, is misplaced.  *See* Govt. Br. 79-80.  Section 1519 does not reference a case filed under Title 11 or "any other matter"; if it did,

then *Ali*'s interpretation might be relevant.  But because Section 1519 omits the capacious phrase "any other," *Ali* does not help the government.

*United States v. Rodgers*, 466 U.S. 475 (1984), also lends no support to the government's uncabined interpretation.  *See* Govt. Br. 78-79.  *Rodgers* held that an FBI criminal investigation was a "matter within the jurisdiction" of the FBI within the meaning of 18 U.S.C. § 1001.  466 U.S. at 479.  That is fully consistent with the interpretation advanced here as an FBI criminal investigation is a specific, concrete inquiry that does more than involve the passive receipt of information; in fact, Section 1519 specifically mentions that it applies to attempts to influence an "investigation."  In any event, *Rodgers* was concerned with defining the term "jurisdiction"—not "matter."  466 U.S. at 479.  The government's argument that *Rodgers* defined "matter within the jurisdiction of" an agency as "all matters confided to the authority of an agency or department," *id.*, is true because it is tautological: of course a "matter" includes "all matters."  *Rodgers* does not illuminate the limits of the term "matter."

Moreover, *McDonnell* supports a confined interpretation of "matter" in Section 1519 because a broader interpretation would create vagueness and federalism problems.  *See* 136 S. Ct. at 2372-73.  The government's response to those vagueness problems is unpersuasive as explained above.  And the government does not dispute that its interpretation would threaten Section 1519 prosecutions for all manner of data reporting to state and local governments that are able to police their own affairs.  It is irrelevant whether this particular case implicates those federalism concerns because the interpretation pressed by the government here would apply in the future to prosecutions that threaten federalism interests.

The rule of lenity further supports a confined interpretation of "matter."  The government attempts to bolster its uncabined interpretation using a selection of the ambiguous legislative

history.  (Govt. Br. 80-81.)  But the government ignores the legislative history referenced in Mr. Schock's motion to dismiss that demonstrated that Congress did not come to any shared understanding in favor of the government's harsher interpretation.  *See* MTD Counts 14-18, at 33-34; *see also* S. Rep. 107-146 (2002), at 27 (additional views of Senators who feared that Section 1519 would be used beyond attempts to obstruct "pending or future criminal investigation, *a formal administrative proceeding*, or bankruptcy case" (emphasis added)).  Because neither the text nor the legislative history requires the government's interpretation, the rule of lenity counsels against turning Section 1519 into a breathtakingly broad false-statement statute.

The government tries to rehabilitate the Section 1519 counts by pointing out that the statute also applies to obstruction "in relation to or contemplation of any such *matter* or case" (emphasis added).  *See* Govt. Br. 82.  That part of the statute does not rescue those counts.  Even if Section 1519 could apply to a contemplated "matter" in the abstract, the Indictment still does not identify any contemplated matter other than the filing of the campaign disclosures themselves.  Although the government evidently wishes it had indicted Mr. Schock for "influenc[ing] a possible review or audit by the FEC," (Govt. Br. 83), the indictment provides no basis for that allegation, and the government cannot rewrite the Indictment in its opposition to dismissal.

Even if the Indictment so alleged, it could not save the charge from dismissal.  To claim that any provision of allegedly false information to a third party that then provides that information to the government[9] amounts to "contemplation" that the government could someday open an investigation or review of the matter is to read a statute with no bounds.  Under that reading, every American taxpayer – even those using professional third party services – is subject to potential

---

[9] The government's allegation in this case is that Mr. Schock caused allegedly false information to be provided to his campaign committees, and that he in turn "caused" the campaign committees to report that same information to the FEC.

Section 1519 prosecution because the IRS could someday conduct an audit on any tax return. The issue is particularly problematic here in light of Mr. Schock's First Amendment and due process rights. It is not necessary to define the word "contemplation" in every respect to in this case conclude that merely passing information on to a third party that passes that information on to the government as part of a government mandated filing system is not "contemplation" of a potential future investigation, audit or inquiry by the government.

## V.    Count 11's undisputed duplicity requires dismissal.

Finally, Count 11's single, catch-all charge of stealing government funds in violation of 18 U.S.C. §§ 641 and 2 must be dismissed as duplicitous under Rule 12(b)(3)(B)(i). That count is duplicitous because the charged Section 641 violation is not a continuing offense, and there is no warrant for Count 11's lumping together of motley offenses. The government offers not even token resistance to Count 11's obvious duplicity.

Instead, the government merely contends that dismissal "is not the appropriate remedy" for duplicity. (Govt. Br. 88.) That would surprise the drafters of the Federal Rules of Criminal Procedure, who specified that defendants should bring a pretrial motion to *dismiss* duplicitous counts. Rule 12(b)(3)(B)(i). Following the drafters' lead, courts dismiss duplicitous counts where the defendant properly raises a duplicity objection before trial and shows the threat of prejudice. *See United States v. Tackett*, No. 11-15-ART, 2011 WL 4005347, at *1 (E.D. Ky. Sept. 8, 2011); *United States v. Bessigano*, No. 2:08-cr-110, 2008 WL 4833110, at *3 (N.D. Ind. Nov. 4, 2008) (When the "defendant properly raise[s] this [duplicity] issue before trial, the proper remedy is dismissal of the duplicitous count.").

The government cites *United States v. Powell*, 99 F. Supp. 3d 262, 268 (D.R.I. 2015) for the statement that "[n]either party in their memoranda have cited any cases that dismissed the

entire Indictment," (Govt. Br. 88), but fails to note that this statement was in the portion of the opinion addressing the statute of limitations—*not* duplicity.  The government also claims (at 88) that *Powell* justifies the "[a]ggregation of multiple transactions into a single Count," but *Powell* and the cases it cites for that proposition all address cases dealing with the fraudulent receipt of periodic benefits such as Social Security benefits—not the miscellaneous unspecified thefts the government alleged (and still alleges) in Count 11.  *Powell* accordingly held that the challenged count was *not* duplicitous, so it provides no basis *here* for postponing resolution of the undisputably duplicitous Count 11 until jury instructions.  *See* Govt. Br. 88.

The government's proposed alternative to dismissal—a post-hoc narrowing of Count 11— is unacceptable.  *Id.*  First, the proposal is unconstitutional:  no grand jury has returned an indictment for the government's reimagined Count 11.  *See* U.S. Const., amdt. V, cl. 1.  And the proposed count still deprives Mr. Schock of fair notice because, for example, it does not identify the alleged false mileage claims to which it would be limited or state whether they are the same claims charged elsewhere in the Indictment.  Thus, both the Fifth Amendment and the Federal Rules of Criminal Procedure require the government to seek a proper indictment if it wishes to pursue the charge its brief proposes.

## CONCLUSION

For the reasons stated above and in Mr. Schock's motions and supporting memoranda, this Court should dismiss the Indictment with prejudice.

The Indictment specifically relies on ambiguous House rules in its introductory allegations. These introductory allegations are incorporated into each count of the Indictment, excepting only the tax counts.  The government has little argument that these rules are unambiguous, and does not dispute that a purported violation of the rules is a necessary component of its scheme to defraud.

As recognized in *Rostenkowski* and following cases, separation of powers immunity protects Members of Congress, as Mr. Schock was at all relevant times, from prosecution based on ambiguous House rules.  Therefore, each count that specifically incorporates the ambiguous House rules must be dismissed, and the tax counts must similarly be dismissed because the government does not dispute that they rely on the same material allegations.

The separation of powers also mandates dismissal under the Speech or Debate Clause.  The logic set forth in *Gravel* is straightforward: the government may not intrude on matters committed to the jurisdiction of Congress.  Rulemaking is one such matter, and actions of House entities applying, interpreting, and enforcing those rules qualify as Rulemaking, as do a Member and his staff when they discuss the application of those same rules or submit a voucher for reimbursement.

The government would have this Court set aside the protections of the Due Process Clause, as well, by seeking to arbitrarily prosecute Mr. Schock based on standards and "rules" of its own making, as to which Mr. Schock lacked any fair notice.

Counts 14-18 should also be dismissed with prejudice.   As a matter of statutory interpretation, Section 1519 does not apply here because the FEC's passive receipt of campaign disclosure reports does not amount to a "matter" within the meaning of the statute, and applying Section 1519 would invert Congress's carefully calibrated enforcement scheme for the FECA. Further, the application of Section 1519 in those counts depends on the prosecutor's unknown (and unknowable) standards for disclosing campaign expenditures to the FEC, which would deprive Mr. Schock of constitutionally guaranteed fair notice.

Finally, Count 11 must be dismissed because its duplicity is undisputed, and the proper remedy is dismissal, not post-hoc revision in motions practice.

Dated: June 23, 2017                              Respectfully submitted,


                                                  */s/ George J. Terwilliger III*
                                                  George J. Terwilliger III
                                                  Robert J. Bittman
                                                  Benjamin L. Hatch
                                                  Nicholas B. Lewis
                                                  **MCGUIREWOODS LLP**
                                                  2001 K Street N.W., Suite 400
                                                  Washington, D.C. 20006-1040
                                                  Tel: 202.857.2473
                                                  Fax: 202.828.2965
                                                  Email: gterwilliger@mcguirewoods.com


                                                  */s/ Christina M. Egan*
                                                  Christina M. Egan
                                                  **MCGUIREWOODS LLP**
                                                  77 West Wacker Drive
                                                  Suite 4100
                                                  Chicago, IL 60601-1818
                                                  Tel: 312.750.8644
                                                  Fax: 312.698.4502
                                                  Email: cegan@mcguirewoods.com


                                                  */s/ Jeffrey B. Lang*
                                                  Jeffrey B. Lang
                                                  **LANE & WATERMAN LLP**
                                                  220 N. Main Street, Suite 600
                                                  Davenport, Iowa 52801-1987
                                                  Tel: 563.333.6647
                                                  Fax: 563.324.1616
                                                  Email: jlang@L-WLaw.com


                                                  *Counsel for Aaron J. Schock*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record at their respective email addresses disclosed on the pleadings on this 23rd day of June, 2017.

*/s/ George J. Terwilliger III*
George J. Terwilliger III